## UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| NAGASE & CO., LTD.,<br><br>        Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>        Defendant. | | Court No. 21-00574 |

## COMPLAINT

Plaintiff NAGASE & CO., LTD. ("Nagase"), by and through the undersigned counsel, alleges and states as follows:

## ADMINISTRATIVE DECISION TO BE REVIEWED

1.      Plaintiff contests the final results issued by the International Trade Administration of the U.S. Department of Commerce ("Department") in the first administrative review of the antidumping ("AD") duty order covering glycine from Japan (Case No. A-588-878) as they relate to glycine exported by Nagase to the United States.  The period of review ("POR") was October 31, 2018, through May 31, 2020.  The final results of the review were published in the *Federal Register* on September 29, 2021.  *Glycine from Japan: Final Results of Antidumping Duty Administrative Review; 2018-2020*, 86 Fed. Reg. 53946 (Dep't Commerce Sept. 29, 2021) ("*Final Results*"); *see also* accompanying *Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Glycine from Japan; 2018-2020* (September 22, 2021) ("*I&D Memo*").

## JURISDICTION

2.      The U.S. Court of International Trade has jurisdiction over Nagase's action pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c).

## STANDING OF PLAINTIFF

3.     Plaintiff Nagase is a Japanese exporter of merchandise subject to the AD duty order at issue.  Plaintiff participated in the Department's administrative review that resulted in the contested *Final Results*.  Plaintiff therefore is an interested party within the meaning of 19 U.S.C. § 1677(9)(A) and a party to the proceeding that resulted in the contested determination.  Accordingly, Plaintiff has standing to bring this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

## TIMELINESS OF THIS ACTION

4.     The *Final Results* were published in the *Federal Register* on September 29, 2021.  *Final Results*, 86 Fed. Reg. at 53946.  Plaintiff filed the summons commencing this action on October 29, 2021 (*i.e.*, within 30 days of the date of publication of the contested determination) in accordance with 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and 1516a(a)(2)(B)(iii).  Plaintiff is filing this complaint on November 24, 2021 (*i.e.*, within 30 days following the filing of the summons) in accordance with 19 U.S.C. § 1516a(a)(2)(A).  Therefore, this action is timely.

## PROCEDURAL HISTORY AND BACKGROUND

5.     In response to requests by Nagase and its affiliated foreign producer of glycine YUKI GOSEI KOGYO CO., LTD. ("YGK") (collectively, "YGK/Nagase"), and GEO Specialty Chemicals, Inc. ("Petitioner"), the Department initiated the first administrative review of YGK/Nagase on August 6, 2020.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 47731, 47735 (Dep't Commerce Aug. 6, 2020).  The Department selected Nagase as a mandatory respondent.  *See Memorandum to Brian C. Davis, Re: Antidumping Duty Administrative Review of Glycine from Japan: Respondent Selection* (Sept. 28, 2020) (ACCESS Barcode 4033750-01).  During the review proceeding, YGK/Nagase,

AMERICAS 110786584

as a collapsed single entity, submitted complete joint responses to all Department requests for information, including the initial questionnaire and multiple supplemental questionnaires.

6.    The Department issued the preliminary results on June 30, 2021, assigning YGK/Nagase a dumping margin of 27.71%.  *See Glycine from Japan: Preliminary Results of Antidumping Administrative Review; 2018-2020*, 86 Fed. Reg. 36105 (Dep't Commerce July 8, 2021) ("*Preliminary Results*"); *see also* accompanying *Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review: Glycine from Japan* (June 30, 2021) ("*Preliminary Decision Memo*").

7.    Following the *Preliminary Results*, YGK/Nagase submitted its case brief to the Department arguing that the Department calculated its G&A expense ratio incorrectly by including Research and Development ("R&D") expenses and a "compensation for payment" expense, both of which related to the production of non-subject products.  *See Case Brief of YUKI GOSEI KOGYO CO., LTD. and NAGASE & CO., LTD.* (Aug. 9, 2021) (ACCESS Barcode 4151296-01) ("*YGK/Nagase Case Brief*").  Later, YGK/Nagase submitted rebuttal arguments to the Department regarding issues raised by Petitioner.  *See Rebuttal Brief of YUKI GOSEI KOGYO CO., LTD. and NAGASE & CO., LTD.* (Aug. 16, 2021) (ACCESS Barcode 4153231-01).

8.    The Department issued the *Final Results* on September 22, 2021, assigning YGK/Nagase a final dumping margin of 27.21%, which was unchanged from the margin calculated in the *Preliminary Results*.  *See Final Results*, 86 Fed. Reg. at 53946.

## A.  The Department's Inclusion of  R&D Expenses for Non-Subject Products in YGK's G&A Expense Ratio

9.    In its initial questionnaire response, YGK/Nagase noted that, "{b}ecause Glycine is a well-established product that YGK has produced for nearly 70 years, the R&D sector has

3

little work relating to Glycine."  YGK/Nagase's Response to Section A of the Questionnaire (Oct. 30, 2020) ("AQR") at A-8.  YGK explained that it tracks R&D expenses "by product category" in its normal books and records, and noted that "R&D costs for Glycine are recorded as amino acid R&D costs."  YGK/Nagase's Response to Section D of the Questionnaire (Nov. 23, 2020) ("DQR") at D-24.  YGK/Nagase also submitted YGK's trial balance accounts in which R&D expenses were recorded by product category.  *See* DQR at Exhibit D-11.

10.    In light of its recordkeeping and the Department's practice of excluding R&D expenses attributable to non-subject merchandise from cost of production ("COP"), *see Frozen Warmwater Shrimp from India: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 72 Fed. Reg. 52055 (Dep't Commerce Sept. 12, 2007), and accompanying Issues & Decision Memorandum at 17 (Comment 6), YGK/Nagase excluded R&D attributable to non-subject products in the calculation of YGK's general and administrative ("G&A") expenses.  Specifically, YGK deducted total R&D expenses from the G&A expenses recorded in its fiscal year 2019 financial statements, and added back the R&D expenses specific to amino acids (the product category that includes glycine) in its G&A expense ratio calculation.

11.    Despite the record evidence, in its First Supplemental Questionnaire, the Department instructed YGK/Nagase to revise the calculation of G&A expenses to include total R&D expenses for all products – subject and non-subject.  In response, YGK/Nagase provided additional evidence to demonstrate its monthly recording of R&D costs on a product-specific basis in the normal course of business, including account level detail for R&D expenses incurred during the April 2019 to March 2020 fiscal year broken down by research center.  *See* YGK/Nagase's Response to the First Supplemental Questionnaire (Jan. 22, 2021) ("SQR") at 17–18, Exhibit S-20.  YGK/Nagase also submitted records illustrating how the R&D costs were

recorded by product category and summed up by product category in YGK's previously submitted general ledger and the trial balance accounts. *See id.* In light of the documentation demonstrating YGK's product-category-specific accounting of R&D costs, YGK also asked the Department to clarify instructions for adjustments to the G&A expense ratio calculation, if still applicable. *See* SQR at 21.

12.     In the *Preliminary Results*, the Department, without explanation, adjusted YGK's G&A expense ratio to include YGK's total R&D expenses for all products – subject and non-subject. *Preliminary Decision Memo* at 13. The Department referred to its "Preliminary Analysis Memorandum" for further explanation, *see Preliminary Decision Memo* at 13, but this memorandum included only the recalculation of YGK/Nagase's G&A expense ratio without explanation. *See Memorandum to Brian C. Davis, Re: Preliminary Results Margin Calculation for Yuki Gosei Kogyo Co., Ltd./Nagase & Co., Ltd.* (June 30, 2021) (ACCESS Barcode 4139198-01). In response, YGK/Nagase argued in its case brief that the Department failed to address the evidence in the record that "YGK keeps R&D expense records by product line and distinguishes the expenses specific to Glycine from the expenses specific to non-subject products in the normal course of business." *YGK/Nagase Case Brief* at 8.

13.     In the *Final Results*, the Department recognized that, "{d}uring the POR, YGK allocated its total R&D costs to 'product categories'" and that the "record demonstrates that YGK has separate trial balance accounts for R&D." *I&D Memo* at 6. The Department also acknowledged that it "will sometimes allocate R&D expenses on a product-specific basis . . . if a respondent allocates R&D costs in its normal books in records." *Id.* Nevertheless, the Department concluded that the worksheets submitted by YGK "show that it is an 'after the fact' allocation of company-wide R&D costs to broad product categories using headcount or hours."

5

*Id.* at 6–7.  In doing so, the Department relied on evidence of YGK's accounting practice during the 2017 period of investigation, *see id.* (citing AQR at Exhibit D-4), rather than evidence concerning YKG's accounting practice during the POR.  Based solely on this unsupported assertion, the Department continued to include YGK's total R&D expenses in its G&A expense ratio calculation.  *I&D Memo* at 6.

### B.  The Department's Inclusion of Production Expenses for Non-Subject Merchandise in YGK's G&A Expense Ratio

14.     In its initial questionnaire response, YGK/Nagase submitted YGK's financial statements for its 2019 fiscal year (April 1, 2019 to March 31, 2020), which included "Compensation for Payment" as an extraordinary loss item.  *See* AQR at Exhibit A-19. YGK/Nagase did not include this loss item in its G&A expense ratio calculation because it related to YGK's production of a non-subject product.

15.     In its First Supplemental Questionnaire, the Department instructed YGK/Nagase to revise its calculation of G&A expenses to include this "compensation for payment" or explain why it "should not be included in the G&A expenses."  *See* SQR at 17.

16.     In response, YGK/Nagase explained that this cost item was incurred to compensate a customer – which had consigned production of a non-subject pharmaceutical product to YGK – for losses resulting from a delay in the relevant governmental authority's approval of the pharmaceutical product.  *See id.* at 20.  YGK/Nagase also submitted a press release titled "Notice regarding the recording of extraordinary losses and special profits."  *See id.* at Exhibit S-22.  The press release explained that, because a customer's application for a drug designed to use raw materials manufactured by YGK was "put on hold by the authorities{,}" YGK "received a request from {the} customer{} to pay . . . the consignment processing costs . . . {YGK} . . . ha{d} already received for the drug."  *Id.*

6

17.     In its second supplemental questionnaire response, YGK/Nagase provided additional details, explaining that YGK and its customer had entered into a contract under which production of the non-subject pharmaceutical product was consigned to YGK.  *See* YGK/Nagase's Response to the Second Supplemental Questionnaire (May 6, 2021) ("SSQR") at 6–7.  After government approval for the drug was delayed, however, YGK discontinued production and agreed to compensate the customer for consignment processing fees already received.  *See id.*  YGK/Nagase also submitted documents corroborating the details provided in the press release, including an agreement between YGK and the customer describing the terms of the compensation for payment, *see id.* at Exhibit SS-7, and the customer's invoice for the compensation amount agreed upon by it and YGK.  *See id.* at Exhibit SS-8.

18.     In the *Preliminary Results*, the Department stated that it modified YGK's G&A expense ratio calculation to include the "compensation for payment" related to YGK's production of a non-subject product.  *See Preliminary Decision Memo* at 13.  In response, YGK/Nagase's case brief cited the uncontradicted evidence provided in its two supplemental questionnaire responses, which demonstrated that the compensation for payment expense related to YGK's consigned production of a non-subject pharmaceutical product, rather than to the company's general operations.  *See YGK/Nagase Case Brief* at 5–8.  YGK/Nagase also cited the record evidence demonstrating that the customer in question was not a glycine customer.  *See id.* (citing YGK/Nagase's Response to Section B of the Questionnaire (Nov. 19, 2021) ("BQR") at Exhibit B-5; YGK/Nagase's Response to Section C of the Questionnaire (Nov. 19, 2021) ("CQR") at Exhibit C-7).

19.     In the *Final Results*, the Department continued to include the "compensation for payment" expense in YGK/Nagase's G&A expenses.   Relying only on the press release

7

submitted in YGK/Nagase's first supplemental questionnaire response, and without addressing the additional evidence submitted by YGK/Nagase in its second supplemental questionnaire response or the arguments in YGK/Nagase's case brief, the Department concluded that the "'compensation for payment' expenses do not relate directly to the production of non-subject merchandise, but rather, relate indirectly to the general operation of the company." *I&D Memo* at 4. Classifying this one-time charge as a "cost of doing business" similar to "penalties, litigation accruals, {and} fines," the Department continued to include the "compensation for payment" expense relating to YGK's consigned production of a non-subject product in YGK/Nagase's G&A expenses. *I&D Memo* at 4–5.

### C. The Department's Errors in the Assessment Rate Calculation

20.     The final assessment rate calculated for YGK/Nagase's constructed export price ("CEP") sales far exceeds the final dumping margin calculated for YGK/Nagase, and is, as a self-evident matter, incorrect on its face. The error in the assessment rate calculation stems from the reporting of entered value in YGK/Nagase's U.S. sales database submitted with the first supplemental questionnaire response. *See* SQR at Exhibit S-28. Specifically, U.S. duty amounts reported for Nagase's CEP sales were inadvertently duplicated and reported as the entered values for the same sales.

21.     Entered value functions as the denominator of the assessment rate calculation; that is, the assessment rate equals the total dumping amount (also known as the "potentially uncollected antidumping duties" or "PUDD") divided by total entered value. *See* 19 C.F.R. § 351.212(b)(1). In YGK/Nagase's case, in calculating the AD assessment rate for CEP sales, the Department divided total PUDD by the total U.S. duty value (which is a small fraction of the total U.S. entered value of the merchandise), resulting in a grossly inflated assessment rate. *See*

8

AMERICAS 110786584

*Memorandum to The File, Re: Final Results Margin Calculation for Yuki Gosei Kogyo Co.,*
*Ltd./Nagase & Co., Ltd.* (Sept. 22, 2021) (ACCESS Barcode 4163426-01) at Attachment 2
(Margin Calculation Program Log and Output at 123 ("Importer-Specific De Minimis Test
Results and Assessment Rates") (ACCESS Barcode 4163316)).

22.     Although the error in the AD assessment rate was not raised until after issuance of
the *Final Results* and after the period specified in the Department's regulations for reporting
ministerial errors had expired, this extreme error is self-evident.   In addition, the factual
information necessary to identify and correct the error is already contained in the agency record.

23.     The Department's Margin Calculation Program Log and Output includes at least
one other material error related to application of the assessment rate.  *See id.*

## STATEMENT OF CLAIMS

## COUNT 1:  THE DEPARTMENT'S INCLUSION OF YGK/NAGASE'S R&D EXPENSES FOR NON-SUBJECT PRODUCTS IN THE G&A EXPENSE RATIO

24.     Paragraphs 1 through 23 are incorporated by reference.

25.     The statute requires the Department to rely on the respondent's reported costs if:
(1) such costs are based on records kept in accordance with the home country's generally
accepted accounting principles ("GAAP"); and (2) such costs reasonably reflect the costs
associated with the production and sale of the merchandise.   19 U.S.C. § 1677b(f)(1)(A).
Moreover, the Department has a long-established practice of excluding R&D expenses that are
specific to non-subject products because "{R&D} expenses that can be differentiated by product
are allocable to the COM {cost of manufacturing} of that product . . . ."  *Frozen Warmwater*
*Shrimp from India: Final Results and Partial Rescission of Antidumping Duty Administrative*
*Review*, 72 Fed. Reg. 52055 (Dep't Commerce Sept. 12, 2007), and accompanying Issues &
Decision Memorandum at 17 (Comment 6); *see also I&D Memo* at 6 (citing *Notice of Final*

9

*Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers from Mexico*, 77 Fed. Reg. 17422 (Dep't Commerce Mar. 26, 2012), and accompanying Issues & Decision Memorandum at 83 (Comment 14) (noting the Department's practice "to allocate R&D expenses to products consistent with the company's normal books (i.e., calculating product and/or division- specific R&D costs as they are calculated in the company's normal books and records)")).

26.     YGK conducted its accounting in accordance with Japanese GAAP, and reported its R&D expenses by product category to the Department – with R&D expenses related to subject merchandise in one product category and R&D expenses related to non-subject merchandise in others.  The Department did not find that YGK's accounting practices were inconsistent with Japanese GAAP or that YGK's records failed to reasonably reflect YGK's costs.  *See I&D Memo* at 6-7.

27.     Moreover, in deciding whether to include YGK's R&D expenses for non-subject products in YGK's G&A expenses, the Department made factual findings that are unsupported by the record evidence.  For example, the Department's assertion that YGK's R&D expenses were allocated "after the fact" – relying on YGK's accounting practice during the 2017 period of investigation – is unsupported by the record.   The Department ignored uncontradicted documentary evidence that YGK changed its R&D recording practice between the period of investigation and the POR.  *See* SQR at Exhibit S-20.  The record demonstrates that YGK tracked and recorded R&D expenses in its normal accounting books on a product-specific-category basis each month during the POR.  *See* SQR at Exhibit S-20.  "{I}t is well-established that Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination

10

unsupported by substantial evidence." *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (Ct. Int'l Trade 2000).

28.     Accordingly, the Department's decision to include YGK's R&D expenses for non-subject products in YGK/Nagase's G&A expense ratio is unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT 2:  THE DEPARTMENT'S INCLUSION OF EXPENSES RELATED TO YGK's PRODUCTION OF A NON-SUBJECT PRODUCT IN THE G&A EXPENSE RATIO

29.     Paragraphs 1 through 23 are incorporated by reference.

30.     This court has long recognized that G&A expenses relate to the general operations of the company as a whole.  *See U.S. Steel Grp. v. United States*, 998 F. Supp. 1151, 1154 (Ct. Int'l Trade 1998) (citing *Rautaruukki Oy v. United States*, 19 C.I.T. 438, 444 (1995)). Consequently, "{t}he Department's established practice in calculating the G&A expense rate is to include *only* those items that relate to the general operations of the company as a whole." *Certain Steel Concrete Reinforcing Bars Final Results, Rescission of Antidumping Duty Administrative Review in Part, and Determination To Revoke in Part*, 70 Fed. Reg. 67665 (Dep't Commerce Nov. 8, 2005), and accompanying Issues and Decision Memorandum at 43 (Comment 13) (emphasis added).

31.     YGK/Nagase submitted evidence demonstrating that the "compensation for payment" expense was for YGK's consigned production of a non-subject pharmaceutical product for a non-glycine customer, and did not relate to the general operations of the company as a whole.  The Department, however, failed to address this evidence in the *Final Results*.  The Department cited only YGK's press release submitted in YGK/Nagase's first supplemental questionnaire response, *see I&D Memo* at 4 (citing SQR at Exhibit S-22), which itself did not support the Department's conclusion, and ignored the detailed evidence submitted in

11

YGK/Nagase's second supplemental questionnaire response, including the compensation agreement between YGK and its customer and the invoice for the agreed upon compensation amount.  *See* SSQR at 6–7, Exhibit SS-7, Exhibit SS-8.  "{I}t is well-established that Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence."  *Allegheny Ludlum*, 112 F. Supp. 2d at 1165.

32.    Moreover, by including the expense related to the consigned production of non-subject merchandise in YGK's G&A expense ratio, the Department failed to adhere to its practice of excluding production expenses related to non-subject merchandise from the respondent's G&A expenses.

33.    Accordingly, the Department's decision to include the compensation for payment expense in YGK/Nagase's G&A expense ratio is unsupported by substantial evidence and otherwise not in accordance with law.

### COUNT 3:  THE ASSESSMENT RATE CALCULATED BY THE DEPARTMENT FOR CEP SALES

34.    Paragraphs 1 through 23 are incorporated by reference.

35.    The Department's fundamental obligation under the statute is to determine dumping margins "as accurately as possible."  *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).  Moreover, the Federal Circuit has recognized that "{t}he affected U.S. industry is not entitled to a remedy in excess of the difference between foreign market value and U.S. price."  *NTN Ltd. v United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).  Here, the assessment rate calculated by the Department for Nagase's CEP sales is grossly inflated on its face and therefore not in accordance with law.  To avoid an extreme over-collection of AD duties, principles of equity support correcting the incorrectly calculated assessment rate.  *See* 28

U.S.C. § 1585 (establishing that the Court of International Trade possesses "all the powers in law and equity of . . . a district court of the United States").  Moreover, the *Final Results* include at least one other material error related to application of the assessment rate.

36.    Accordingly, the assessment rate calculated by the Department for Nagase's CEP sales is unsupported by substantial evidence and is otherwise not in accordance with law.

13

## <u>PRAYER FOR RELIEF AND JUDGMENT</u>

WHEREFORE, Plaintiff respectfully requests that the Court:

(A)     Enter judgment in favor of Plaintiff;

(B)     Hold and declare that the 27.21% dumping margin assigned by the Department to Nagase in the *Final Results* is unsupported by substantial evidence and otherwise not in accordance with law;

(C)     Hold and declare that the AD assessment rate calculated for CEP sales in the *Final Results* is unsupported by substantial evidence and otherwise not in accordance with law;

(D)     Remand this matter to the Department to issue revised final results in conformity with the Court's decision; and

(E)     Grant Plaintiff such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Jay C. Campbell
Jay C. Campbell
William J. Moran
Cristina M. Cornejo
WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

/s/  Neil R. Ellis
LAW OFFICE OF NEIL ELLIS PLLC
5335 Wisconsin Avenue, NW
Suite 440
Washington, DC  20015
(202) 258-5421

Date:  November 24, 2021

14

## CERTIFICATE OF SERVICE

I, Jay C. Campbell of the law firm White & Case LLP, hereby certify that on November 24, 2021, pursuant to CIT Rule 3(f), copies of the foregoing complaint were delivered to the following parties by certified mail, return receipt requested:

**UPON THE UNITED STATES:**
Attorney-in-Charge
International Trade Field Office
U.S. Department of Justice
Commercial Litigation Branch
National Courts Section
Room 346
26 Federal Plaza
New York, NY 10278

Jeanne Davidson
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20530

**UPON THE DEPARTMENT OF COMMERCE:**
Leslie Kiernan
General Counsel
U.S. Department of Commerce
Mail Stop 5875 HCHB
14th and Constitution Avenue, NW
Washington DC 20230

Robert Heilferty
Chief Counsel
Office of the Chief Counsel for Trade Enforcement and Compliance
International Trade Administration
U.S. Department of Commerce
1401 Constitution Ave., NW
Washington, DC 20230

**UPON GEO SPECIALTY CHEMICALS, INC.**
David M. Schwartz, Esq.
**Thompson Hine LLP**
1919 M Street, NW
Suite 700
Washington, DC 20036
Phone: 202-331-8800
Email: david.schwartz@thompsonhine.com

**UPON SHOWA DENKO K.K.,**
Bernd G. Janzen, Esq.
**Akin Gump Strauss Hauer & Feld LLP**
2001 K Street NW
Washington, DC 20006
 Phone: 202-887-4000
Email: bjanzen@akingump.com

**UPON AJINOMOTO CO., INC., AJINOMOTO HEALTH AND NUTRITION NORTH AMERICA, INC.,**
Jonathan Thomas Stoel, Esq.
**Hogan Lovells US LLP**
555 Thirteenth Street, NW
Washington, DC 20004
Phone: 202-637-5600
Email: jonathan.stoel@hoganlovells.com


                                    /s/ Jay C. Campbell
                                  Jay C. Campbell