**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| NAGASE & CO., LTD.,<br><br>                    Plaintiff,<br><br>          v.<br><br>UNITED STATES,<br><br>                    Defendant,<br><br>          and<br><br>GEO SPECIALTY CHEMICALS, INC.,<br><br>          Defendant-Intervenor. | **Court No. 21-00574**<br><br>**NON-CONFIDENTIAL**<br>**VERSION** |

**MOTION FOR JUDGMENT**
**ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff Nagase & Co., Ltd. ("Nagase") hereby submits this Motion for Judgment on the Agency Record with regard to the three Counts set forth in the Complaint filed on November 24, 2021.  This action challenges the final results issued by the U.S. Department of Commerce in the first administrative review of the antidumping duty order on *Glycine from Japan* (DOC Case No. A-588-878) for the period of review of October 31, 2018 through May 31, 2020.  *See Glycine from Japan: Final Results of Antidumping Duty Administrative Review; 2018-2020*, 86 Fed. Reg. 53946 (Dep't Commerce Sept. 29, 2021), Appx3062–3063; *Glycine from Japan: Final Results of the Antidumping Administrative Review; 2018-2020; Correction*, 86 Fed. Reg. 57127 (Dep't Commerce Oct. 14, 2021), Appx3067.

In an order dated January 28, 2022, the Court directed that Nagase's motion for judgment on the agency record be filed by today's date. *See* Scheduling Order, January 28, 2022, ECF No. 26.

For the reasons set forth in the accompanying Memorandum of Points and Authorities, Plaintiff hereby moves that the Court grant this motion for judgment on the agency record.

A proposed order is attached.

Respectfully submitted,

/s/ Jay C. Campbell

Jay C. Campbell
White & Case LLP
701 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 626-3600
jcampbell@whitecase.com

/s/ Neil R. Ellis

Neil R. Ellis
Law Office of Neil Ellis PLLC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C. 20015
(202) 258-5421
neil@neilellislaw.com

*Counsel to Plaintiff Nagase & Co., Ltd.*

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

NAGASE & CO., LTD.,

                Plaintiff,

    v.

UNITED STATES,

                Defendant,

    and

GEO SPECIALTY CHEMICALS, INC.,

        Defendant-Intervenor.

Court No. 21-00574

**NON-CONFIDENTIAL VERSION**

**Business Proprietary Information has been deleted from pages 2, 5-6, 8, 14-16, 23-25, 30-32, 34-37 and 39.**

**MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF MOTION**
**FOR JUDGMENT ON THE AGENCY RECORD**

White & Case LLP
701 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 626-3600

Law Office of Neil Ellis PLLC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C. 20015
(202-258-5421)

Counsel to Nagase & Co., Ltd.

April 11, 2022

**TABLE OF CONTENTS**

Page No.

RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT ..................................................2

I.    Administrative Determination of Which Review Is Sought .................................................2

II.    Issues Presented and Summary of the Argument ...............................................................3

    A.    Commerce's Inclusion of Research and Development Expenses for Non-Subject Products in YGK's General and Administrative Expense Ratio Is Not Supported by Substantial Evidence and Is Not Otherwise in Accordance with Law ..................................................................................................................................3

    B.    Commerce's Inclusion of an Expense Related to a Non-Subject Product in YGK's G&A Expense Ratio Is Not Supported by Substantial Evidence and Is Not Otherwise in Accordance with Law ............................................................................4

    C.    Commerce Abused Its Discretion by Issuing Assessment Instructions Based on an Erroneous Rate that Is Unsupported by Substantial Evidence ........................5

STATEMENT OF FACTS ..................................................................................................................6

I.    Administrative Proceedings ...............................................................................................6

II.    Facts Underlying Nagase's Claims ....................................................................................8

    A.    The Inclusion of R&D Expenses for Non-Subject Products in YGK's G&A Expense Ratio ..........................................................................................................8

    B.    The Inclusion of a Production Expense for a Non-Subject Product in YGK's G&A Expense Ratio ......................................................................................................11

    C.    The Error in the Assessment Rate Calculation ...................................................13

STANDARD OF REVIEW ..............................................................................................................17

ARGUMENT ....................................................................................................................................18

I.    Commerce's Inclusion of R&D Costs for Non-Subject Products in YGK's G&A Expense Ratio Is Not Supported by Substantial Evidence and Is Not Otherwise in Accordance with Law ........................................................................................................19

    A.    Legal Background ...............................................................................................19

    B.    Commerce's Inclusion of R&D Expenses Related to Non-Subject Products in YGK/Nagase's G&A Expenses was Unsupported by Substantial Evidence and Not in Accordance with Law .....................................................................................22

II.     Commerce's Inclusion of an Expense Related to a Non-Subject Product in YGK's
        G&A Expense Ratio Is Not Supported by Substantial Evidence and Is Not Otherwise
        in Accordance with Law ................................................................................................28

III.    Commerce Abused Its Discretion by Issuing Assessment Instructions Based on an
        Erroneous Rate that Is Unsupported by Substantial Evidence...........................................32

        A.    Legal Framework ....................................................................................................32

        B.    The Error .................................................................................................................34

        C.    Correction of the Error ...........................................................................................36

CONCLUSION.................................................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AK Steel Corp. v. United States*,
   226 F. 3d 1361 (Fed. Cir. 2000)............................................................................14

*Allegheny Ludlum Corp. v. United States*,
   112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) .........................................4, 27, 28, 32

*Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd.*,
   334 F.3d 1284 (Fed. Cir. 2003)............................................................................38

*Brennan v. Dep't of Health & Human Servs.*,
   787 F.2d 1559 (Fed. Cir.), *cert. denied*, 479 U.S. 985 (1986)...............................17

*Celik Halat ve Tel Sanayi A.S. v. United States*,
   Slip Op. No. 22-12 (Ct Int'l Trade 2022)..............................................................17

*Chaparral Steel Co. v. United States*,
   901 F. 2d 1097 (Fed. Cir. 1990).......................................................................6, 38

*Consol. Edison Co. v. Nat'l Labor Relations Bd.*,
   305 U.S. 197 (1938)..............................................................................................17

*E.I. DuPont de Nemours & Co. v. United States*,
   22 CIT 19 (1998) ............................................................................................27, 30

*Fischer S.A. v. United States*,
   471 Fed. Appx. 892 (Fed. Cir. 2012) (unpublished opinion) ................................38

*Grobest & I-Mei Indus (Vietnam) Co. v. United States*,
   815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) .....................................................6, 38

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States*,
   853 F.Supp.2d 1352 (Ct. Int'l Trade 2012) ..........................................................17

*Husteel Co. v. United States*,
   98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ..........................................................29

*Koyo Seiko Co. v. United States*,
   258 F. 3d 1340 (Fed. Cir. 2001)...........................................................................34

*Matsushita Elec. Indus. Co. v. United States*,
   750 F.2d 927 (Fed. Cir. 1984)..............................................................................17

*Micron Tech. Inc. v. United States,*
    117 F.3d 1386 (Fed. Cir. 1997)........................................................................17

*NTN Bearing Corp. v. United States,*
    74 F. 3d 1204 (Fed. Cir. 1995).................................................................18, 38

*Pro-Team Coil Nail Enterprise, Inc. v. United States,*
    419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) .........................................17

*Qingdao Sea-Line Trading Co. v. United States,*
    766 F.3d 1378 (Fed. Cir. 2014)......................................................................27

*Rautaruukki Oy v. United States,*
    19 C.I.T. 438 (1995) ...................................................................................4, 20

*Rhone Poulenc, Inc. v. United States,*
    899 F. 2d 1185 (Fed. Cir. 1990).................................................................6, 38

*Target Corp. v. United States,*
    609 F.3d 1352 (Fed. Cir. 2010)......................................................................17

*Tehnoimportexport v. United States,*
    15 C.I.T. 250, 766 F. Supp. 1169 (Ct. Int'l Trade 1991) .........................18

*Torrington Co. v. United States,*
    44 F. 3d 1572 (Fed. Cir. 1995)......................................................................34

*U.S. Steel Grp. v. United States,*
    998 F. Supp. 1151 (Ct. Int'l Trade 1998) ................................................4, 20

*Universal Camera Corp. v. Nat'l Labor Relations Bd.,*
    340 U.S. 474 (1951)........................................................................................17

## STATUTES AND REGULATIONS

19 C.F.R. § 351.212(b)(1)....................................................................................34

19 U.S.C. § 1516a(b)(1)(B)(i)..............................................................................17

19 U.S.C. § 1673f(b)..............................................................................................33

19 U.S.C. § 1675(a)(2)(C) ..............................................................................33, 34

19 U.S.C. § 1677(35)(B).................................................................................33, 34

19 U.S.C. § 1677a(a) & (b)...................................................................................14

19 U.S.C. § 1677b(b)(3)(B) ..................................................................................19

19 U.S.C. § 1677b(e)(2)(A) ...........................................................................20

19 U.S.C. § 1677b(f)(1)(A)...................................................................3, 20, 27

19 U.S.C. § 1677f-1(d) ................................................................................13

19 U.S.C. § 1677g(a) ...................................................................................33

28 U.S.C. § 1585.........................................................................................39

## ADMINISTRATIVE DETERMINATIONS

*Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea; Final Determination of Sales at Less Than Fair Value and Negative Critical Circumstances Determination,*
77 Fed Reg 17413 (Mar. 26, 2012)..............................................................20

*Canned Pineapple Fruit from Thailand: Final Results of Antidumping Duty Administrative Review,*
67 Fed. Reg. 76718 (Dec. 13, 2002) ............................................................21

*Certain Frozen Warmwater Shrimp from India: Final Results and Partial Rescission of Antidumping Duty Administrative Review,*
72 Fed. Reg. 52055 (Sept. 12, 2007) .......................................................8, 22

*Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review, 2012-2013,*
79 Fed. Reg. 57047 (Sept. 24, 2014) ............................................................27

*Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review, 2016-2017,*
83 Fed. Reg. 46704 (Sept. 14, 2018) ............................................................27

*Certain Lined Paper Products from India Final Results of Antidumping Duty Administrative Review,*
74 Fed. Reg. 17149 (Apr. 14, 2009) ............................................................21

*Certain Steel Concrete Reinforcing Bars from Turkey; Final Results, Rescission of Antidumping Duty Administrative Review in Part, and Determination To Revoke in Part,*
70 Fed. Reg. 67665 (Nov. 8, 2005)..........................................................4, 20

*Chlorinated Isocyanurates from Spain: Final Results of Antidumping Duty Administrative Review,*
74 Fed. Reg. 50774 (Oct. 1, 2009)...............................................................26

*Frozen Warmwater Shrimp from India: Final Results and Partial Rescission of Antidumping Duty Administrative Review,*
   72 Fed. Reg. 52055 (Sept. 12, 2007) ........................................................................22

*Glycine from Japan: Final Determination of Sales at Less Than Fair Value,*
   84 Fed. Reg. 18484 (May 1, 2019) ..........................................................................33

*Glycine from Japan: Preliminary Results of Antidumping Administrative Review; 2018-2020,*
   86 Fed. Reg. 36105 (July 8, 2021)...........................................................7, 9, 10, 12

*Glycine from Japan: Final Results of Antidumping Duty Administrative Review; 2018-2020,*
   86 Fed. Reg. 53946 (Sept. 29, 2021) ................................................................ passim

*Glycine from Japan: Final Results of the Antidumping Administrative Review; 2018-2020; Correction,*
   86 Fed. Reg. 57127 (Oct. 14, 2021).......................................................................1, 2

*High-Tenacity Rayon Filament Yarn From Germany; Final Results of Antidumping Duty Administrative Review,*
   60 Fed. Reg. 15897 (Mar. 28, 1995).........................................................................22

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
   85 Fed. Reg. 47731 (Aug. 6, 2020)..........................................................................6

*Large Power Transformers From Japan; Final Results of Antidumping Duty Administrative Review,*
   57 Fed. Reg. 45767 (Oct. 5, 1992).........................................................................22

*Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp From Thailand,*
   69 Fed. Reg. 76918 (Dep't Commerce Dec. 23, 2004), ...........................................4

*Notice of Final Determination of Sales at Less Than Fair Value: Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Japan,*
   64 Fed. Reg. 24329, 24354 (May 6, 1999), ...........................................................20

*Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers from Mexico,*
   77 Fed. Reg. 17422 (Mar. 26, 2012)...................................................................22, 28

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| NAGASE & CO., LTD., | |
| Plaintiff, | Court No. 21-00574 |
| v. | **NON-CONFIDENTIAL VERSION** |
| UNITED STATES, | **Business Proprietary Information has been deleted from pages 2, 5-6, 8, 14-16, 23-25, 30-32, 34-37 and 39.** |
| Defendant, | |
| and | |
| GEO SPECIALTY CHEMICALS, INC., | |
| Defendant-Intervenor. | |

**MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF MOTION**
**FOR JUDGMENT ON THE AGENCY RECORD**

Nagase & Co., Ltd. ("Nagase"), plaintiff in the above-captioned action, hereby submits this Memorandum of Points and Authorities in Support of its Motion for Judgment on the Agency Record, with regard to the three Counts set forth in the Complaint filed on November 24, 2021. *See* Complaint, November 24, 2021, ECF No. 7. For the reasons provided below, Nagase respectfully requests that the Court reverse the challenged determination of the U.S. Department of Commerce (the "Department" or "Commerce") and remand with instructions to redetermine Nagase's dumping margin and assessment rate.

## RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT

**I.      ADMINISTRATIVE DETERMINATION OF WHICH REVIEW IS SOUGHT**

Nagase seeks review of the final results of the first administrative review of the antidumping ("AD") duty order on *Glycine from Japan* (DOC Case No. A-588-878).  The period of review ("POR") for this administrative review covered October 31, 2018 through May 31, 2020. The Department published the final results of the review on September 29, 2021, in *Glycine from Japan: Final Results of Antidumping Duty Administrative Review; 2018-2020*, 86 Fed. Reg. 53946 (Dep't Commerce Sept. 29, 2021) ("*Final Results*"), Appx3062–3063.[1]  In the *Final Results*, the Department calculated a weighted-average dumping margin of 27.21% for Nagase, *see id.* at 53946, Appx3062, and an assessment rate of **[          ]**%, *see Memorandum to The File, Re: Final Results Margin Calculation for Yuki Gosei Kogyo Co., Ltd./Nagase & Co., Ltd.* (Sept. 22, 2021), Attachment 2 ("Margin Calculation Program Log and Output") at 123, Appx103299 (hereinafter "Margin Output").[2]  The Department's analysis of issues raised in the *Final Results* is contained in, *inter alia*, "Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Glycine from Japan; 2018-2020" (Sept. 22, 2021) ("*Final Decision Memo*"), Appx2916–2927.

---

[1]  The Department issued a correction to the *Final Results* on October 14, 2021.  *See Glycine from Japan: Final Results of the Antidumping Administrative Review; 2018-2020; Correction*, 86 Fed. Reg. 57127 (Dep't Commerce Oct. 14, 2021), Appx3067.  The correction did not affect the calculation of Nagase's dumping margin or assessment rate, and therefore will not be discussed further in this Memorandum.

[2]  For many documents in the administrative record there are both a confidential version, which contains business proprietary information ("BPI"), and a public version, from which the BPI has been redacted.  In this Memorandum, Nagase refers to the joint appendix page(s) for the business proprietary version of those documents, because that version contains the data that are necessary for the Court's analysis of the issues.  For certain documents (e.g., the *Final Results* and the *Final Decision Memo*) only a public version joint appendix cite is provided; for those documents, there is no parallel business proprietary version.

## II.   ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT

This memorandum addresses three issues raised by Nagase with respect to Commerce's final determination of Nagase's dumping margin and assessment rate in the first administrative review of the AD order on *Glycine from Japan*.

### A.   Commerce's Inclusion of Research and Development Expenses for Non-Subject Products in YGK's General and Administrative Expense Ratio Is Not Supported by Substantial Evidence and Is Not Otherwise in Accordance with Law

The statute requires Commerce to rely on a respondent's reported costs of production when: (1) such costs are based on records kept in accordance with the home country's generally accepted accounting principles ("GAAP"); and (2) such costs reasonably reflect the costs associated with the production and sale of the merchandise. 19 U.S.C. § 1677b(f)(1)(A). During the POR, YGK conducted its accounting in accordance with Japanese GAAP and recorded research and development ("R&D") costs on a product-category-specific basis. Accordingly, Nagase/YGK reported YGK's R&D costs by product category to Commerce – with R&D costs related to subject merchandise in one product category and R&D costs related to non-subject merchandise in others.

In deciding to include YGK's R&D costs for non-subject products in YGK's general and administrative ("G&A") expenses, Commerce arbitrarily disregarded its established practice of excluding R&D costs that are specific to non-subject merchandise. Moreover, Commerce ignored undisputed documentary evidence of YGK's practice for recording R&D costs on a product-category-specific basis during the period covered by this review (October 31, 2018 to May 31, 2020), and instead relied upon YGK's practice during the period covered by the original investigation (calendar year 2017). In addition, Commerce made factual findings that were contradicted by the record evidence. Therefore, Commerce's decision to include R&D costs for

non-subject products in YGK's G&A expense ratio was unsupported by substantial evidence on the record of this administrative review, and was otherwise not in accordance with law.

**B.    Commerce's Inclusion of an Expense Related to a Non-Subject Product in YGK's G&A Expense Ratio Is Not Supported by Substantial Evidence and Is Not Otherwise in Accordance with Law**

This Court and Commerce have long recognized that G&A expenses relate to the general operations of the company as a whole.  *See U.S. Steel Grp. v. United States,* 998 F. Supp. 1151, 1154 (Ct. Int'l Trade 1998) (citing *Rautaruukki Oy v. United States,* 19 C.I.T. 438, 444 (1995)); *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp From Thailand*, 69 Fed. Reg. 76918 (Dep't Commerce Dec. 23, 2004), and accompanying Issues and Decision Memorandum at 35 (Comment 2).  Consequently, "{t}he Department's established practice in calculating the G&A expense rate is to include *only* those items that relate to the general operations of the company as a whole." *Certain Steel Concrete Reinforcing Bars From Turkey; Final Results, Rescission of Antidumping Duty Administrative Review in Part, and Determination To Revoke in Part,* 70 Fed. Reg. 67665 (Dep't Commerce Nov. 8, 2005), and accompanying Issues and Decision Memorandum at 43 (Comment 13) (emphasis added).

In deciding to include a "compensation for payment" expense related to YGK's production of a non-subject pharmaceutical product in YGK/Nagase's G&A expense ratio, Commerce failed to address evidence on the record demonstrating that the expense was not related to the company's general operations.  "{I}t is . . . well-established that Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence." *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (Ct. Int'l Trade 2000). Moreover, Commerce failed to adhere to its established practice of excluding production expenses

related to non-subject merchandise from a respondent's G&A expenses.    Accordingly,

Commerce's decision to include the "compensation for payment" expense, which was incurred

exclusively for a non-subject product, in YGK/Nagase's G&A expense ratio is unsupported by

substantial evidence and otherwise not in accordance with law.

### C.    Commerce Abused Its Discretion by Issuing Assessment Instructions Based on an Erroneous Rate that Is Unsupported by Substantial Evidence

Commerce calculated an assessment rate of [        ] percent for Nagase's "constructed

export price" ("CEP") sales.  That figure is incorrect and vastly inflated.  This is not a dispute

regarding the merits of a methodological issue; it is simply a calculation error that is self-evident

upon a close review of Commerce's materials prepared for Nagase's final determination.  These

materials reflect that, while the dumping margin was calculated at roughly one-quarter the value

of the imported merchandise, the assessment rate was calculated at over [          ] the value

of the imported merchandise – or approximately [          ] the dumping margin.  This is

wrong; U.S. Customs & Border Protection ("CBP") cannot be expected to collect duties in an

amount greater than [         ] the value of the goods themselves.

The error arose when the Department calculated the total customs value (or entered value)

based on an erroneous per-unit entered value reported for Nagase's CEP sales.  The total (incorrect)

CEP entered value is shown as [        ].  This figure is absurdly low, as demonstrated by the

fact that the entered value for *one entry* for which Nagase submitted a sample customs entry

document, [         ] is greater than the total entered value amount calculated by the Department

for the entire universe of CEP sales during the review period.

In addition to being indisputable, the error is easily correctable based entirely on

information that is already on the record.  This means that no time-consuming remand process

would be required; nor would Commerce be required to reopen the record and obtain additional

information in order to undertake the necessary correction.  In this situation, there is no legal or procedural impediment to the Court's remanding to Commerce to correct this error.  Commerce has already corrected an error found in its final assessment instructions, and there is no reason why it could not likewise correct an indisputable error in the duty assessment rate – especially an error of the magnitude seen here, which, if left uncorrected, would lead CBP to collect [                    ] in AD duties in excess of the amount to which it is entitled.

Further, this Court and the Court of Appeals have long recognized the principles that the antidumping laws are remedial, not punitive, *Chaparral Steel Co. v. United States*, 901 F. 2d 1097, 1103–04 (Fed. Cir. 1990), and that the goal of the AD law is to calculate dumping margins "as accurately as possible." *Rhone Poulenc, Inc. v. United States*, 899 F. 2d 1185, 1191 (Fed. Cir. 1990); *Grobest & I-Mei Indus (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342, 1365 (Ct. Int'l Trade 2012).  Nagase submits that Commerce abused its discretion in instructing CBP to collect duties pursuant to the erroneous and vastly inflated assessment rate, and that the Court should remand this case to Commerce to recalculate Nagase's assessment rate in a manner that ensures the collection of the correct amount of antidumping duties due.

## STATEMENT OF FACTS

## I.   ADMINISTRATIVE PROCEEDINGS

In response to requests by Nagase and its affiliated foreign producer of glycine, Yuki Gosei Kogyo Co., Ltd. ("YGK") (collectively, "YGK/Nagase"), and the domestic producer, GEO Specialty Chemicals, Inc. ("Petitioner"), the Department initiated the first administrative review of YGK/Nagase on August 6, 2020.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 47731, 47735 (Dep't Commerce Aug. 6, 2020), Appx1031. The administrative review covered the period October 31, 2018 through May 31, 2020 (the "period of review" or "POR").  The Department selected Nagase as a mandatory respondent.  *See*

6

*Memorandum to Brian C. Davis, Re: Antidumping Duty Administrative Review of Glycine from Japan: Respondent Selection* (Sept. 28, 2020) at 5, Appx80016.  During the review proceeding, YGK/Nagase, as a collapsed single entity, submitted complete joint responses to all Department requests for information, including the initial questionnaire and multiple supplemental questionnaires.

The Department issued the preliminary results on June 30, 2021, assigning YGK/Nagase a dumping margin of 27.71%.  *See Glycine from Japan: Preliminary Results of Antidumping Administrative Review; 2018-2020*, 86 Fed. Reg. 36105 (Dep't Commerce July 8, 2021) ("*Preliminary Results*"), Appx2822–2823; *see also* accompanying *Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Glycine from Japan* (June 30, 2021) ("*Preliminary Decision Memo*"), Appx2653–2667.

Following the *Preliminary Results*, YGK/Nagase submitted its case brief to the Department arguing that the Department calculated its G&A expense ratio incorrectly by including Research and Development ("R&D") costs and a "compensation for payment" expense, both of which related to the production of non-subject products.  *See Case Brief of YUKI GOSEI KOGYO CO., LTD. and NAGASE & CO., LTD.* (Aug. 9, 2021) ("*YGK/Nagase Case Brief*"), Appx102804–102823.  Later, YGK/Nagase submitted rebuttal arguments to the Department regarding issues raised by Petitioner.  *See Rebuttal Brief of YUKI GOSEI KOGYO CO., LTD. and NAGASE & CO., LTD.* (Aug. 16, 2021), Appx102844–102864.

The Department issued the *Final Results* on September 22, 2021, assigning YGK/Nagase a final dumping margin of 27.21%, which was unchanged from the margin calculated in the *Preliminary Results*.  *See Final Results*, 86 Fed. Reg. at 53946, Appx3062.

## II.    FACTS UNDERLYING NAGASE'S CLAIMS

### A.    The Inclusion of R&D Expenses for Non-Subject Products in YGK's G&A Expense Ratio

In its initial questionnaire response, YGK/Nagase noted that, "{b}ecause Glycine is a well-established product that YGK has produced for nearly 70 years, the R&D Sector has little work relating to Glycine." YGK/Nagase's Response to Section A of the Questionnaire (Oct. 30, 2020) ("AQR") at A-8, Appx80052. YGK explained that it tracked R&D expenses "by product category" in its normal books and records during the POR, and noted that "R&D costs for Glycine are recorded as amino acid R&D costs." YGK/Nagase's Response to Section D of the Questionnaire (Nov. 23, 2020) ("DQR") at D-24, Appx83974. YGK's R&D "focuses on the development of new chemical and pharmaceutical products" rather than glycine. AQR at A-8, Appx80052. YGK/Nagase also submitted YGK's trial balance accounts showing that its R&D expenses were recorded by product category (i.e., [

]). *See* DQR at Exhibit D-11, Appx84035. YGK's accounting practices are in accordance with GAAP of Japan. *See* DQR at D-10, Appx83960.

Commerce has an established practice of excluding R&D expenses attributable to non-subject merchandise from cost of production ("COP"). *See Certain Frozen Warmwater Shrimp from India: Final Results and Partial Rescission of Antidumping Duty Administrative Review,* 72 Fed. Reg. 52055 (Dep't Commerce Sept. 12, 2007), and accompanying Issues & Decision Memorandum at 17 (Comment 6). In light of that practice and YGK's recordkeeping, YGK/Nagase excluded R&D expenses attributable to non-subject products in the calculation of YGK's G&A expenses. Specifically, YGK deducted total R&D expenses from the G&A expenses recorded in its April 2019 to March 2020 (YGK's fiscal year 2019) financial statements, and added

back the R&D expenses specific to amino acids (the product category that includes glycine) in its G&A expense ratio calculation. *See* DQR at Exhibit D-9, Appx84029.

Despite the record evidence that YGK separately recorded R&D expenses by product category in its normal books and records, Commerce instructed YGK/Nagase to revise the calculation of G&A expenses to include total R&D expenses for all products – subject and non-subject. In its Response to the First Supplemental Questionnaire, YGK/Nagase provided additional evidence to demonstrate its monthly recording of R&D costs on a product-specific basis in the normal course of business, including account level detail for R&D expenses incurred during the April 2019 to March 2020 fiscal year broken down by research center. *See* YGK/Nagase's Response to the First Supplemental Questionnaire (Jan. 22, 2021) ("SQR") at 17–18, Appx84165–84166, and Exhibit S-20, Appx84962–84973. YGK/Nagase also submitted records illustrating how the R&D costs were recorded by product category and summed up by product category in YGK's previously-submitted general ledger and the trial balance accounts, which also state the R&D costs by product category. *See id.* Moreover, the category-specific R&D costs in YGK's accounting records tied directly to the category-specific R&D costs recorded in the trial balance for the fiscal year. *Compare* SQR at Exhibit S-20, Appx84973 *with* DQR at Exhibit D-11, Appx84035. In light of the documentation demonstrating YGK's product-category-specific accounting of R&D costs, YGK also asked Commerce to clarify its instructions for adjustments to the G&A expense ratio calculation, if still applicable. *See* SQR at 21, Appx84169.

In the *Preliminary Results,* Commerce, without explanation, adjusted YGK's G&A expense ratio to include YGK's total R&D expenses for all products – subject and non-subject. *Preliminary Decision Memo* at 13, Appx2665. Commerce referred to its "Preliminary Analysis Memorandum" for further explanation, but this memorandum included only the recalculation of

9

YGK/Nagase's G&A expense ratio without further explanation.  *See Memorandum to File, Re: Preliminary Results Margin Calculation for Yuki Gosei Kogyo Co., Ltd./Nagase & Co., Ltd.* (June 30, 2021), Appx102331–102337.   In response, YGK/Nagase argued in its case brief that Commerce failed to address the evidence in the record that "YGK keeps R&D expense records by product line and distinguishes the expenses specific to Glycine from the expenses specific to non-subject products in the normal course of business." *YGK/Nagase Case Brief* at 8, Appx102815.

In the *Final Results,* Commerce recognized that, "{d}uring the POR, YGK allocated its total R&D costs to 'product categories'" and that the "record demonstrates that YGK has separate trial balance accounts for R&D." *Final Decision Memo* at 6, Appx2921.   Commerce also acknowledged that its "practice has been to allocate R&D expenses to products consistent with the company's normal books and records (*i.e.*, calculating product-specific R&D costs as they are calculated in the company's normal books and records and allocate general R&D costs over sales of all products)" and "will sometimes allocate R&D expenses on a product-specific basis . . . if a respondent allocates R&D costs in its normal books in records." *Id.*   Nevertheless, Commerce concluded that the worksheets submitted by YGK "show that it is an 'after the fact' allocation of company-wide R&D costs to broad product categories using headcount or hours." *Id.* at 6–7, Appx2921–2922.   In doing so, Commerce cited YGK's obsolete accounting practice during the period of investigation (calendar year 2017), *see id.* at 6, Appx2921 (citing DQR at Exhibit D-4, Appx84014), rather than evidence concerning the relevant time period – i.e., YKG's accounting practice during the POR, YGK's trial balance during the POR, and YGK's underlying accounting records.   Based solely on the unsupported assertion of an "'after the fact' allocation," Commerce continued to include YGK's total R&D expenses in its G&A expense ratio calculation. *See id.*

10

B.      **The Inclusion of a Production Expense for a Non-Subject Product in YGK's G&A Expense Ratio**

In its initial questionnaire response, YGK/Nagase submitted YGK's financial statements for its 2019 fiscal year (April 1, 2019 to March 31, 2020), which included "Compensation for Payment" as an extraordinary loss item. *See* AQR at Exhibit A-19, Appx80191. YGK/Nagase did not include this loss item in its G&A expense ratio calculation because it related to YGK's production of a non-subject product.

In its First Supplemental Questionnaire, Commerce instructed YGK/Nagase to revise its calculation of G&A expenses to include this "compensation for payment" or explain why it "should not be included in the G&A expenses." *See* SQR at 17, Appx84165. In response, YGK/Nagase explained that this cost item was incurred to compensate a customer – which had consigned production of a non-subject pharmaceutical product to YGK – for losses resulting from a delay in the relevant governmental authority's approval of the pharmaceutical product. *See id.* at 20, Appx84168. YGK/Nagase also submitted a press release entitled "Notice regarding the recording of extraordinary losses and special profits." *See id.* at Exhibit S-22, Appx84977–84980. The press release explained that, because a customer's application for a drug designed to use raw materials manufactured by YGK was "put on hold by the authorities{,}" YGK "received a request from {the} customer{} to pay . . . the consignment processing costs . . . {YGK} . . . ha{d} already received for the drug." *Id.*, Appx84979.

In its Second Supplemental Questionnaire Response, YGK/Nagase provided additional details, explaining that YGK and its customer had entered into a contract under which production of the non-subject pharmaceutical product was consigned to YGK. *See* YGK/Nagase's Response to the Second Supplemental Questionnaire (May 6, 2021) ("SSQR") at 6–7, Appx92718–92719. After government approval for the drug was delayed, however, YGK discontinued production and

11

agreed to compensate the customer for consignment processing fees already received. *See id.* YGK/Nagase also submitted documents corroborating the details provided in the press release, including an agreement between YGK and the customer describing the terms of the compensation for payment, *see id.* at Exhibit SS-7, Appx92781–92786, the customer's invoice for the compensation amount agreed upon by it and YGK, and YGK's payment record, *see id.* at Exhibit SS-8, Appx92787–92790.

In the *Preliminary Results,* Commerce stated that it modified YGK's G&A expense ratio calculation to include the "compensation for payment" related to YGK's production of a non-subject product. *See Preliminary Decision Memo* at 13, Appx2665. In response, YGK/Nagase referred to the uncontradicted evidence provided in its two supplemental questionnaire responses, which demonstrated that the compensation for payment expense related to YGK's production of a non-subject pharmaceutical product, rather than to the company's general operations. *See YGK/Nagase Case Brief* at 5–8, Appx102812–102815. YGK/Nagase also cited the record evidence demonstrating that the customer in question was not a glycine customer. *See id.* at 6, Appx102813 (citing YGK/Nagase's Response to Sections B and C of the Questionnaire (Nov. 19, 2020) ("BCQR") at Exhibit B-5, Appx80572–80575, and Exhibit C-7, Appx80826–80827).

In the *Final Results,* Commerce continued to include the "compensation for payment" expense in YGK/Nagase's G&A expenses. Relying only on the press release submitted in YGK/Nagase's first supplemental questionnaire response, and without addressing the additional evidence submitted by YGK/Nagase in its second supplemental questionnaire response or the arguments in YGK/Nagase's case brief, Commerce concluded that the "'compensation for payment' expenses do not relate directly to the production of non-subject merchandise, but rather, relate indirectly to the general operation of the company." *Final Decision Memo* at 4, Appx2919.

Classifying this one-time charge as a "cost of doing business" similar to "penalties, litigation accruals, {and} fines," Commerce continued to include the "compensation for payment" expense relating to YGK's production of a non-subject product in YGK/Nagase's G&A expenses. *Id.* at 4–5, Appx2919–2920.

### C.  The Error in the Assessment Rate Calculation

The final assessment rate calculated for Nagase's CEP sales far exceeds the final dumping margin calculated for YGK/Nagase, and is, as a self-evident matter, incorrect on its face.  As background, together with the final results of an AD administrative review Commerce typically issues a package of respondent-specific data showing its calculations of the company's dumping margin.  This package consists of numerous pages of computer programming instructions and sample printouts of the data generated by the application of the programming instructions to the respondent's submitted data.  In Nagase's case, the printouts were 126 pages long.  The last few pages show the final steps in the calculation of the dumping margin and the assessment rate, calculated by Commerce pursuant to three margin calculation methodologies (the differences among which are not relevant for this appeal).[3]

For Nagase, the summary of the calculation of the dumping margins for the three methodologies is shown on page 126 of the Department's Margin Output, Appx103302.  Pages 123-125 of the Margin Output summarize the dumping margin and assessment rate calculations for each of the three methodologies.  *See id.* at 123–25, Appx103299–103301.  For each methodology, there are two line items, one for Nagase's CEP sales, and the other for Nagase's

---

[3]  The three different comparison methodologies are employed to implement Commerce's "differential pricing" (or "targeted dumping") methodology, pursuant to 19 U.S.C. § 1677f-1(d). The differences among the dumping margins generated by the different methodologies for Nagase were relatively insignificant, and this issue is not in dispute in the current litigation.

"export price" ("EP") sales.[4]  For Nagase's CEP sales, Commerce calculated the assessment rate

on an ad valorem basis, whereas for EP sales they were calculated on a per-kilogram basis.  The

dumping margin (cash deposit rate), combined for both EP and CEP sales, is shown as 27.71

percent for one methodology and [      ] percent for the other two.  *See* Margin Output at 126,

Appx103302.  The assessment rate for Nagase's CEP sales is shown as [      ] percent for one

scenario and [      ] percent for the other two.  *See id.* at 123–25, Appx103299–103301.  The

Department adopted the scenario shown on page 123 of the Margin Output, Appx103299 – i.e.,

with the 27.71 percent dumping margin (cash deposit rate) and [      ] percent assessment rate.[5]

    The error is reflected in the total customs value (entered value), which is shown on page

123 of Commerce's Margin Output.  This value is shown in column A as $[      ].  *See id.*  This

figure is impossibly low and erroneous on its face, as evident from the fact that this total figure for

the entire universe of CEP sales during the review period – $[      ] – is *less than the entered*

*value for a single entry* for which Nagase submitted a sample customs entry document, $[      ].

*See* BCQR at Exhibit C-14, Appx80854.

    In addition, the record reflects the source of the error, which stems from the reporting of

entered value in YGK/Nagase's U.S. sales database submitted with its first supplemental

questionnaire response.  *See* SQR at Exhibit S-28, Appx85019–85029.  Specifically, the per-unit

---

[4]  These two types of sales are defined in 19 U.S.C. § 1677a(a) & (b), respectively.  Generally, EP
sales are those made by the foreign producer/exporter to an unaffiliated U.S. customer before
importation into the United States, whereas CEP sales are those made by the exporter or an
affiliated importer to unaffiliated U.S. customers after importation.  *See AK Steel Corp. v. United
States*, 226 F. 3d 1361, 1364–65 (Fed. Cir. 2000).  The differences between these two categories
of sales are not relevant for this appeal, except that the error occurred only in the calculation of
Nagase's assessment rate for its CEP sales.

[5]  Because the "standard methodology" reflected in the data on page 123 of the Margin Output was
the methodology selected by the Department to set Nagase's dumping margin and assessment rate,
this discussion will focus on that page.  The same error arises, however, regardless which of the
three comparison methodologies' data are considered.

amount of regular U.S. duty paid on Nagase's imports and reported for Nagase's CEP sales were inadvertently duplicated and reported as the entered values for those sales.  This is seen in the sample printout of the U.S. sales database, included with the Department's final margin calculation materials, which shows ENTVALUE of [    ] (i.e., [  ] cents per kilogram) for all of Nagase's reported sales.  *See* Margin Output at 12, Appx103188.  This is the same as the per unit amount reported in the USDUTYU field for all sales.  *See id.* at 11, Appx103187; *see also* SQR at Exhibit S-28, Appx85021–85029 (revised U.S. sales database).

The Department multiplied the erroneous [    ] per kilogram entered value times the quantity (kilograms) for each CEP sale and then summed the values for all of Nagase's CEP sales.  The result was an incorrect total entered value amount of $[      ].  *See id.* at 123, Appx103299.  And when the total amount of antidumping duties due ($[      ]) for CEP sales is divided by $[    ], the result is the ad valorem assessment rate of [    ] percent.  *See id.*

Nagase's counsel discovered the error in the Department's Margin Output in mid-October 2021, shortly after the Department published its final results in the review.  They promptly contacted the Department personnel, and discussed the issue by telephone on October 18, 2021.  During the telephone conference, counsel explained the error and the manner in which it could be corrected using data on the record.  Afterwards, the Department submitted a memo to the file, stating that "this administrative review is complete, the record is closed, and there is no mechanism for Commerce to change the results or the manner of duty assessment." *Memorandum to File from Dana S. Mermelstein, Re: Final Results of Administrative Review of the Antidumping Duty Order on Glycine from Japan; 2018–2020; Telephone Conversation with Counsel for Respondent* (Oct. 19, 2021) ("Ex Parte Memo"), Appx3068.

The statement that "there is no mechanism for Commerce to change the results or the manner of duty assessment" was subsequently proven to be incorrect. Commerce in fact corrected another error in the Margin Output. Specifically, the Margin Output identifies Nagase's U.S. customers (EP and CEP) by code number. The code number for the CEP customer is shown as [                ]. *See* Margin Output at 123, Appx103299. Although this code number was correct for the purpose of identifying the ultimate customer (i.e., the purpose for which Nagase had submitted the information), it was incorrect for the purpose intended by the Department in listing the code number on page 123 of the Margin Output (i.e., the application of the assessment rate) because the code represents the ultimate customer, not the importer of record. *See* BCQR at C-16, Appx80739 (identifying the customer with the customer code shown on page 123 of the Margin Output).[6] When Commerce issued the liquidation instructions to CBP, however, that incorrect code had been revised because the instructions correctly identify the importer of record for Nagase's CEP sales – i.e., [                        ]. *See* Commerce Liquidation Instructions, Message No. 1328401 (A-588-878) (Nov. 24, 2021) at ¶1a ("Liquidation Instructions"), Appx103308.

Thus, it appears that the Department does indeed have the authority to correct errors in "the manner of duty assessment" after the completion of the review but before the liquidation instructions are issued to CBP. Why the Department used that authority to correct the identity of the importer but not the assessment rate to be applied to that importer's entries, is not evident.

---

[6] Nagase properly distinguished the importer from the ultimate customer in the data submitted to Commerce, by reporting [        ], not [            ], in the IMPORTER field in the U.S. sales database.

## STANDARD OF REVIEW

The Court "shall hold unlawful" the Department's determination if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *see also Micron Tech. Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997).  Under well-established legal principles, substantial evidence is "more than a mere scintilla{;} {i}t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938), and *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474, 477 (1951)).

In determining whether the Department's conclusions are based on substantial evidence, the Court must consider "the record as a whole, including {evidence} which fairly detracts from {the} weight" of the Department's conclusions. *Target Corp. v. United States*, 609 F.3d 1352, 1358 (Fed. Cir. 2010) (internal quotation marks and citation omitted).  If the Court finds that on balance the Department's determination was not supported by substantial evidence, it must remand the case to the Department for reconsideration.

Further, this Court has explained that "{d}ecisions that an agency makes in the enforcement and administration of its regulatory requirements that call for an exercise of discretion are examined according to an abuse of discretion standard." *Celik Halat ve Tel Sanayi A.S. v. United States*, Slip Op. No. 22-12, at 9 (Ct Int'l Trade 2022) (citing *Brennan v. Dep't of Health & Human Servs.*, 787 F.2d 1559, 1564 (Fed. Cir.), *cert. denied*, 479 U.S. 985 (1986)).  As explained in *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 853 F.Supp.2d 1352, 1363–64 (Ct. Int'l Trade 2012), "When the record cannot support the agency's determination or the agency's exercise of discretion exceeds the limits of the statute, the agency has abused its discretion."  The same analysis applies, for example, with regard to deadlines set by Commerce. *See, e.g., Pro-Team Coil*

17

*Nail Enterprise, Inc. v. United States*, 419 F. Supp. 3d 1319, 1331 (Ct. Int'l Trade 2019) ("{I}t is well-settled that a deadline-setting regulation that is not required by statute may, in appropriate circumstances, be waived and must be waived where failure to do so would amount to an abuse of discretion.") (internal quotation marks omitted).  And as a general principle, the Court of Appeals has explained that "a regulation which is not required by statute may, in appropriate circumstances, be waived and must be waived where failure to do so would amount to an abuse of discretion." *NTN Bearing Corp. v. United States*, 74 F. 3d 1204, 1207 (Fed. Cir. 1995) (citing *Tehnoimportexport v. United States,* 15 C.I.T. 250, 766 F. Supp. 1169, 1178 (Ct. Int'l Trade 1991)).

As demonstrated below, in calculating Nagase's dumping margin, Commerce failed to apply the AD statute according to its own established practice and precedents of this Court and the Court of Appeals, and it failed to support its conclusions with substantial evidence on the record. In addition, Commerce abused its discretion in failing to correct an error in the assessment rate that is evident on its face.  Therefore, Nagase submits that, in accordance with the applicable standard of review, the Court should remand this case to Commerce to recalculate Nagase's dumping margin and assessment rate.

## ARGUMENT

Commerce's Final Results may not be sustained for three reasons.  First, by including R&D costs specific to non-subject products in YGK/Nagase's G&A expense ratio, Commerce arbitrarily disregarded its established practice and made findings unsupported by substantial evidence. Second, in including a "compensation for payment" expense related to the production of a non-subject pharmaceutical product in YGK/Nagase's G&A expense ratio, Commerce ignored record evidence that the expense did not relate to the general operations of the company, arbitrarily disregarded its established practice, and made findings unsupported by substantial evidence.

Third, by failing to correct an assessment rate that is erroneous and grossly inflated on its face, Commerce abused its discretion and failed to meet its statutory obligation to calculate Nagase's assessment rate as accurately as possible.

## I.   COMMERCE'S INCLUSION OF R&D COSTS FOR NON-SUBJECT PRODUCTS IN YGK'S G&A EXPENSE RATIO IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS NOT OTHERWISE IN ACCORDANCE WITH LAW

Commerce erred by including YGK's R&D costs for non-subject products in the G&A expenses that were attributed to the subject merchandise. In doing so, Commerce disregarded its standard practice of excluding R&D expenses that are specific to non-subject merchandise. Moreover, Commerce relied on obsolete evidence from a prior proceeding (the original investigation), thereby ignoring uncontradicted documentary evidence that YGK's R&D accounting practice during the period of review (October 31, 2018 to May 31, 2020) differed from the accounting practice used by the company in the period covered by the investigation (calendar year 2017). *See* SQR at Exhibit S-20, Appx84962–84973. Therefore, Commerce's decision to include R&D costs for non-subject products in YGK's G&A expense ratio was unsupported by substantial evidence and otherwise not in accordance with law.

### A.   Legal Background

The statute instructs Commerce to calculate the "cost of production" and "constructed value" of the foreign like product. For the cost of production, one element is "an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question," 19 U.S.C. § 1677b(b)(3)(B), and for constructed value, the same cost element is defined as "the actual amounts incurred and realized by the specific exporter or producer being examined in the . . . review for selling, general, and administrative expenses, . . . in connection with the production and sale of a  foreign like  product

. . . ." 19 U.S.C. § 1677b(e)(2)(A).  Moreover, as a general principle, when calculating the cost of

production, the statute requires Commerce to rely on the respondent's reported costs if: (1) such

costs are based on records kept in accordance with the home country's GAAP; and (2) such costs

reasonably reflect the costs associated with the production and sale of the merchandise.  19 U.S.C.

§ 1677b(f)(1)(A).

Based on these statutory instructions, Commerce's established practice is to include only

company-wide general and administrative ("G&A") expenses in the G&A expense ratio and to

exclude expenses that do not pertain to the production and sale of the foreign like product.  *See,*

*e.g., U.S. Steel Group v. United States*, 998 F. Supp. 1151, 1154 (Ct. Int'l Trade 1998) (citing

*Rautaruukki Oy v. United States*, 19 C.I.T. 438, 444 (1995)); *Certain Steel Concrete Reinforcing*

*Bars from Turkey; Final Results, Rescission of Antidumping Duty Administrative Review in Part,*

*and Determination To Revoke in Part*, 70 Fed. Reg. 67665 (Nov. 8, 2005), and accompanying

Issues and Decision Memorandum at 43 (Comment 13) (Commerce's "established practice in

calculating the G&A expense rate is to include *only* those items that relate to the general operations

of the company as a whole.") (emphasis added).  Conversely, "{i}f the Department identifies

expenses that are directly related to a particular production process or product, {the agency}

normally and more appropriately consider{s} those expenses to be manufacturing costs" rather

than G&A expenses.  *Bottom Mount Combination Refrigerator-Freezers from the Republic of*

*Korea; Final Determination of Sales at Less Than Fair Value and Negative Critical Circumstances*

*Determination*, 77 Fed. Reg. 17413 (Mar. 26, 2012), and accompanying Issues and Decision

Memorandum at 117 (Comment 35).[7]

---

[7] *Accord, Notice of Final Determination of Sales at Less Than Fair Value: Hot-Rolled Flat-Rolled*
*Carbon-Quality Steel Products from Japan*, 64 Fed. Reg. 24329, 24354 (May 6, 1999), and
accompanying Issues and Decision Memorandum at Comment 25 ("G&A expenses by their nature

Accordingly, Commerce examines individual expense items to determine whether they relate to the general operations of the company or relate directly to the production or sale of particular products.[8]   If the expense directly relates to the production or sale of non-subject merchandise, Commerce omits such expenses from the respondent's G&A expense calculation.

This principle governs Commerce's treatment of R&D costs (the subject of Count One). That is, to determine whether to include R&D costs as an element in the cost of production of the subject merchandise, Commerce considers whether those expenses relate to individual products or benefit the company as a whole.  Where R&D costs relate specifically to non-subject merchandise, Commerce has an established practice of excluding such costs from the calculation of the cost of production of the subject merchandise.  Commerce has summarized this practice:

> In determining whether expenses associated with R&D activities should be included in the reported costs, we look at whether these expenses relate specifically to individual products or are general in nature. Those expenses that can be differentiated by product are allocable to the COM of that product.

---

are indirect expenses incurred by the company as a whole.  If they directly related to one process or product, they would more appropriately be considered manufacturing costs.").

[8]  For example, in *Certain Lined Paper Products from India*, Commerce excluded certain expenses that had been recorded by the respondent as G&A expenses from the G&A expense calculation, because they related to a non-subject product, rather than the company's general operations. *Certain Lined Paper Products from India Final Results of Antidumping Duty Administrative Review*, 74 Fed. Reg. 17149 (Apr. 14, 2009) and accompanying Issues and Decision Memorandum at 12 (Comment 4) ("{A}lthough these costs were reported as G&A expenses on the income statement, they were nonetheless costs directly related to {Respondent's} newsprint trading operations and were not supporting the general operations of the company as a whole."); *see also Canned Pineapple Fruit from Thailand: Final Results of Antidumping Duty Administrative Review*, 67 Fed. Reg. 76718 (Dec. 13, 2002) and accompanying Issues and Decision Memorandum at 13-14 (Comment 7) (Commerce excludes what Respondent describes as "direct expenses related to non-subject merchandise" from G&A "because they represent direct selling expenses or production costs. Because these expenses relate directly to the production or sale of specific merchandise, it is {Commerce's} normal practice to remove them from the SG&A when we create G&A.")

*Frozen Warmwater Shrimp from India: Final Results and Partial Rescission of Antidumping Duty Administrative Review,* 72 Fed. Reg. 52055 (Sept. 12, 2007), and accompanying Issues & Decision Memorandum at 17 (Comment 6).  *See also Large Power Transformers From Japan; Final Results of Antidumping Duty Administrative Review,* 57 Fed. Reg. 45767 (Oct. 5, 1992) at Comment 3 (Since {respondent's} internal accounting methodology allows it to identify R&D costs that are not related to the subject merchandise, {respondent} acted properly by not allocating these R&D costs across the subject merchandise).[9]   Indeed, Commerce recognized this practice in the *Final Results* of the current case:

> Commerce's practice has been to allocate R&D expenses to products consistent with the company's normal books (i.e., calculating product and/or division-specific R&D costs as they are calculated in the company's normal books and records and allocate general R&D costs over sales of all products).

*Final Decision Memo* at 6 (citing *Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers from Mexico*, 77 Fed. Reg. 17422 (Dep't Commerce Mar. 26, 2012), and accompanying Issues and Decision Memorandum at 83 (Comment 14)).

### B.   Commerce's Inclusion of R&D Expenses Related to Non-Subject Products in YGK/Nagase's G&A Expenses was Unsupported by Substantial Evidence and Not in Accordance with Law

Despite acknowledging its established practice outlined above, Commerce disregarded this practice when it decided "to treat {YGK/Nagase's} R&D expenses as company-wide expenses

---

[9]  *Accord, High-Tenacity Rayon Filament Yarn From Germany; Final Results of Antidumping Duty Administrative Review,* 60 Fed. Reg. 15897 (Mar. 28, 1995) at Comment 5 ("The R&D expenses submitted by {respondent} were allocated on a product-specific or product line basis, according to the nature of the research being performed. The methodology used to allocate the R&D is that used in {respondent's} normal course of business and reconciles to the financial statements. Further, the Department has accepted the submitted methodology in similar cases.") (citations omitted).

within G&A{.}" *Final Decision Memo* at 7, Appx2922.  Commerce found that "{d}uring the POR, YGK allocated its total R&D costs to 'product categories'" and that the "record demonstrates that YGK had separate trial balance accounts for R&D." *Id.* at 6, Appx2921.  Nonetheless, Commerce disregarded its past practice and included R&D costs specific to non-subject pharmaceutical products in YGK/Nagase's G&A expense ratio for the subject product (glycine). In doing so, Commerce relied on a description of YGK's obsolete method of recording R&D costs during the period (calendar year 2017) examined in the original AD investigation, and ignored uncontested record evidence concerning YGK's product-specific accounting of R&D costs during the POR (October 31, 2018 through May 31, 2020).

In its initial questionnaire response, YGK/Nagase explained to Commerce that, "{b}ecause Glycine is a well-established product that YGK has produced for nearly 70 years, the R&D sector has little work relating to Glycine."  AQR at A-8, Appx80052.  In its Section D questionnaire response, when asked to "{d}escribe how you used your normal cost and financial accounting records to compute . . . research and development costs," YGK/Nagase explained:

> YGK tracks and records research and development ("R&D") costs
> by product category. R&D costs for Glycine are recorded as amino
> acid R&D costs. YGK also incurs R&D costs for [
>
> ].

DQR at D-24, Appx83974.  In its first supplemental questionnaire response, YGK/Nagase reiterated that, "{i}n the normal course of business, YGK maintains product-specific research and development ('R&D') expenses," and provided account-level detail demonstrating its product-category-specific recording of R&D expenses at each location (*i.e.*, the Tokyo Research Institute ("TRI") and the production engineering departments at the Joban/Tokiwa Plant).  SQR at 17, Appx84165, and Exhibit S-20, Appx84962–84973.

At the TRI, YGK recorded R&D costs by headcount for each research "theme" on a monthly basis. *See id.* at Exhibit S-20, Appx84969, Appx 84971. YGK's research themes at TRI are classified by product category – one of which, "Amino Acids," includes glycine.[10] *See id.* At the Joban/Tokiwa Plant, YGK recorded R&D costs by person hours for each research theme.[11] *See id.*, Appx84970, Appx84972. YGK's research themes at the Plant are also classified by product category, one of which includes glycine (again, "Amino Acids"). At each location and in the normal course of business, YGK assigned the total R&D costs incurred during a given month to each product category based on the percentage of headcount or person hours expended on research themes associated with each product category. On a monthly basis, YGK aggregated and recorded these product-category-specific R&D costs in corresponding product-category-specific R&D accounts in its trial balance. *Compare id.* at Exhibit S-20, Appx84973 (recording cumulative

---

[10]  Exhibit S-20 shows that the R&D cost for each month was calculated based on the number of staff working on the respective research themes. As a result, the cost amounts recorded monthly fluctuated in relation to the staffing assigned to individual research themes for each month. As an illustration of the record-keeping process at TRI, there were [    ] glycine-related R&D projects categorized under "Amino Acids" in April 2019 – [    ] and [                    ] – and there were [    ] projects related to the product categories for non-subject merchandise (*i.e.*, chemicals and medicines). *See* SQR at Exhibit S-20, Appx84969. In April 2019, total staffing at TRI was [    ] people, of which [    ] worked on the [            ] theme and [    ] worked on the [            ] theme. In May 2019, total staffing at TRI increased to [    ], and the total monthly R&D cost increased. However, the R&D cost related to "Amino Acids" decreased that month, because only [    ] people were involved with "Amino Acid" research projects, a decrease of [    ] from April. *See id.* Consequently, TRI assigned [    ] percent of the R&D costs incurred in April 2019 to Amino Acids, and [    ] percent of the R&D costs in May 2019 to Amino Acids. *See id.*

[11]  As an illustration of the record-keeping process at the Joban/Tokiwa Plant, there were no glycine-related research themes categorized under "Amino Acids" during the April 2019 to March 2020 fiscal year at the Plant. *See* Exhibit S-20, Appx 84970, Appx84972. That no cost was incurred for the research and development of new production methodologies (which is the focus of factory-based R&D) for glycine is not surprising given that glycine is a basic amino acid, a "well-established product that YGK has produced for nearly 70 years." AQR at A-8, Appx80052. Thus, all R&D costs at the Plant were recorded under the product categories for non-subject merchandise, according to the [                    ] spent on each of the respective research themes. *See* Exhibit S-20, Appx 84970, Appx84972.

fiscal year totals of JPY [          ] for Amino Acids; JPY [          ] for Chemicals; and JPY

[          ] for Medicine) *with* DQR at Exhibit D-11, Appx84035 (reporting identical

cumulative totals in the corresponding trial balance accounts [     ], [     ], and [     ],

respectively, for each product category).  Commerce did not find that YGK's accounting practices

were inconsistent with Japanese GAAP or that YGK's records failed to reasonably reflect YGK's

costs.  *See Final Decision Memo* at 6–7, Appx2921–2922.

Although Commerce acknowledged that YGK's records provided evidence that "YGK

allocated its total R&D costs to 'product categories'" including "worksheets supporting its

allocation," Commerce did "not find that these worksheets demonstrate that R&D costs are

incurred on a product-specific basis, because the worksheets show that it is an '*after the fact*'

allocation of company-wide R&D costs to broad categories using headcount or hours."  *Id.* at 6,

Appx2921 (emphasis added).  To support its incorrect "after the fact" characterization, Commerce

cited to YGK's financial statements for fiscal year 2019, which reported one total amount for all

R&D expenses, as well as YGK's description of its R&D cost recording practices included in

Commerce's cost verification report for the period of investigation (2017) – not the evidence of

YGK's R&D cost accounting practice during the fiscal year covered by the current POR (April

2019 to March 2020).  Notably, Commerce failed to address the current record evidence provided

by YGK/Nagase demonstrating that YGK assigned its R&D costs on a monthly and product-

category-specific basis throughout the POR.

The fact that YGK reported a total R&D cost amount in its financial statements – which is

unremarkable given that financial statements commonly present high-level summaries of a

company's financial information – does not support Commerce's finding that YGK allocated R&D

costs "after the fact."  Even when a respondent reports only a total R&D cost amount in its GAAP-

compliant financial statements, Commerce still includes "the exact amount of R&D expense" related to the subject merchandise, if this amount can be determined from the respondent's normal books and records. *See Chlorinated Isocyanurates from Spain: Final Results of Antidumping Duty Administrative Review,* 74 Fed. Reg. 50774 (Oct. 1, 2009), and accompanying Issues and Decision Memorandum at Comment 3 (including "the exact amount of R&D expense related to . . . the merchandise under consideration" even though only "the *total* R&D recorded by {Respondent} is included in its trial balances and in its financial statements prepared in accordance with Spanish GAAP") (emphasis added).

Thus, Commerce's reference to the total R&D costs reported in YGK's financial statements misses the point. Commerce overlooked the more detailed accounting information that YGK/Nagase provided regarding its product-category-specific R&D costs recorded on a monthly basis during the April 2019 to March 2020 fiscal year, which show that YGK recorded its R&D costs by product category. *See* SQR at 17, Appx84165, and Exhibit S-20, Appx84962–84973. Thus, Commerce's reference to YGK's financial statements does not support its finding that YGK's R&D costs were "after the fact" allocations of company-wide R&D costs.

Commerce also based its finding on YGK/Nagase's verification report prepared by Commerce for the period covered by the original investigation, calendar year 2017. *See Final Decision Memo* at 6, Appx2921 (citing DQR at Exhibit D-4, Appx84014). Commerce's verification report for the 2017 period of investigation states "that YGK does not assign R&D expenses to specific products in the normal course of business because researchers do R&D work as a seed for future products, and so it is difficult to attach R&D expenses to existing products." *See* DQR at Exhibit D-4, Appx84014.

It is well-settled, however, that "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014); *accord, Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review, 2016-2017*, 83 Fed. Reg. 46704 (Dep't Commerce Sept. 14, 2018), accompanying Issues and Decision Memorandum at Comment 3 ("{I}t is Commerce's practice to treat each segment of an antidumping proceeding independently with separate records which lead to independent determinations.").[12]  Here, as detailed above, YGK submitted uncontested evidence demonstrating that the company's methodology for recording R&D costs differed in the current POR (in which it recorded such costs on a product-category-specific basis) as compared to the methodology in effect during the 2017 period of investigation.  Commerce's failure to address the record evidence in the current review renders its calculation of YGK's G&A expenses unsupported by substantial evidence.  *See Allegheny*, 112 F. Supp. 2d at 1165 ("{I}t is . . . well-established that Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence.").

Lastly, Commerce did not find that YGK's accounting practices were inconsistent with Japanese GAAP or that YGK's records failed to reasonably reflect YGK's costs.  In accordance with 19 U.S.C. § 1677b(f)(1)(A), if Commerce lacks evidence that a respondent's product-specific

---

[12]  *See also Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review, 2012-2013*, 79 Fed. Reg. 57047 (Dep't Commerce Sept. 24, 2014), accompanying Issues and Decision Memorandum at Comment 1 (noting Commerce's practice "to treat each segment of an antidumping proceeding as independent proceedings with separate records which lead to independent determinations" in explaining why Commerce has "not considered decisions in past segments of this proceeding" in making a decision for the segment at hand); *E.I. DuPont de Nemours & Co. v. United States*, 22 CIT 19, 32 (1998).

R&D cost records are inconsistent with home-market GAAP or are distortive, it must rely on those costs as recorded in the normal course of business. *See Bottom Mount Combination Refrigerator-Freezers from Mexico*, 77 Fed. Reg. 17422 (Dep't Commerce Mar. 26, 2012), and accompanying Issues and Decision Memorandum at 83 (Comment 14) (relying on the company's division-specific R&D expenses because Respondent "normally records R&D expenses by division" and Commerce "lack{ed} evidence that such allocations {were} distortive").    Consequently, Commerce's decision to include R&D costs for non-subject products in YGK's G&A expense ratio was unsupported by substantial evidence and otherwise not in accordance with law, because Commerce failed to find any inconsistency with Japanese GAAP or distortion in YGK's reported R&D costs.

## II.   COMMERCE'S INCLUSION OF AN EXPENSE RELATED TO A NON-SUBJECT PRODUCT IN YGK'S G&A EXPENSE RATIO IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS NOT OTHERWISE IN ACCORDANCE WITH LAW

In deciding to include a "compensation for payment" expense related to YGK's consigned production of a non-subject pharmaceutical product in YGK/Nagase's G&A expense ratio, Commerce failed to make the required statutory determination of whether the expense relates to the company's general operations as a whole or was directly related to a particular product or service.  Moreover, Commerce failed to address evidence on the record demonstrating that the expense was not related to YGK's general operations.  As noted above, "it is . . . well-established that Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence." *Allegheny*, 112 F. Supp. 2d at 1165.  For these reasons, Commerce's decision to include YGK's "compensation for payment" expense related to a non-

subject product in YGK/Nagase's G&A expense ratio is unsupported by substantial evidence and otherwise not in accordance with law.[13]

In its *Final Results*, Commerce concluded that the "'compensation for payment' expense{} do{es} not relate directly to the production of non-subject merchandise, but rather, relate{s} indirectly to the general operation of the company." *Final Decision Memo* at 4, Appx2919. Classifying this one-time charge as a "cost of doing business{,}" Commerce noted that it "allocates expenses of this nature (*e.g.*, penalties, litigation accruals, fines, *etc.*) over all products because they do not relate to a production activity, but to the company as a whole . . . ." *Id.* Based on this inapt classification, Commerce included the "compensation for payment" expense relating to YGK's production of a non-subject pharmaceutical product in YGK/Nagase's G&A expense ratio. *Id.* at 4–5, Appx2919–2920. Commerce's determination was unsupported by substantial evidence on the record, which established that this expense related directly to a non-subject pharmaceutical product.

As an initial matter, Commerce's analysis of the "compensation for payment" expense in its *Final Results* fails to address the fundamental question underlying whether an expense should be included in G&A – namely, whether the expense relates to the company's activities as a whole, or directly to the production of a non-subject product.  Regardless of how Commerce labels an expense, the statute and Commerce's past practice require that it determine whether the expense relates to the company as a whole before including the expense in the G&A ratio.  *See Husteel Co. v. United States*, 98 F. Supp. 3d 1315, 1357 (Ct. Int'l Trade 2015) (affirming Commerce's exclusion of the cost related to a payment guarantee for a non-subject customer from G&A, which

---

[13]  The legal framework discussed in Section I.A of the Argument above is also relevant to the following discussion.

Commerce analyzed and classified as akin to "a bad debt," emphasizing that "what matters is not whether the loss is properly classified as a bad debt, but rather whether the loss is related to {Respondent's} general operations").   Here, Commerce classified YGK's "compensation for payment" expense as akin to "penalties, litigation accruals, {and} fines" but failed to explain how that expense related to YGK's general operations.   *See Final Decision Memo* at 4, Appx 2919. Therefore, Commerce's minimal analysis of the "compensation for payment" expense misses the mark set by the statute and its past practice.

Moreover, as a factual matter, the record demonstrates that YGK's "compensation for payment" expense was not analogous to a penalty, litigation accrual, or fine.   To the contrary, record evidence confirms that the "compensation for payment" was an expense directly related to the provision of a non-subject service (*i.e.*, YGK's production of a non-subject pharmaceutical product).   As described in YGK/Nagase's response to Commerce's Second Supplemental Questionnaire, YGK and its non-glycine customer "[            ] entered into a contract in [

] under which production of {a non-subject pharmaceutical product} . . . was consigned to YGK{.}"   SSQR at 6, Appx92718 (citing Exhibit SS-7, Appx92781–92786).   YGK began production of the non-subject pharmaceutical product in [            ].   After "the [

] in [            ] to YGK, production was discontinued and the product already produced for [            ] in its inventory was [            ] . . . ." *Id.*[14]

---

[14] In July 2017, [            ] sought approval from the FDA for YGK to manufacture the non-subject pharmaceutical product. *See id.* at Exhibit SS-7, Appx92785.   However, [

]. *See id.*

Commerce relied solely on the fact that YGK issued a press release to its shareholders as evidence that the "compensation for payment" expense relates "to the company as a whole . . . ." *See Final Decision Memo* at 4, Appx 2919. Contrary to Commerce's determination, however, the contents of the press release indicated that the expense related directly to YGK's provision of a service for a non-subject product. The press release describes how YGK was asked to pay "the consignment processing costs {it} had already received for the {non-subject pharmaceutical} drug" after the drug's "application was put on hold by the authorities . . . ." SQR at Exhibit S-22, Appx84977–84980. The record also includes the compensation agreement between YGK and its non-glycine customer, in which YGK agreed to pay an invoice issued by the customer to compensate it for the "cost of materials paid, processing costs for raw materials, . . . storage costs and disposal costs" associated with YGK's production of the non-subject pharmaceutical product. *See* SSQR at Exhibit SS-7, Appx92785. Moreover, YGK/Nagase also submitted the customer's invoice details and YGK's payment record, which demonstrate that the purpose of the payment was to compensate the customer for consignment fees and other expenses related to YGK's manufacturing of the non-subject pharmaceutical product. *See id.* at Exhibit SS-7, Appx92781–92786, and Exhibit SS-8, Appx92787–92790. Finally, the record demonstrates that the customer is a non-glycine customer. *See* BCQR at Exhibit B-5, Appx80572–80575 ([          ] not found in home-market glycine customer list), and Exhibit C-7, Appx80826–80827 ([          ] not found in U.S. market glycine customer list).

In sum, the record contains no evidence – much less, substantial evidence – supporting Commerce's finding that the "compensation for payment" expense was analogous to a penalty, litigation accrual, or fine. Moreover, Commerce failed to consider record evidence that detracted from its finding regarding YGK's "compensation for payment" expense. When issuing its *Final*

*Results*, Commerce failed to cite, let alone address, any of the additional documentation that YGK/Nagase provided in its Second Supplemental Questionnaire Response, including the compensation agreement between the non-glycine customer and YGK and the related invoice and payment record. *See Final Decision Memo* at 4–5, Appx2919–2920. The compensation agreement between YGK and its non-glycine customer, customer invoice, and payment record all demonstrate that the purpose of the payment was to compensate a customer for expenses related to YGK's provision of a non-subject service (the consigned production of a non-subject product). Commerce's failure to address this significant contradictory evidence renders its determination "unsupported by substantial evidence." *Allegheny*, 112 F. Supp. 2d at 1165.

For these reasons, Commerce's decision to include an expense directly related to the provision of a non-subject service (the consigned production of a non-subject pharmaceutical product) in YGK/Nagase's G&A expense ratio was unsupported by substantial evidence and otherwise not in accordance with law.

## III. COMMERCE ABUSED ITS DISCRETION BY ISSUING ASSESSMENT INSTRUCTIONS BASED ON AN ERRONEOUS RATE THAT IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

In calculating Nagase's assessment rate, Commerce incorporated an enormous error, which, if not corrected, will result in the over-collection of [            ] of dollars of dumping duties. Whatever doctrines, canons and policies may apply to the judicial review of administrative decision-making, they do not permit such a grossly unfair outcome.

### A. Legal Framework

When it issues the final results of an antidumping administrative review, Commerce typically calculates both a dumping margin and an assessment rate for each respondent. The

dumping margin and the assessment rate are used for two different purposes.[15]  Specifically, the dumping margin serves as the cash deposit rate that will apply to calculate the amount that the respondent (or its importers) must pay to CBP at the time of entry of the subject merchandise.  This rate is applied prospectively to such entries until the completion of the next administrative review, when the Department calculates another cash deposit rate that will supersede the existing rate.  For example, in the current case, YGK/Nagase's cash deposit rate was set at 53.66 percent in the final results of the original investigation (published on May 1, 2019).[16]  That rate remained in effect until September 29, 2021, when it was superseded by the 27.71 percent cash deposit rate calculated by the Department in the final results of the administrative review that is the subject of this appeal.

The assessment rate, on the other hand, is applied retrospectively to determine the final dumping duty liability to be assigned to the entries of the subject merchandise during the period of review (in this case, October 31, 2018 – May 31, 2020).  If the assessment rate is higher than the cash deposit rate that applied at the time of entry of the merchandise, CBP, at the time of final liquidation of the merchandise, will send an invoice to the importer requesting payment of the difference with interest.  Conversely, if the assessment rate is lower than the cash deposit rate that applied at the time of entry of the merchandise, CBP will issue payment to the importer for the difference with interest.  *See* 19 U.S.C. §§ 1673f(b), 1677g(a).

The two rates are calculated in a similar fashion, but with one important difference, which is at the center of the appeal on this issue.  Both rates use the "aggregate dumping margins" (19 U.S.C. § 1677(35)(B)) (also known as the "antidumping duties due") calculated on the

---

[15]  *See* 19 U.S.C. § 1675(a)(2)(C) ("The determination under this paragraph shall be the basis {1} for the assessment of countervailing or antidumping duties on entries of merchandise covered by the determination and {2} for deposits of estimated duties").

[16]  *See Glycine from Japan: Final Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 18484 (Dep't Commerce May 1, 2019).

respondent's U.S. sales during the review period as the numerator. The denominator for the calculation of the dumping margin (cash deposit rate) is the reported value of the respondent's U.S. sales during the review period. *See id.* The denominator for the calculation of the assessment rate, on the other hand, is the entered value of the subject merchandise during the review period; that is, the assessment rate equals the "aggregate dumping margins" (the "antidumping duties due") divided by total entered value. *See* 19 C.F.R. § 351.212(b)(1); s*ee also Torrington Co. v. United States*, 44 F. 3d 1572, 1576 (Fed. Cir. 1995).[17]

### B.    The Error

As explained in detail in the Statement of Facts above, Commerce calculated an assessment rate of [        ] percent for Nagase's entries of merchandise sold in CEP transactions. That figure is vastly incorrect.

The error does not arise from a dispute regarding the merits of a methodological issue; it is simply a calculation error that is self-evident upon a close review of Commerce's materials

---

[17] The use of different formulas for the calculation of the cash deposit rate and the assessment rate was found by the Court of Appeals to be reasonable because, as noted above, Congress directed that the assessment rate is to be applied to "entries of merchandise." 19 U.S.C. § 1675(a)(2)(C); *see also Koyo Seiko Co. v. United States*, 258 F. 3d 1340, 1348 (Fed. Cir. 2001). Therefore, CBP applies the assessment rate to the entered value – not the sales value – of the merchandise to collect any unpaid duties at the time of liquidation. Generally, sales values are greater than entered values. Thus, if the dumping margin – calculated with a larger denominator, and hence a smaller rate – is applied to the entered values of the merchandise, Customs would end up under-collecting the duties owed.

For example, assume that the amount of AD duties due is $100,000, the total sales value during the POR is $1,000,000, and the total entered value is $800,000. In this case, the dumping margin (cash deposit rate) would be 10%, and the assessment rate would be 12.5%. If the 10% dumping margin were applied by CBP to the entered value of the individual entries at the time of liquidation, it would end up collecting only $80,000 in duties. By calculating an assessment rate using the total entered value as the denominator, the Department ensures that the rate – when applied against the entered value of the individual entries of imported merchandise –will lead CBP to collect the full amount of AD duties due. In this case, 12.5% times $800,000 will generate $100,000 of duties.

prepared for Nagase's final determination.  The record reflects that, whereas Commerce calculated the dumping margin at roughly one-quarter the value of the imported merchandise, the assessment rate was calculated at over [          ] the value of the imported merchandise – or over [          ] the dumping margin.  This is wrong; CBP cannot be expected to collect duties in an amount greater than [          ] the value of the goods themselves.  Rather, one would expect that the assessment rate would be several percentage points higher than the dumping margin, according to the ratio of the total entered value of the subject merchandise during the POR to the total sales value of subject merchandise sold during the POR (as described in the hypothetical example in footnote 17 above).

As noted above, the error arose when Commerce calculated the total CEP customs (or entered) value by summing the extended entered value (i.e., the quantity in kilograms times the erroneous entered value of [      ] per kilogram) for all of Nagase's CEP sales.  The total (incorrect) CEP entered value is shown as [          ] in the Margin Output at 123, Appx103299.  This figure is absurdly low, as demonstrated by the fact that the entered value for *one entry* for which Nagase submitted a sample customs entry document, [          ], *see* BCQR at Exhibit C-14, Appx80854, is greater than the total entered value amount reported in Commerce's Margin Output for the entire universe of CEP sales during the review period.  When the total amount of AD duties due on CEP sales ($[          ]) is divided by the total (incorrect) entered value, $[          ], the result is the ad valorem assessment rate of [        ] percent.  *See* Margin Output at 123, Appx103299.

The draconian impact of this error will be felt when CBP multiplies the [        ] percent assessment rate against the *correct* entered value of the imports at the time of liquidation; it will generate a total amount of dumping duties far larger than the amount to which the Government is entitled.  Specifically, the correct total entered value of Nagase's CEP sales is over four million

dollars.  When that figure is multiplied times [        ] percent, the result is well over [

] dollars – which is [            ] more than the $[        ] to which CBP is entitled,

as Commerce itself determined.

  **C.**  **Correction of the Error**

  In addition to being indisputable, the error is easily correctable based entirely on

information that is already on the record.  This means that no time-consuming remand process

would be required; nor would Commerce be required to reopen the record and obtain additional

information in order to undertake the necessary correction.  Indeed, there are at least two

alternative methods by which Commerce could use existing data on the record to calculate

Nagase's correct assessment rate.  First, Commerce could calculate a per-unit (i.e., per-kilogram)

assessment rate for Nagase's CEP sales, in the same manner as it has already done for the EP sales.

There is no inherent reason why the final duty amount cannot be collected by CBP using the same

assessment basis (per-kg or ad valorem) for both categories of sales.  Thus, as seen on page 123

of the Margin Output, Appx103299, the total entered quantity for Nagase's CEP sales was

[        ] kilograms.  When the amount of AD duties due ($[        ]) is divided by that

entered quantity, the result is $[      ] per kg.  This per-kg rate could be assessed on all the entries

of the merchandise sold in CEP sales during the POR.

  Second, the Department could "reverse engineer" the total entered value of the CEP sales,

and then calculate the correct ad valorem assessment rate using the corrected total entered value

as the denominator.  The correct total entered value can be calculated by dividing the erroneous

total entered value $[        ] – which, as explained above, is actually the total amount of regular

customs duties paid on the entries – by the regular customs duty rate, which is found on the record.

In this case, the subject merchandise (glycine) is covered by just one tariff code under the U.S.

Harmonized Tariff Schedule, and hence there is just one regular customs duty rate (4.2%), plus

the merchandise processing fee (0.3464%).  This is shown on the sample entry summary (Form 7501) that was submitted to the Department as Exhibit C-14.  *See* BCQR at Exhibit C-14, Appx80854.[18]  The sum of those two figures is 4.5464%.  Dividing the total amount of regular duties, $[          ], by 0.045464 results in a total entered value of $[          ].  Dividing the total amount of AD duties due, $[          ], by the correct total entered value results in an assessment rate of [     ]% for the CEP sales – a far more realistic figure than [     ]%.

Additional options may exist.[19]  The key point for the purpose of this litigation is that options exist for the correction of the error based entirely on data that is already on the record.  The process of correcting the error will be straightforward and efficient.

Moreover, there is no legal or procedural impediment to the Court's remanding this case to the Department to correct the error.  Indeed, although the Department stated in its Ex Parte Memo that "there is no mechanism for Commerce to change the results or the manner of duty assessment{.}" Ex Parte Memo at 1, Appx3068, that statement, as noted above, is incorrect.  Commerce has, and has exercised, the authority to correct an error in "the manner of duty assessment," as demonstrated by its correction of the erroneous code number for Nagase's importer of record when issuing the liquidation instructions to CBP.  *See* Liquidation Instructions at ¶1a, Appx103308.  There is no apparent reason why the Department could not likewise correct an indisputable error in the assessment rate – especially an error of the magnitude seen here, by which, if left uncorrected, CBP would collect [          ] of dollars more than the duty amount to which it is entitled.

---

[18]  The same customs duty rate and merchandise processing fee are shown on the second sample Form 7501 submitted by Nagase.  *See* SQR at Exhibit S-16, Appx84806.

[19]  For example, Nagase also reported the total entered value of CEP entries during the POR.  This figure could be used as the denominator in calculating the ad valorem assessment rate.

Further, this Court and the Court of Appeals have long recognized the principles that the antidumping laws are remedial, not punitive, *Chaparral Steel Co. v. United States*, 901 F. 2d 1097, 1103–04 (Fed. Cir. 1990) (noting that antidumping duties "were intended to be solely remedial"), and that the goal of the antidumping law is to calculate dumping margins "as accurately as possible." *Rhone Poulenc, Inc. v. United States*, 899 F. 2d 1185, 1191 (Fed. Cir. 1990); *Grobest & I-Mei Indus (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342, 1365 (Ct. Int'l Trade 2012). Accordingly, in calculating dumping margins and collecting duties, the Government and the domestic industry are entitled to the amount of dumping in which the imports have engaged, no more. *See, e.g., NTN Bearing Corp. v. United States*, 74 F. 3d 1204, 1208 (Fed. Cir. 1995) ("The affected U.S. industry is not entitled to a remedy in excess of the difference between foreign market value and U.S. price."); *accord, Fischer S.A. v. United States,* 471 Fed. Appx. 892, 895 (Fed. Cir. 2012) (unpublished opinion).

Nagase is aware that, in the current case, the error was discovered late in the process, which raises issues of the finality of administrative decisions and timeliness of objections. However, Nagase also submits that those concerns, significant as they may be, are counter-balanced by the circumstances surrounding the assessment rate error in this case – namely, its enormous impact, the fact that it is evident on the face of the Department's Margin Output,[20] that it is indisputably clerical in nature, and easily correctable based on evidence already on the record. In these circumstances, it would be highly punitive – contrary to the "remedial" nature of the AD law – for

---

[20]   In this way, the current case does not raise the concern identified by the Court of Appeals in *Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd.*, 334 F.3d 1284 (Fed. Cir. 2003) – namely, that "Commerce is not required to correct a final determination reflecting an error made by a private party *when that error is not apparent from Commerce's final calculations* . . . or from the final determination itself." *Id.* at 1292 (emphasis added).

the error to go uncorrected and for Nagase to be compelled to pay [                    ] of dollars in excess duties.

Congress has vested this Court with "all the powers in law and equity" of a district court, 28 U.S.C. § 1585, and fundamental principles of equity would be well served by the correction of this error.  Accordingly, Nagase submits that the Court should remand the case to the Department with directions to correct the error in the calculation of the assessment rate and in the instructions issued to CBP.

## CONCLUSION

For the foregoing reasons, Commerce's determination of Nagase's dumping margin and assessment rate in the *Final Results* of the first administrative review of the AD order on *Glycine from Japan* is not supported by substantial evidence and is otherwise not in accordance with law. In addition, Commerce abused its discretion in failing to correct the assessment rate included in the instructions issued to CBP.  Accordingly, Nagase respectfully requests that the Court grant its Motion for Judgment on the Agency Record and remand this case with instructions to redetermine Nagase's dumping margin and recalculate its assessment rate.

A proposed order is attached.

Respectfully submitted,

/s/ Jay C. Campbell
Jay C. Campbell
White & Case LLP
701 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 626-3600
jcampbell@whitecase.com

/s/ Neil R. Ellis
Neil R. Ellis
Law Office of Neil Ellis PLLC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C. 20015
(202) 258-5421
neil@neilellislaw.com

*Counsel to Plaintiff Nagase & Co., Ltd.*

April 11, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for the Memorandum of Points and Authorities in Support of the Motion for Judgment on the Agency Record filed by Nagase & Co., Ltd., as computed by White & Case LLP's word processing system (Microsoft Word 2016), is 12,326 words.

/s/ Jay C. Campbell
Jay C. Campbell