UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN

| | |
|---|---|
| NAGASE & CO., LTD., Plaintiff, | |
| v. | Court No. 21-00574 |
| UNITED STATES, Defendant, | **NON-CONFIDENTIAL VERSION** |
| and, | |
| GEO SPECIALTY CHEMICALS, INC. Defendant-Intervenor | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Assistant Director

OF COUNSEL:
MYKHAYLO A. GRYZLOV
Senior Counsel
Office of the Chief Counsel
for Trade Enforcement & Compliance
U.S. Department of Commerce

KELLY GEDDES
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 307-2867
Email: Kelly.Geddes2@usdoj.gov


July 1, 2022

*Attorneys for Defendant United States*

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN

NAGASE & CO., LTD.,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

GEO SPECIALTY CHEMICALS, INC.

Defendant-Intervenor.

Court No. 21-00574

**ORDER**

Upon consideration of plaintiff's motion for judgment upon the administrative record, defendant's response, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained in all respects.

Dated: ____________________, 2022
New York, NY

_______________________________
JUDGE

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................................ ii

STATEMENT PURSUANT TO RULE 56.2 ........................................................................ 1

I. Administrative Determination Under Review .............................................................. 1

II. Issues Presented For Review ....................................................................................... 2

STATEMENT OF FACTS ........................................................................................................ 2

SUMMARY OF THE ARGUMENT ......................................................................................... 6

ARGUMENT ............................................................................................................................... 7

I. Standard Of Review .......................................................................................................... 7

II. Commerce's Inclusion Of YGK's R&D Expenses In Calculation Of The General And Administrative Expense Ratio Is Supported By Substantial Evidence And In Accordance With Law 9

III. Commerce's Inclusion Of The "Compensation For Payment" Expenses In The Calculation Of The General And Administrative Expenses Is Supported By Substantial Evidence And In Accordance With Law ................................................................ 14

IV. Commerce Did Not Abuse Its Discretion By Declining To Reopen A Completed Administrative Proceeding To Recalculate The Assessment Rate For Nagase's CEP Sales.... 18

A. Legal Framework ........................................................................................................ 19

B. The Alleged Error Resulted From Nagase's Own Reporting Of Its Data...................... 19

C. Nagase Failed To Exhaust Its Administrative Remedies ............................................ 20

D. The Alleged Error Was Not Apparent Nor Should Have Been Apparent From The Face Of Calculations Or Commerce's Determination ................................................................ 21

E. Nagase's Proposals Regarding Methods To Correct Alleged Error Do Not Provide A Basis For Reversal.................................................................................................................. 24

F. Commerce Did Not Abuse Its Discretion In Declining To Reopen The Proceedings To Investigate The Alleged Error ............................................................................................ 26

CONCLUSION ............................................................................................................................ 28

# TABLE OF AUTHORITIES

## CASES

*Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd.*, 334 F.3d 1284, 1292-93 (Fed. Cir. 2003) ........ passim

*Atl. Sugar, Ltd., v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) ........ 9

*Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) ........ 22

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ........ 9

*Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) ........ 9

*Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). ........ 8

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) ........ 8, 14

*Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010) ........ 22

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) ........ 8

*Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) ........ 9

*Husteel Co. v. United States*, 520 F. Supp. 3d 1296, 1307 (Ct. Int'l Trade 2021) ........ 16, 17, 18, 19

*INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992) ........ 8

*Koyo Seiko Co. v. United States*, 258 F.3d 1340, 1346 (Fed. Cir. 2001) ........ 3

*Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) ........ 9

*NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ........ 21, 29

*QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1328 (Fed. Cir. 2011) ........ 22

*Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) ........ 8

*Stanley Works (Langfang) Fastening Sys. v. United States*, 964 F. Supp 2d 1311, 1402 (Ct. Int'l Trade 2013) ........ 23

*United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) ........ 10

## STATUTES

18 U.S.C. § 1581 ........ 27

19 U.S.C. § 1516a ..... 7

19 U.S.C. § 1675 ..... 2, 3, 18

19 U.S.C. § 1677b ..... 6, 9

**REGULATIONS**

19 C.F.R. § 351.212 ..... 24

19 C.F.R. § 351.222 ..... 4, 5, 20

19 C.F.R. § 351.224 ..... passim

19 C.F.R. § 351.309 ..... 20

19 C.F.R. 351.212 ..... 3

**ADMINISTRATIVE DETERMINATIONS**

*Acetone from Korea*, 85 Fed. Reg. 8,252 (Dep't of Commerce Feb. 13, 2020) ..... 17

*Bottom Mount Combination Refrigerator-Freezers from Mexico*, 77 Fed. Reg. 17,442 (Dep't of Commerce Mar. 26, 2012) and accompanying IDM ..... 13

*Certain Cold-Rolled Carbon-Steel Flat Products from Taiwan*, 67 Fed. Reg. 62,104 (Dep't of Commerce October 3, 2002) (final LTFV determination) and accompanying IDM ..... 16

*Certain Cold-Rolled Flat-Rolled Carbon-Quality Steel Products from Taiwan*, 65 Fed. Reg. 34,658 (Dep't of Commerce May 31, 2000) (final LTFV determination) and accompanying IDM ..... 16

*Chlorinated Isocyanurates from Spain*, 74 Fed. Reg. 50,774 (Dep't of Comm. Oct. 1, 2009) (final admin. review) and accompanying IDM ..... 12

*Circular Welded Pipe from the Republic of Korea*, 79 Fed. Reg. 37,284 (Dep't of Commerce July 1, 2014) and accompanying IDM ..... 17

*Magnesium Metal from the Russian Federation*, 70 Fed. Reg. 9,041 (Dep't of Commerce Feb. 24, 2001) (final LTFV determination) and accompanying IDM ..... 15

*Polyethylene Terephthalate Resin from the Republic of Korea*, 83 Fed. Reg. 48,283 (Dept. of Commerce Sept. 24, 2018) (final affirmative LTFV determination) and accompanying IDM 11

*Silicomanganese from Brazil*, 69 Fed. Reg. 13,813 (Dep't of Commerce March 24, 2004) (final admin. review) and accompanying IDM ..... 16

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN

NAGASE & CO., LTD.,

Plaintiff,

v.

UNITED STATES,

Defendant,

and,

GEO SPECIALTY CHEMICALS, INC.

Defendant-Intervenor

Court No. 21-00574

**NON-CONFIDENTIAL VERSION**

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Defendant, the United States, respectfully responds to the motion for judgment upon the administrative record filed by plaintiff, Nagase & Co., Ltd. (Nagase), challenging the Department of Commerce's (Commerce's) final results of the first administrative review of an antidumping duty order on Glycine from Japan. We demonstrate below that the Court should deny Nagase's motion and enter judgment for the Government.

**STATEMENT PURSUANT TO RULE 56.2**

## I. Administrative Determination Under Review

The administrative determination under review is *Glycine from Japan: Final Results of Antidumping Duty Administrative Review; 2018-2020*, 86 Fed. Reg. 53946 (Dep't Commerce Sept. 29, 2021) ("*Final Results*") (Final Results) (P.R. 106), and the accompanying Issues and

Decision Memorandum (IDM) (P.R. 102).[1] The period of review is October 31, 2018, through May 31, 2020.

## II. Issues Presented For Review

1. Whether Commerce's inclusion of research and development (R&D) expenses of Nagase's affiliate, Yuki Gosei Kogyo Co., Ltd. (YGK), in the calculation of the general and administrative (G&A) expense ratio is supported by substantial evidence and in accordance with law, where YGK treated such expenses as a general expense in its audited financial statements, which are compliant with Japan's generally accepted accounting principles (GAAP).

2. Whether Commerce's inclusion of a "compensation for payment" expense, which related indirectly to the general operations of the company, in the calculation of the G&A expense ratio is supported by substantial evidence and in accordance with law.

3. Whether Commerce is required to reopen a completed administrative review to correct an alleged error made by Nagase in reporting the entered value of Nagase's constructed export price (CEP) sales, if the error is not apparent on the face of Commerce's determination or underlying calculations and if Nagase did not exhaust its administrative remedies by applying to Commerce to correct the error within the timeframe provided in Commerce's regulations.

## STATEMENT OF FACTS

In administrative reviews, Commerce assesses antidumping or countervailing duties on merchandise imported during the period of review and calculates cash deposits of estimated duties for future entries of the subject merchandise. 19 U.S.C. § 1675(a)(2)(C). The statute states, in relevant part, that "the amount by which normal value exceeds the United States price (the dumping margin) 'shall be the basis for the assessment of . . . antidumping duties on entries

[1] "P.R." and "C.R." refer to documents in the public and confidential records, respectively.

of merchandise'" and for deposits of estimated duties. *Koyo Seiko Co. v. United States*, 258 F.3d 1340, 1346 (Fed. Cir. 2001) (quoting 19 U.S.C. § 1675(a)(2)(C)). To comply with this requirement, when calculating importer-specific or customer-specific assessment rates, "Commerce uses the dumping margin {based on period of review sales to that importer or customer} as the numerator of the assessment rate formula." *Id*. In the denominator, Commerce uses the entered value of the subject merchandise for normal customs duty purposes sold to that importer or customer during the period of review. *Id*. at 1344-45 (citing 19 C.F.R. 351.212(b)(1)). This rate is assessed on entries of the importer made during the period of review. *Id*.

In calculating the cash deposit rate for estimated duties for future entries of the subject merchandise, Commerce divides the aggregate dumping margins determined for an exporter or producer by the aggregate export prices or constructed export prices of such exporter and producer and applies that rate to future entries. *Id*. In other words, the formula for cash deposit rates uses *sales prices* during the review period as the denominator; the formula for the final assessment rates uses *import values* as the denominator. *Id*. The assessment rate is applied retroactively to the entries that were subject to review, in this instance, during the 2018-2020 period of review, while the cash deposit rate is applied to future entries beginning on the date of publication of the final results, in this instance September 29, 2021.

In response to requests by GEO Specialty Chemicals (petitioner), a domestic producer of glycine, and by Nagase and its affiliate, Yuki Gosei Kogyo Co., Ltd., (collectively, YGK/Nagase), Commerce initiated the first administrative review of the antidumping duty order on glycine from Japan. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 47,731, 47,735 (Dep't of Commerce Aug. 6, 2020) (initiation notice)

(P.R. 11). Commerce selected Nagase and Showa Denko K.K. (Showa Denko) for individual examination as the mandatory respondents in this review. IDM at 2; Respondent Selection Memo (Sept. 28, 2020) (P.R. 17). YGK/Nagase, as a collapsed entity,[2] submitted joint responses to Commerce's questionnaires and supplemental questionnaires.

On June 30, 2021, Commerce issued its preliminary results, calculating YGK/Nagase's weighted-average dumping margin of 27.71 percent. *Glycine from Japan*, 86 Fed. Reg. 36,105 (Dep't of Commerce July 8, 2021) (prelim. results; 2019-2020) (P.R. 89; P.R. 94). The preliminary results included each of the three determinations at issue in this action. First, Commerce disclosed that it included YGK's research and development (R&D) costs in its calculation of the general and administrative (G&A) expense ratio. C.R. 71 at 2. Second, Commerce disclosed that it similarly included in its calculation of the G&A expense ratio an item titled "compensation for payment" that YGK had reported as an "extraordinary loss" in its income statement covering the fiscal year of April 1, 2019 through March 31, 2020. *Id.* Finally, consistent with 19 C.F.R. § 351.222, Commerce disclosed all preliminary calculations, including the assessment rate of [redacted] percent for YGK/Nagase's CEP sales. C.R. 79, Preliminary Margin Output, at 123.

On August 10, 2021, Nagase submitted its case brief. In its case brief, Nagase challenged the treatment of R&D costs and of the "compensation for payment" expense. C.R. 81. Nagase did not challenge the calculation of the [redacted] assessment rate for its CEP sales nor did it contend in its case brief that it had reported any erroneous entered value. *Id*. Likewise, no other party challenged the [redacted] assessment rate calculated for Nagase's CEP sales or called into question the accuracy of the entered value that Nagase reported to Commerce.

[2] Commerce collapsed Nagase and YGK and treated them as a single entity in this proceeding. IDM at 2.

On August 17, 2021, Nagase submitted its rebuttal brief. C.R. 84. Once again, Nagase did not challenge the calculation of the [redacted] assessment rate for its CEP sales nor did it contend in its rebuttal brief that it had reported any erroneous entered value. *Id.*

On September 23, 2021, after considering comments in the briefs, Commerce issued the Final Results, in which it continued to include YGK's R&D expenses and the "compensation for payment" expense in the G&A expenses calculation. P.R. 101; P.R. 106; IDM at 4, 5-6 (P.R. 102). With respect to the R&D expenses, Commerce explained that YGK/Nagase reported its R&D expenses as general expenses in its financial statement, which was compliant with Japan's generally accepted accounting principles (GAAP), and that Commerce would therefore treat those expenses as general expenses. IDM at 6 (P.R. 102). Commerce also explained that it reviewed worksheets provided by YGK wherein YGK allocated its R&D costs to various product categories, and that Commerce concluded that this was an after-the-fact allocation and did not support the conclusion that the R&D costs should be allocated on a product-specific basis, especially where YGK/Nagase's GAAP-compliant financial statement treated those costs as general expenses. *Id.*

With respect to the "compensation for payment" expense, Commerce explained that the record, including a press release issued by YGK/Nagase, indicated that the expense at issue was akin to expenses such as litigation costs, which are not ascribed to particular products but rather are viewed as expenses relating to the general operation of the company. *Id.* at 4.

Finally, the [redacted] assessment rate calculated for Nagase's CEP sales, which no party had contested, remained unchanged in the Final Results. C.R. 90 at 123.

No party filed ministerial error comments pursuant to 19 C.F.R. § 351.222 with respect to the Final Results. On October 8, 2021, Commerce issued a notice of correction with respect to

the Final Results, in which it corrected a citation to the preliminary results and a typographical error in the weighted-average margin for YGK/Nagase in the Federal Register notice. P.R. 107; P.R. 108.

On October 18, 2021, 25 days after the release of the final calculations and 19 days after publication of the Final Results, Nagase's counsel requested that Commerce reopen the completed proceeding to recalculate the assessment for Nagase's CEP sales. P.R. 109. Commerce declined to reopen the completed proceeding and "explained that this administrative review is complete, the record is closed, and there is no mechanism for Commerce to change the results or the manner of duty assessment." P.R. 109. This suit followed.

## SUMMARY OF THE ARGUMENT

Commerce's Final Results should be sustained. Commerce's inclusion of YGK's R&D expenses in calculation of the G&A expense ratio is supported by substantial evidence and in accordance with law. The antidumping duty statute requires that costs "shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1). Commerce properly followed YGK's audited GAAP-compliant financial statements, which treated R&D expenses as selling, general and administrative expenses. Nagase has failed to demonstrate that YGK's GAAP-compliant financial statements do not reasonably reflect the costs associated with the production and sale of the subject merchandise.

Commerce's inclusion of the "compensation for payment" expense in the calculation of the G&A expense ratio is also supported by substantial evidence and in accordance with law.

Because the expense resulted from a compensation agreement with a customer (*i.e.*, settlement) to cover the customer's losses with respect to a failed product with no revenue stream, the expense was covered by revenue from all other products of the company and, thus, it was appropriate to allocate such expense to the operations of the entire company. IDM at 4.

Finally, Commerce did not abuse its discretion in declining to reopen a completed administrative proceeding to calculate a new rate for Nagase's CEP sales. Federal Circuit precedent provides that Commerce is not required to correct errors of a respondent raised after the final determination unless (1) the error is apparent on the face of Commerce's determination or underlying calculations and (2) the party properly requested correction of such error by "applying to Commerce to correct the error within five days of the release of calculations or, if an extension is granted, within five days after the publication of the final determination." *Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd.*, 334 F.3d 1284, 1292-93 (Fed. Cir. 2003) (*Alloy Piping*) (citing 19 C.F.R. § 351.224(c)(2), (c)(4)). In this case, the error is not apparent and Nagase did not timely request a correction during the administrative proceeding. As such, Commerce correctly declined to reopen the proceeding.

## ARGUMENT

### I. Standard Of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence on the record, or otherwise unlawful. *See Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "Substantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and "the possibility

of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence". *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (recognizing tremendous deference to Commerce's factual findings). It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted), and the Court will not substitute its judgment for Commerce in choosing between two fairly conflicting views, even if it could justifiably have made a different choice had the matter been before it *de novo*. *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains Commerce's factual determinations if they are reasonable and supported by the record as a whole, even if evidence detracts from them. *See Atl. Sugar, Ltd., v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When the Court examines Commerce's interpretations of the statute that it administers, the Court employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). First, the Court examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency and Court

must comply with Congress's clear intent. *Id.* at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted).

## II. Commerce's Inclusion Of YGK's R&D Expenses In Calculation Of The General And Administrative Expense Ratio Is Supported By Substantial Evidence And In Accordance With Law

Commerce's inclusion of YGK's R&D expenses in the calculation of the G&A expense ratio is supported by substantial evidence and in accordance with law.

The parties agree that the calculation of YGK's production costs shall include "an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question." 19 U.S.C. § 1677b(f)(1); *see* Nagase Br. at 19. The parties also agree that these expenses "shall normally be calculated based on the records of the exporter . . . if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1); *see* Nagase Br. at 20.

Commerce's standard questionnaire defines G&A expenses as "expenses which relate indirectly to general operations of the company rather than relate directly to the production process." P.R. 19 at I-10. These include, among other things, "general research and development activities." *Id.* R&D activities are considered "general" if they are not linked to a specific, commercially viable product. C.R. 7, at Exhibit A-19, at pdf. pp. 134-135, 167. Where

R&D costs are linked to such a specific product, they are capitalized as part of that product's production costs. In that case, Commerce would not include those costs in a respondent's G&A expenses. However, any R&D activities not linked to a specific commercially viable product are included as part of the G&A expenses.

In this case, neither party argues that YGK's records are not compliant with Japan's GAAP principles or that they do not reasonably reflect the costs associated with the production and sale of the merchandise. *See* Nagase Br. at 25. Rather, the sole issue is whether YGK's normal records provide substantial evidence in support of Commerce's conclusion that YGK's R&D expenses are general rather than attributable to a specific, commercially viable product other than glycine.

For several reasons, YGK's records support that conclusion.

First and foremost, YGK's records clearly and consistently categorize the R&D expenses as general expenses rather than as part of the production cost of any specific product. YGK's audited financial statements from the period of review explicitly categorize the R&D expenses as "selling, general, and administrative expenses." C.R. 7, at Exhibit A-19, at pdf. pp. 134-135, 167. This alone is sufficient to support Commerce's determination, because an exporter's audited financial statements are the primary document that Commerce looks to in order to calculate an exporter's costs. As Commerce has explained in other cases, the public-facing nature of financial statements, which are relied on by shareholders and other parties, makes them especially appropriate and reliable sources of information. *See Polyethylene Terephthalate Resin from the Republic of Korea*, 83 Fed. Reg. 48,283 (Dept. of Commerce Sept. 24, 2018) (final affirmative LTFV determination) and accompanying IDM at Comment 2. Accordingly, "departure from the financial statement accounting must be justified and supported by record

evidence." *Id.* Here, where the financial statements clearly identify the expenses as "selling, general, and administrative expenses," Commerce was justified in following that designation by classifying the R&D expenses as general.

YGK's other records are consistent with the financial statements. Nagase hinges its argument on the fact that YGK's trial balances[3] show [redacted] separate accounts for [redacted] subcategories of R&D expenses – [redacted] *See* Nagase Br. at 22-23. However, those trial balances list all of those accounts as falling *within* YGK's "selling general and administrative expenses." C.R. 19 at pdf 91. In other words, the fact that the expenses may have been allocated to subcategories is irrelevant, because the very document YGK relies on to show those subcategories affirms that YGK recognized them under YGK's general expenses subtotal. Therefore, when Commerce determined that the R&D costs were G&A expenses, Commerce did nothing more than apply the same designation that YGK consistently used, including in both its accounting statements and its trial balances.[4]

---

[3] A trial balance is a listing of all accounts from a company's general ledger at a specific time. The accounts will have either debit or credit balances. To keep the general ledger balanced, the total of all debit and credit balances should equal. At year-end, the trial balance serves as a basis for the preparation of the balance sheet and income statement.

[4] Plaintiff makes much of the fact that in some cases, Commerce might look past the *total* R&D costs reported in financial statements in cases where some of those expenses were solely related to separate divisions of the exporter companies from the divisions that produced the subject merchandise. *See* Nagase Br. at 25-26. Indeed, Commerce generally allows companies to treat R&D expenses recorded in their *divisional* statements as manufacturing expenses for those divisions. *See Chlorinated Isocyanurates from Spain*, 74 Fed. Reg. 50,774 (Dep't of Comm. Oct. 1, 2009) (final admin. review) and accompanying IDM at 13 (Comment 3) ("Aragonesas records its R&D expense specifically by division."); *Bottom Mount Combination Refrigerator-Freezers from Mexico*, 77 Fed. Reg. 17,442 (Dep't of Commerce Mar. 26, 2012) and accompanying IDM at 64 (Comment 14) ("However, at verification we found that although LGE normally records R&D expenses by division (*e.g.*, home appliance division), the company did not rely on these figures for reporting to the Department."). In such situations, any general R&D (not recorded to specific product division or recorded to a headquarters division) would then be part of the G&A expense ratio. In contrast, here, YGK did not track company-wide costs

Second, even if YGK's records did not explicitly place the subcategories of R&D expenses within the larger category of general expenses (which they did), the subcategories do not link the R&D costs to *specific commercially viable products* other than the subject merchandise. Nagase argues that glycine-related research would fall entirely within the [redacted] [redacted] category, and that other categories of R&D should therefore be excluded from YGK's G&A expenses. Nagase Br. at 24-25. This argument misunderstands the issue. Commerce did not conclude that all of the R&D expenses at issue necessarily related to glycine, but rather that they were not allocated to other specific commercially viable products and were therefore *general* expenses. This conclusion is supported by the record. If the R&D expenses were associated with other specific products, YGK would have categorized those expenses as part of the "cost of sales" of its merchandise. Instead, YGK allocated all of the R&D expenses to the "selling general and administrative" category, and merely subdivided some of the expenses into [redacted] broad product categories that did not correspond to specific products. C.R. 7, at Exhibit A-19, at pdf. pp. 119, 120, 134-135, 154, 155, 167. Accordingly, those expenses were properly considered general R&D expenses and were properly included in Commerce's calculation of YGK's G&A expenses regardless of whether they related directly to glycine.

Third, even if the subcategories had constituted specific products, YGK did not actually allocate the R&D expenses to those subcategories for the majority of the period of review. Between [redacted] – that is, for [redacted] months in the period of review –YGK reported only general R&D expenses in its trial balances, and reported

---

by product divisions. For instance, it had no separate trial balances or income statements for separate divisions of the company. C.R. 19 at Exhibit D-11, at pdf 91. Instead, YKG merely separated its general R&D expenses into separate trial balance accounts corresponding to broad "product categories" after the antidumping duty order was imposed in this proceeding, but did not allocate any of its other expenses between those categories. *Id*.

[redacted] for each of the [redacted] subcategories. C.R. 19 at pdf. p. 91. In the final six months of the period of review [redacted], YGK appears to have retroactively reallocated its R&D expenses to the [redacted] subcategories.[5] *Id.* Thus, for the majority of the period of review, it does not appear that YGK was actually allocating the R&D expenses between the product categories as it claims. At the very least, the fact that YGK initially classified the expenses as general and later reallocated them to subcategories suggests that reasonable minds might differ as to which classification is more accurate, in which case the Court should still uphold Commerce's determination. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). More importantly, as discussed above, all R&D accounts appear under the "selling general and administrative" subtotal in the trial balances. C.R. 19 at pdf. p. 91.

Fourth and finally, even if Commerce were to ignore (1) YGK's consistent, explicit classification of the R&D expenses as "selling general and administrative expenses," (2) the fact that even when YGK allocated the expenses into broad product categories it failed to attribute the R&D expenses to specific commercially viable products other than glycine, and (3) the fact that YGK only allocated those expenses into subcategories (all of which were still under the umbrella of general expenses) for a small portion of the period of review, there would still be reason for Commerce to include the R&D expenses in its calculation of YGK's G&A expenses. The record evidence demonstrates that YGK produces [redacted]

[5] The trial balances show that an amount of [redacted] was recognized during the period April 1, 2019, through September 30, 2019 in account [redacted], the [redacted] account. However, that same amount was subtracted from that account during the final 6-month period of the period of review, [redacted]. That amount was then attributed to the [redacted] accounts associated with the [redacted] product categories [redacted], which had [redacted] balance prior to [redacted]. *Id.* In other words, the subcategory accounts now reflect the total R&D costs for fiscal year 2019, but all of those costs were allocated to those accounts during the second half of that year, which required YGK to retroactively reallocate the [redacted] that was allocated to the [redacted] account in the first half of the year. *Id.*

[REDACTED] C.R. 7 at A-24. In fact, [REDACTED] [REDACTED]. *Id.* Accordingly, for example, labeling R&D expenses as [REDACTED] does not preclude such R&D research from benefiting the subject merchandise, because glycine is widely used in [REDACTED] products and YGK's glycine in particular is [REDACTED]. *Id.* Thus, it would be reasonable to conclude that R&D expenses in all [REDACTED] categories related to the subject merchandise.

## III. Commerce's Inclusion Of The "Compensation For Payment" Expenses In The Calculation Of The General And Administrative Expenses Is Supported By Substantial Evidence And In Accordance With Law

Nagase challenges Commerce's decision to include in the G&A ratio an expense arising from a settlement with a customer who had contracted with YGK [REDACTED]. However, that decision is supported by substantial evidence in the record and is in accordance with the law, and should therefore be sustained.

As discussed above, Commerce defines G&A expenses as "expenses which relate indirectly to general operations of the company rather than relate directly to the production process." P.R. 19 at I-10.[6] As was also explained above with respect to R&D expenses, Commerce generally considers expenses "general and administrative" unless they are tied to the current production of a specific commercially viable product. This Court has sustained this

[6] For determinations discussing this standard, *see Magnesium Metal from the Russian Federation*, 70 Fed. Reg. 9,041 (Dep't of Commerce Feb. 24, 2001) (final LTFV determination) and accompanying IDM at 36 (comment 10); *Silicomanganese from Brazil*, 69 Fed. Reg. 13,813 (Dep't of Commerce March 24, 2004) (final admin. review) and accompanying IDM at Comment 10; *Certain Cold-Rolled Carbon-Steel Flat Products from Taiwan*, 67 Fed. Reg. 62,104 (Dep't of Commerce October 3, 2002) (final LTFV determination) and accompanying IDM, at Comment 6; *Certain Cold-Rolled Flat-Rolled Carbon-Quality Steel Products from Taiwan*, 65 Fed. Reg. 34,658 (Dep't of Commerce May 31, 2000) (final LTFV determination) and accompanying IDM, at Comment 11.

practice, affirming Commerce's decision to include in the G&A ratio expenses that relate to non-subject merchandise where those non-subject merchandise are not currently being produced and creating a revenue stream. *See, e.g.*, *Husteel Co. v. United States*, 520 F. Supp. 3d 1296, 1307 (Ct. Int'l Trade 2021). In part, this is because where the non-subject merchandise is not producing a revenue stream, the expenses at issue must necessarily be paid out of the company's general revenues. *See id.* at 1307.

Here, Nagase reported an expense for "compensation for payment," which was categorized as an "extraordinary loss" in its income statement for the period of April 1, 2019 through March 31, 2020. C.R. 7 at Exhibit A-19, pdf p. 155. That expense arises from a [redacted] agreement between YGK and a customer to [redacted]. C.R. 59 at SS-7. [redacted]. *Id.* Because of the [redacted], the production of the [redacted] was discontinued prior to the period of review and the product inventory was [redacted]. *Id.*; *see also* C.R. 59 at pdf. p. 6. The customer demanded that YGK compensate it for certain costs it incurred, including [redacted], and YGK settled its customer's claims by agreeing to compensate its customer. C.R. 36 at Exhibit S-22; C.R. 36 at pdf 26; C.R. 59 at Exhibit SS-7. Accordingly, while the settlement did relate to a specific product that YGK attempted to produce, the production was terminated before the period of review began, such that the expense cannot be tied to any production that occurred during the period of review. Nor can it have been paid out

of any revenue stream from the product it related to. Commerce therefore properly considered the expense in the G&A ratio.

Commerce has reached the same conclusion in similar cases,[7] and the Court sustained a similar decision last year in *Husteel Co. v. United States*, 520 F.Supp. 3d at 1307. There, the respondent had suspended several lines in its facilities that were used for producing certain materials and products. *See Certain Oil Country Tubular Goods from the Republic of Korea*, 84 Fed. Reg. 24,085 (Dep't of Commerce May 24, 2019) and accompanying IDM at 95. The respondent initially attributed the costs associated with suspended productions to "costs of goods sold," but Commerce found that this did not reasonably reflect production costs and reallocated those costs to G&A. Commerce reasoned:

> {O}nce a production line is suspended, it no longer relates to the ongoing production. . . . {T}here are no longer products produced on those production lines or current intentions to produce products on those lines that can bear the burden of the costs associated with those production lines. As such . . . we consider the associated costs to be related to the general operations of the company as a whole, and not specific to products associated with the production lines. Therefore, for the final results, we have continued to reclassify the suspended loss to G&A expenses.

[7] *See, e.g.*, *Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 15,539 (Dep't of Commerce April 2, 2002) (final LTFV determination) and accompanying IDM at 88 (Comment 48) ("Settlement of claims are not cost of goods sold. …Instead, these costs represent the settlement of claims against products sold in prior years….While the costs relate to non-subject product, hardboard siding, the Department typically allocates business charges of this nature over all products because they do not relate to a production activity but to a company as a whole"); *Acetone from Korea,* 85 Fed. Reg. 8,252 (Dep't of Commerce Feb. 13, 2020) ("If expenses are directly related to a particular production process or product, they would be classified as manufacturing costs in the audited financial statement."); *Circular Welded Pipe from the Republic of Korea*, 79 Fed. Reg. 37,284 (Dep't of Commerce July 1, 2014) and accompanying IDM at 14-15 (explaining that litigation accruals, which the respondent claimed were associated with the antitrust penalties with respect to the sale of non-subject merchandise, are considered to relate to the general operations of the company and should be captured as the G&A expenses rather than treated as part of the cost of manufacturing).

The Court sustained Commerce's decision. *Husteel*, 520 F.Supp.3d at 1306. It summarized Commerce's reasoning by explaining that Commerce supposed "that costs should generally relate to a benefit during the period of review, that costs associated with extended suspension of production of non-subject merchandise no longer relate to the benefit of ongoing production and revenue generation from those products during the period of review, and that, as a consequence, those costs more reasonably relate to the general operations of the company." *Id.* at 1307 (internal citation omitted).

In this case, production of the non-subject merchandise at issue was not merely suspended during the period of review, after producing revenue in the past, but rather was entirely discontinued before the period of review began and before it could ever produce revenue. In addition, YGK never treated the settlement expense as part of the "costs of goods sold," but rather listed it as a separate expense in its normal records. C.R. 7 at Exhibit A-19, pdf p. 155. Thus, the facts of this case are even more compelling than those in *Husteel*, and, thus, Commerce's decision here should similarly be sustained.

In challenging Commerce's treatment of the "compensation for payment" expense, Nagase makes two arguments. First, Nagase contends that "Commerce failed to make the required statutory determination whether the expense relates to the company's general operations as a whole or was directly related to a particular product or service." Nagase Br. at 28. However, Commerce expressly found that "the record indicates that the 'compensation for payment' expenses do not relate directly to the production of non-subject merchandise, but rather, relate indirectly to the general operation of the company." IDM at 4. As just explained, this finding was fully supported by the record.

Second, Nagase contends that "Commerce failed to address evidence on the record demonstrating that the expense was not related to YGK's general operations." *Id*. Specifically, Nagase contends that Commerce failed to consider the evidence that the expense "related directly to a non-subject pharmaceutical product." Nagase Br. at 29. However, Commerce does not dispute this fact. Rather, it properly determined that an expense resulting from a failed arrangement to produce a non-subject pharmaceutical product should be included in the G&A ratio because it is not a production cost tied to the *ongoing production* of any *revenue-generating* non-subject merchandise.

In short, Commerce adopted a reasonable approach that is consistent with the statute, its regulations, its past administrative decisions, and record evidence.

## IV. Commerce Did Not Abuse Its Discretion By Declining To Reopen A Completed Administrative Proceeding To Recalculate The Assessment Rate For Nagase's CEP Sales

Commerce correctly declined to reopen a completed administrative proceeding to recalculate the assessment rate for Nagase's CEP sales. Commerce completed the administrative review and issued the Final Results on September 23, 2021. P.R. 101. In issuing the Final Results, Commerce considered all comments submitted by interested parties in their case briefs and rebuttal briefs, including the arguments submitted by Nagase. During the proceeding, Nagase did not claim that the assessment rate for its CEP entries was incorrect. *See* Nagase's Case Brief, C.R. 81; Nagase's Rebuttal Brief, C.R. 84. Nor did Nagase avail itself of the procedure for correcting ministerial errors after Commerce issued the Final Results as provided in 19 U.S.C. § 1675(h) and 19 C.F.R. § 351.224. Nothing requires Commerce to reopen a completed administrative review to make corrections based on late arguments alleging error. *Alloy Piping*, 334 F.3d at 1292.

A. *Legal Framework*

In *Alloy Piping*, the Federal Circuit held that "Commerce is not required to correct a final determination reflecting an error made by a private party when that error is not apparent from Commerce's final calculations released pursuant to 19 C.F.R. § 351.224(d) or from the final determination itself." *Id*. Even when an error is apparent or should have been apparent from the face of the calculations or the final determination, "the respondent is required to exhaust its administrative remedies" by "applying to Commerce to correct the error within five days of the release of calculations or, if an extension is granted, within five days after the publication of the final determination." *Id*. at 1292-1293 (*citing* 19 C.F.R. § 351.224(c)(2), (c)(4)). These requirements are important because the Federal Circuit "recognize{s} . . . a strong interest in the finality of Commerce's decisions." *Id.* at 1292 (citing *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).

B. *The Alleged Error Resulted From Nagase's Own Reporting Of Its Data*

Nagase contends that the assessment rate for Nagase's CEP sales is incorrect. Nagase Br. at 34. There is no dispute that the source of the alleged error is a mistake Nagase made when reporting its data to Commerce. *See* Nagase Br. at 14-15 ("{T}he record reflects the source of the error, which stems from the reporting of entered value in YGK/Nagase's U.S. sales database submitted with its first supplemental questionnaire response"). Nagase agrees that Commerce used the correct calculation methodology. Accordingly, this is a case where Commerce is being asked to correct the error of a private party. Under *Alloy Piping*, Nagase can therefore prevail only if (1) it exhausted its administrative remedies, and (2) the error was apparent from Commerce's final calculations or final determination.

*C. Nagase Failed To Exhaust Its Administrative Remedies*

The Federal Circuit in *Alloy Piping* explained that an exporter can request that Commerce correct an error after the publication of the Final Results, but "the respondent is required to exhaust its administrative remedies" by "applying to Commerce to correct the error within five days of the release of calculations or, if an extension is granted, within five days after the publication of the final determination." *Id.* at 1292-1293 (citing 19 C.F.R. § 351.224(c)(2), (c)(4)). Here, Commerce disclosed the final calculations on September 23, 2021, and published the Final Results on September 29. C.R. 90, Final Margin Output, at 123; P.R. 106, Final Results. Nagase did not raise the issue of the alleged error until October 18, 2021, 25 days after the release of the final calculations and 19 days after publication of the Final Results. P.R. 109. Therefore, Nagase has failed to exhaust its administrative remedies and the Court should not consider its claim.

Nor did Nagase raise the issue earlier in the proceeding. Commerce disclosed its preliminary calculations, including the ████ percent assessment rate on July 1, 2021. C.R. 79, Preliminary Margin Output, at 123. Nagase made several objections to the preliminary calculations, but did not raise the error it now alleges. *See* 19 C.F.R. § 351.222(c)(1) ("Comments concerning ministerial errors made in the preliminary results of a review should be included in a party's case brief."); *see also* 19 C.F.R. § 351.309(c)(2) ("*The case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results*, including any arguments presented before the date of publication of the preliminary determination or preliminary results") (emphasis added); *see Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017). Under similar circumstances, the Federal Circuit has previously rejected the contention that Commerce committed reversible error.

*See QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1328 (Fed. Cir. 2011) ("Commerce's refusal to make a ministerial error correction is not a reversible error when the alleged mistake was discoverable earlier in the proceeding, but was not pointed to Commerce during the time period specified by regulation."); *Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010) ("AFMC has pointed to no decision of either the CIT or this court that holds that Commerce's refusal to fix a clerical error in the calculation of an antidumping duty margin is an abuse of discretion when the clerical error was discoverable during the original proceeding but was not pointed out to Commerce during the time period specified in the regulations. We have found no such case."); *Stanley Works (Langfang) Fastening Sys. v. United States*, 964 F. Supp 2d 1311, 1402 (Ct. Int'l Trade 2013) ("Stanley's failure to raise any ministerial error allegations at the time Commerce's {preliminary} calculations were disclosed, or even in its administrative case brief, is fatal to the claim that it seeks to press here.").

D. *The Alleged Error Was Not Apparent Nor Should Have Been Apparent From The Face Of Calculations Or Commerce's Determination*

The Federal Circuit explained in *Alloy Piping* that where a private party's submission error resulted in an error in the Final Results, the party must demonstrate the error is "apparent on the face of Commerce's own final decision or from the calculations underlying that decision and released pursuant to 19 C.F.R. § 351.224(b)." *Alloy Piping*, 334 F.3d at 1292. If such an error "goes uncorrected, that error, in effect, becomes a government error and, hence, a 'ministerial error' and the government is required to correct it." *Id*. at 1293. Of course, as discussed above, the party must still timely raise such error through a ministerial error procedure, which Nagase did not do. But in any case, Nagase did not demonstrate that the error was apparent from the final decision or from calculations.

First, Nagase argues that the total value for Nagase's CEP sales, calculated based on the allegedly erroneous data Nagase provided, is "impossibly low and erroneous on its face, as evident from the fact that this total figure for the entire universe of CEP sales during the review period – $[redacted] – is *less than the entered value for a single entry* for which Nagase submitted a sample customs entry document, $[redacted]." Pl. Br. at 14. Nagase appears to be asking the court to compare the entered value for a specific shipment of Glycine *imported* to the United States in the period of review to the total entered values for all *sales* of glycine made during the period of review. However, the difference between these numbers does not demonstrate an error, because the quantity and value of Nagase's glycine imported to the United States is not the same as the quantity and value of glycine that Nagase's United States affiliates actually sell to its unaffiliated customer. C.R. at A-18.

Nagase's CEP sales are ultimately made to a single United States customer. Those sales are made on consignment basis by [redacted]. C.R. at A-18. [redacted]. Specifically, for CEP sales, Nagase reported that "{t}he US customer issues a [redacted]." *Id.* Nagase further reported that it arranges shipments to the US customer's [redacted]. *Id.* For CEP sales, which are made on consignment basis, the purchase price changes periodically and "the purchase quantity cannot be confirmed until [redacted]

[REDACTED].” *Id.* at A-20. In sum, the amount of glycine imported is determined by [REDACTED] [REDACTED], but the actual sales of merchandise from that inventory are normally in quantities that are different from the quantities imported into the United States, and such sales may be from inventory which entered the United States prior to the period of review, or from that which entered during the period of review, or from both. In other words, the reported sales are not specifically linked to shipments and, thus, it is impossible to determine whether the shipment in question was linked to U.S. CEP sales during the period of review. As a result, it is meaningless to compare the value or quantity of a period of review *entry,* which would be placed in the consignment warehouse along with glycine from other entries including those predating the period of review, to the entered value of period of review consignment *sales* from the warehouse that may be completely unrelated to that specific entry. Accordingly, Nagase’s contention – that the entered value from the sample customs entry in Exhibit C-14 demonstrates that the total of the reported values in the “ENTVALUE” field for all CEP sales from the period is on its face incorrect – is unpersuasive.

Furthermore, because the CEP sales database lists sales, the figure listed in Exhibit C-14 does not appear in the database of U.S. sales that is used in the dumping margin and assessment rate calculations. Therefore, even if this number were evidence of an error – which it is not, for the reasons discussed above – it was not obvious or apparent from the calculations that Nagase’s reported ENTVALUE field is incorrect. Rather, Nagase is suggesting that Commerce should have looked beyond the database of numbers actually used in its calculations, found a number buried within thousands of pages of supporting documentation, and compared that number to the database values to ensure consistency. However, *Alloy Piping* requires that the error at issue be

"apparent *from Commerce's final calculations . . . or from the final determination itself*." *Alloy Piping*, 334 F.3d at 1292 (emphasis added). It is unreasonable to expect that Commerce could have or should have identified the alleged error on the face of its own final decision or the from the calculations underlying it on the basis of the proposed comparison of the entered value listed in a sample customs document (which is not in the electronic databases used in the calculations) with the entered value of CEP sales reported in the U.S. sales database.

Second, Nagase contends that the error should have been apparent because the importer-specific assessment rate for CEP sales is significantly higher than the overall weighted-average dumping margin for Nagase. Nagase Br. at 35. However, the difference between the importer-specific assessment rate and exporter-specific dumping margin alone, even if significant, would not have alerted Commerce to the alleged error. Importer-specific assessment rates are calculated using a different methodology based on a subset of the full U.S. sales database (*i.e.*, only sales made to that specific importer), 19 C.F.R. § 351.212(b)(1), and, thus, could be significantly lower or significantly higher than the overall weighted-average exporter-specific dumping margin. For example, an exporter could sell merchandise through multiple importers and price its sales to each importer differently. Depending on the facts of each specific case, some importers could have a low assessment rate (or even zero assessment rate) even when the exporter's weighted-average dumping margin is high. Conversely, other importers of the same exporter could have assessment rates higher than the dumping margin. The mere fact that an assessment rate differs significantly from the dumping margin is unremarkable and, on its own, would not have alerted the agency regarding Nagase's alleged reporting error.

E. *Nagase's Proposals Regarding Methods To Correct Alleged Error Do Not Provide A Basis For Reversal*

Nagase contends that the alleged error "is easily correctable based entirely on

information that is already on the record." Nagase Br. at 36. Nagase argues that "Commerce could calculate a per-unit (*i.e.*, per-kilogram) assessment rate for Nagase's CEP sales, in the same manner as it has already done for the EP sales" or, alternatively, "'reverse engineer' the total entered value of the CEP sales, and then calculate the correct ad valorem assessment rate" and that "other options may exist." Nagase Br. at 36-37. Commerce has no reason to consider whether any of the proposed methods are viable, and it is far from a foregone conclusion that such proposed methods would be appropriate here. However, even if an alternative methodology might exist to calculate a per-unit assessment rate instead of *ad valorem* assessment rate, or if it is possible to attempt to construct a proxy for entered value, as Nagase suggests, based on information in the record, that does not mean Commerce abused its discretion in declining to reopen this proceeding after the Final Results were issued and the window for correction of errors had passed.

Nagase also argues that "Commerce has already corrected an error found in its final assessment instructions, and there is no reason why it could not likewise correct an indisputable error in the duty assessment rate." Pl. Br. at 6. However, there is no error in the code for CEP sales. Nagase is referring to the fact that the Margin Output, where Commerce provided its final calculations, included a code number that referred to Nagase's ultimate, unaffiliated United States customer, rather than a code number referring to the importer, ████. Nagase argues that this was "incorrect" because the assessment rate is ultimately applied to ████ rather than the unaffiliated customer. Nagase also points out that Commerce did refer to ████ when it issued liquidation instructions to Customs and Border Control, arguing that this amounted to a correction. However, for technical reasons explained below, Commerce intentionally used the

customer's code in the Margin Output, and intentionally referenced [redacted] as the "Importer or Customer" when it issued the liquidation instructions. C.R. 94.

During the period of review, YGK/Nagase made both export price (EP) sales and CEP sales. The CEP sales were made through [redacted], to a single United States customer, [redacted]. C.R. 7 at A-3; C.R. 15 at C-16 ("During the POI, [redacted] sold the subject merchandise to only one customer in the United States: [redacted] (customer code [redacted])."). All EP sales made during the period of review were to another customer [redacted], but Nagase reported the importers for such sales as "unknown" because the sales were made directly to the unaffiliated customer rather than being imported and resold by [redacted]. C.R. 15 at Exhibit C-1 (printout of sample pages in the U.S. sales database); C.R. 18 (US Database SAS File); C.R. 42 (excel file) at column "BE" titled "IMPORTER". For this reason, Commerce chose to code the programming language to reflect the identity of the customers rather than importers for all U.S. sales, because if the program used the identity of importers, some of the assessment rates would have been calculated for "unknown" entities. *See* C.R. 88, SAS margin calculation program at Line 421; see also C.R. 89, SAS margin program log, at Line 8241 at 9 pdf. This was not an error. Further, because all CEP sales were made through [redacted], Nagase's affiliated importer, to a single customer, referencing the customer rather than [redacted] in the assessment rate calculations did not change the calculations or cause any confusion.

*F. Commerce Did Not Abuse Its Discretion In Declining To Reopen The Proceedings To Investigate The Alleged Error*

Nagase contends that "Commerce abused its discretion in failing to correct an error in the assessment rate that is evident on its face" and therefore "fail{ing} to meet its statutory obligation to calculate Nagase's assessment rate as accurately as possible." Nagase Br. at 18.

However, as discussed above, the alleged error was not evident on its face, and in any case Nagase did not raise this issue for several months, and only did so after the Final Results were published and the window for correcting errors had closed. As explained above, the Federal Circuit "recognize{s} . . . a strong interest in the finality of Commerce's decisions." *Alloy Piping*, 334 F.3d at 1292 (citing *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995)). Further, Commerce must be able to establish procedures that parties must follow to raise objections in a timely manner. It was not an abuse of discretion for Commerce to decline to set aside its established procedures here.

Finally, Nagase contends that "Commerce abused its discretion in instructing CBP to collect duties pursuant to the erroneous and vastly inflated assessment rate." Nagase Br. at 6. To the extent that Nagase is challenging the issuance of liquidation instructions as a separate act from the calculation of the Final Results, there is no jurisdiction over such a challenge pursuant to 18 U.S.C. § 1581(c), the only statute cited for jurisdiction in the complaint. Moreover, Commerce issued liquidation instructions to CBP that are consistent with the assessment rates that Commerce determined in the Final Results of this administrative review.[8] *Glycine from Japan: Final Results of Antidumping Duty Administrative Review; 2018-2020*, 86 Fed. Reg. 53946 (Dep't Commerce Sept. 29, 2021) ("*Final Results*") (Final Results) (P.R. 106) ("Upon issuance of the final results of this administrative review, if any importer-specific assessment rates calculated in the final results are above *de minimis* (*i.e.,* at or above 0.5 percent), Commerce will issue instructions directly to CBP to assess antidumping duties on appropriate entries.").

[8] The liquidation of Nagase's entries has been suspended pursuant to the statutory injunction, to which Commerce consented.

**CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's Final Results.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/Claudia Burke
CLAUDIA BURKE
Assistant Director

OF COUNSEL:
MYKHAYLO A. GRYZLOV
Senior Counsel
Office of the Chief Counsel
for Trade Enforcement & Compliance
U.S. Department of Commerce

/s/ Kelly Geddes
Kelly Geddes
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 307-2867
Email: Kelly.Geddes2@usdoj.gov

July 1, 2022

*Attorneys for Defendant United States*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains approximately 9056 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

/s/ Kelly Geddes