NON-CONFIDENTIAL VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| NAGASE & CO., LTD.,<br><br>                 Plaintiff,<br><br>   v.<br><br>UNITED STATES,<br><br>                 Defendant,<br><br>  and<br><br>GEO SPECIALTY CHEMICALS, INC.,<br><br>                 Defendant-Intervenor. | **Court No. 21-00574**<br><br>**NON-CONFIDENTIAL VERSION** |

### DEFENDANT-INTERVENOR
### GEO SPECIALTY CHEMICALS' RESPONSE
### TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

David M. Schwartz
Meixuan (Michelle) Li
**THOMPSON HINE LLP**
1919 M Street, N.W., Suite 700
Washington, DC 20036
(202) 263-4170
(202) 331-8330 (fax)
David.Schwartz@ThompsonHine.com
Michelle.Li@ThompsonHine.com

*Counsel to GEO Specialty Chemicals, Inc.*

Dated:  July 21, 2022

NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ...................................................................................................... 1

II.  STATEMENT PURSUANT TO RULE 56.2 ............................................................. 1

    A.  THE ADMINISTRATIVE DETERMINATION UNDER REVIEW ................... 1

    B.  ISSUES PRESENTED FOR REVIEW ............................................................... 2

III.  STATEMENT OF FACTS ........................................................................................ 2

IV.  SUMMARY OF ARGUMENT .................................................................................. 6

V.  STANDARD OF REVIEW ........................................................................................ 8

VI.  ARGUMENT .............................................................................................................. 9

    A.  COMMERCE PROPERLY INCLUDED R&D COSTS IN
       G&A EXPENSES ................................................................................................ 9

         1.  LEGAL FRAMEWORK CONTROLLING COMMERCE'S
            DETERMINATION OF G&A EXPENSES ............................................. 10

         2.  RECORD EVIDENCE SUPPORTS COMMERCE'S FACTUAL
            FINDINGS THAT YGK/NAGASE'S R&D COSTS ARE NOT
            RECORDED ON A PRODUCT-SPECIFIC BASIS .............................. 13

    B.  COMMERCE PROPERLY INCLUDED COMPENSATION FOR
       PAYMENT EXPENSES IN G&A EXPENSES ................................................. 16

    C.  COMMERCE PROPERLY RELIED ON YGK/NAGASE'S REPORTED
       ENTERED VALUE AND PROPERLY CALCULATED THE
       ASSESSMENT RATE FOR YGK/NAGASE'S CEP SALES ............................ 19

         1.  LEGAL FRAMEWORK CONTROLLING ASSESSMENT RATE ...... 19

         2.  COMMERCE PROPERLY RELIED ON YGK/NAGASE'S
            REPORTED ENTERED VALUE TO CALCULATE THE
            ASSESSMENT RATE AND REFUSED TO CONSIDER THEIR
            ALLEGED ERROR AFTER THE REVIEW CONCLUDED ............... 22

    D.  COMMERCE HAS "BROAD DISCRETION" TO NOT AMEND ITS
       FINAL RESULTS TO PRESERVE THE FINALITY OF ITS DECISION ....... 26

    E.  PLAINTIFF'S ARGUMENTS FOR ERROR CORRECTION ARE
       WAIVED ........................................................................................................... 28

VII.  CONCLUSION ......................................................................................................... 30

Non-Confidential Version

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acciai Spciali Terni S.P.A. v. United States,*
  25 Ct. Int'l Tr. 245 (2001) ............................................................................23

*Alloy Piping Prods. v. Kanzen Tetsu Sdn. Bhd.*
  334 F.3d 1284 (Fed. Cir. 2003).............................................................26, 29

*Alloy Piping Prods., v. United States,*
  26 Ct. Int'l Tr. 330 (2002) ........................................................................... 29

*Am. Silicon Techs v. United States,*
  261 F.3d 1371 (Fed. Cir. 2001).....................................................................16

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States,*
  No. 2020-2014, 2021 U.S. App. LEXIS 21386 (Fed. Cir. July 20, 2021)................8, 9, 10, 19

*Chinsung Indus. Co., Ltd. v. United States,*
  13 Ct. Int'l Tr. 103, 705 F. Supp. 598 (1989) ......................................23, 25

*Civil Aeronautics Bd. v. Delta Air Lines, Inc.,*
  367 U.S. 316, 6 L. Ed. 2d 869, 81 S. Ct. 1611 (1961).................................27

*Coal. of Am. Millwork Producers v. United States,* 2022 Ct. Int'l Tr. LEXIS 67*
  (June 15, 2022)...............................................................................................12

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197 (1938).........................................................................................8

*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607 (1966)...............................................................................8, 9, 19

*Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Technical, Salaried and*
  *Mach. Workers, AFL-CIO,*
  6 F.3d 1511 (Fed. Cir. 1993).........................................................................18

*Dorbest Ltd. v. United States,*
  604 F.3d 1363 (Fed. Cir. 2020)................................................................28, 29

*F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States,*

Non-Confidential Version

216 F. 3d 1027 (Fed. Cir. 2020) ................................................................. 9

*Fischer S.A. v. United States,*
34 Ct. Int'l Tr. 334 (2010) ...................................................................26

*Fujitsu Gen. Ltd. v. United States,*
88 F.3d 1034 (Fed. Cir. 1996)................................................................12, 15

*Goldlink Industries Co. v. United States,*
431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ...........................................9

*Goodluck India Ltd. v. United States,*
11 F.4h 1335 (Fed. Cir. 2021)................................................................26, 27

*Grobest I-Mei Indus. (Vietnam) Co. v. United States,*
815 F. Supp. 2d 1352 (Ct. Int'l Trade 2012) ..........................................18

*Husteel Co. v. United States,*
520 F. Supp. 3d 1296 (Ct' Int'l Trade 2021) ..........................................18

*Hynix Semiconductor, Inc. v. United States,*
424 F. 3d 1363 (Fed. Cir. 2005)..............................................................16

*INS v. Elias-Zacarias,*
502 U.S. 478 (1992)................................................................9, 18, 19

*Koyo Seiko Co. v. United States,*
258 F. 3d 1340 (Fed. Cir. 2001)..............................................................20

*Mannesmannrohren-Werke AG v. United States,*
24 Ct. Int'l Tr. 1082 (2000) ...................................................................23, 25

*Matsushita Elec. Industrial Co. v. United States,*
750 F.2d 927 (Fed. Cir. 1984)................................................................8

*Mid Continent Steel & Wire, Inc. v. United States,*
219 F. Supp. 3d 1326 (Ct. Int'l Trade 2017) ..........................................15

*Mid Continent Steel & Wire, Inc. v. United States,*
273 F. Supp. 3d 1161 (Ct. Int'l Trade 2017) ..........................................11, 12, 15

*Mid Continent Steel & Wire v. United States,*
2019 U.S. App. LEXIS 29,654 (Fed. Cir. Oct. 3, 2019)..........................11, 12

*Mittal Steel Point Lisas Ltd. v. United States,*

**Non-Confidential Version**

548 F.3d 1375 (Fed. Cir. 2008)............................................................................29

*NSK, Ltd. and NSK Corp. v. United States,*
17 Ct. Int'l Tr. 590 (1993) .............................................................................23

*NTN Bearing Corp. v. United States,*
74 F.3d 1204 (Fed. Cir. 1995)..............................................................24, 26, 27

*Nucor Corp. v. United States,*
612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ..........................................9, 19

*Seah Steel Corp. v. United States,*
513 F. Supp. 3d 1367 (Ct. Int'l Trade 2021) ................................................18

*Shandong Huarong Gen. Corp. v. United States,*
159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) ...................................................9

*Sugiyama Chain Co. v. United States,*
797 F. Supp. 989 (Ct. Int'l Trade 1992) ......................................................23

*Ta Chen Stainless Steel Pipe Ltd. v. United States,*
1999 Ct. Int'l Tr. LEXIS 110 (Oct. 28, 1999) ...........................................23

*Tehnoimportexport v. United States,*
15 Ct. Int'l Tr. 250 (1991) ...........................................................................24

*Thai Plastic Bags Indus. Co. v. United States,*
36 Ct. Int'l Tr. 947 (2012) ...........................................................................18

*Timken U.S. Corp. v. United States,*
434 F.3d 1345 (Fed. Cir. 2006)....................................................................26

*Torrington Co. v. United States,*
44 F.3d 1572 (Fed. Cir. 1995)...............................................................20, 24

*Yamaha Motor Co., Ltd. v. United States,*
19 Ct. Int'l Tr. 1349 (1995) ....................................................................23, 25

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)..............................................................................8

19 U.S.C. § 1675(a)(1)(B) ...................................................................................19

19 U.S.C. § 1675(a)(2)(C) ...................................................................................19

NON-CONFIDENTIAL VERSION

19 U.S.C. § 1677(35)(A) ................................................................................................20

19 U.S.C. § 1677b(b)(3) ...........................................................................................10, 11

19 U.S.C. § 1677b(f)(1) ........................................................................................7, 11, 12

19 U.S.C. § 1677b(f)(1)(A) ............................................................................................12

**Regulations**

19 C.F.R. § 351.212(b)(1).................................................................................................20

19 C.F.R. § 351.222 ..................................................................................................6, 29

19 C.F.R. § 351.224(c) ....................................................................................................28

19 C.F.R. § 351.224(c)(2) .........................................................................................8, 26

19 C.F.R. § 351.309(c)(2) ...............................................................................................28

**Administrative Determinations**

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (Dep't of
   Commerce May 19, 1997) ...............................................................................20, 21, 24

*Glycine from Japan: Final Results of Antidumping Duty Administrative Review;
   2018-2020*, 86 Fed. Reg. 53,946 (Dep't of Commerce Sept. 29, 2021) .........................*passim*

*Glycine from Japan: Preliminary Results of Antidumping Administrative Review;
   2018-2020*, 86 Fed. Reg. 36,105 (Dep't of Commerce July 8, 2021) ...........................*passim*

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85
   Fed. Reg. 47,731 (Dep't of Commerce Aug. 6, 2020).............................................................2

*Notice of Final Determination of Sales at Less Than Fair Value and Affirmative
   Critical Circumstances Determination: Bottom Mount Combination
   Refrigerator-Freezers From Mexico*, 77 Fed. Reg. 17,422 (Dep't of
   Commerce March 26, 2012) ........................................................................................12

**Other Authorities**

*Statement of Administrative Action, Uruguay Round Agreements Act*, Pub. L. No.
   103-465, 103rd Cong. 2d Sess., H. Doc. 103-316, vol. I, at 834 (1994) ................................16

NON-CONFIDENTIAL VERSION

## I.  INTRODUCTION

Pursuant to this Court's order of January 28, 2022, Defendant-Intervenor GEO Specialty Chemicals, Inc. ("GEO" or "Domestic Producer"), a domestic producer of glycine, hereby submits its response to the motion for judgment on the agency record filed by Plaintiff Nagase & Co, Ltd. ("Nagase" or "Plaintiff").  *See* Pl.'s Rule 56.2 Mot. For J. Upon the Agency R., April 12, 2022, ECF Nos. 34 and 36.[1]  GEO respectfully requests that Plaintiff's motion for judgment on the agency record be denied and that judgment be entered in favor of Defendant the United States for the reasons detailed in this response.

## II.  STATEMENT PURSUANT TO RULE 56.2

### A.  THE ADMINISTRATIVE DETERMINATION UNDER REVIEW

The administrative determination under review is the final results of the first antidumping duty administrative review ("AR1") of the antidumping duty order covering glycine from Japan.  *See Glycine from Japan: Final Results of Antidumping Duty Administrative Review; 2018-2020*, 86 Fed. Reg. 53,946 (Dep't of Commerce Sept. 29, 2021) ("*Final Results*"), P.R. 106.[2]  The challenged determinations, findings, and conclusions are set out primarily in the Issues and Decision Memorandum ("IDM") accompanying the *Final Results.  See* Issues and Decision

---

[1]      Plaintiff filed both Confidential and Public Version of its brief in support of its motion for judgment upon the agency record. *See* Mem. in Supp. of the Rule 56.2 Mot. of Pl.'s for J. on the Agency R., April 12, 2022, ECF Nos. 34 and 36 ("Pl.'s Brief").  This response references certain confidential information in the Confidential Version of Plaintiff's Brief.

[2]      References to the Administrative Record will be abbreviated as follows:  The Public Record will be identified as "P.R. __" with the appropriate document number inserted.  The Confidential Record will be identified as "C.R. __" with the appropriate document number inserted.  There will also be references herein to the Appendix as "Appx__" with the appropriate document number inserted.

NON-CONFIDENTIAL VERSION

Memorandum for the Final Results of the Administrative Review of the Antidumping Duty

Order on Glycine from Japan; 2018-2020 (Sept. 22, 2021) ("Final IDM"), P.R. 102.

The *Final Results* apply to entries of subject merchandise from October 31, 2018,

through May 31, 2020 ("POR").  *See Final Results*, 86 Fed. Reg. at 53,946.

### B.    ISSUES PRESENTED FOR REVIEW

Plaintiff presents three issues for this Court's review:

1. Whether Commerce properly included research and development ("R&D") costs of Nagase's affiliate, Yuki Gosei Kogyo Co., Ltd. ("YGK"), in the calculation of the general and administrative ("G&A") expense ratio when its audited financial statements, which comply with Japan's generally accepted accounting principles ("GAAP"), treated such expenses as a general expense.

2. Whether Commerce properly included "compensation for payment" expenses for a failed commercial arrangement in the calculation of the G&A expenses.

3. Whether Commerce reasonably relied on Nagase's reported entered value to calculate the assessment rate for Nagase's constructed export price ("CEP") sales and reasonably refused Nagase's request to correct Nagase's own error long after the administrative review concluded and Commerce issued and published its *Final Results.*

## III.   STATEMENT OF FACTS

Based on administrative review requests filed by GEO and by Nagase and its affiliate

YGK, *see*, *e.g.*, Letter from Thompson Hine to Commerce, "Request for Administrative Review"

(June 30, 2020), P.R. 5, Commerce initiated its first administrative review of the antidumping

duty order on glycine from India on August 6, 2020.  *Initiation of Antidumping and*

*Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 47,731 (Dep't of Commerce Aug. 6,

2020), P.R. 11.  Commerce selected for individual examinations the two exporters and producers

with the largest volume of entries of subject merchandise, Nagase and Showa Denko K.K.

Department Memorandum, "Antidumping Duty Administrative Review of Glycine from Japan:

**NON-CONFIDENTIAL VERSION**

Respondent Selection," (Sept. 28, 2020), P.R. 17. YGK/Nagase submitted joint responses as a collapsed entity.

Nagase's response to Commerce's antidumping duty questionnaire explained that its affiliated Japanese manufacturer, YGK, produced glycine and also sold glycine through an affiliated U.S. reseller, Nagase America LLC – [          ] percent of YGK/Nagase's U.S. sales by quantity. *See* Letter from White & Case LLP, "Response to Section A of the Questionnaire" (Oct. 30, 2020) ("YGK/Nagase's AQR"), C.R. 7, Appx80047. These sales were reported as constructed export price ("CEP") sales in the U.S. sales database. *Id.* For the remaining [     ] percent U.S. sales by quantity, YGK sold glycine directly to unaffiliated U.S. customers during the POR. *Id.* These sales were reported as export price ("EP") sales. *Id.*

On June 30, 2021, Commerce issued its preliminary results, assigning YGK/Nagase a dumping margin of 27.71%. *See Glycine from Japan: Preliminary Results of Antidumping Administrative Review; 2018-2020*, 86 Fed. Reg. 36,105 (Dep't of Commerce July 8, 2021) ("*Preliminary Results*"), P.R. 89, Appx2670.

In the *Preliminary Results*, Commerce explained that it included YGK's R&D costs and compensation for payment expenses in its G&A calculation for the cost of production ("COP"). *See* Department Memorandum, "Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review:  Glycine from Japan" (June 30, 2021) at 13, P.R. 88, Appx2665; *see also* Department Memorandum, "Preliminary Results Margin Calculation for Yuki Gosei Kogyo Co., Ltd./Nagase & Co. Ltd." (June 30, 2021) at 2, C.R. 71, Appx102332. Commerce also relied on Nagase's reported entered value and calculated an assessment rate of [          ]

for YGK/Nagase's CEP sales in the *Preliminary Results*. *See* Preliminary Margin Output, C.R. 79, Appx102781-102784.

On August 10, 2021, YGK/Nagase submitted their case brief. *See* YGK/Nagase Case Brief, C.R. 81, Appx102799-102823. In their case brief, YGK/Nagase did not challenge Commerce's assessment rate calculations. *Id.* YGK/Nagase argued that R&D costs and compensation for payment expenses should not be included in Commerce's G&A calculation. *Id.* Specifically, YGK/Nagase argued that Commerce should not include all R&D costs in the G&A calculations because YGK maintained its R&D expense records on a product-specific basis during the POR. *Id.* at Appx102817- 102820. Further, YGK/Nagase argued that compensation for payment expenses should be excluded from the G&A calculations because the expense related to the consigned production of non-subject merchandise. *Id.* at Appx102809- 102815.

On August 16, 2021, GEO submitted its rebuttal brief addressing YGK/Nagase's arguments concerning the exclusion of R&D costs and compensation for payment expenses from the G&A calculations. *See* GEO's Rebuttal Brief, C.R. 83, Appx102825–102838. In its rebuttal brief, GEO explained that both R&D costs and compensation for payment expenses should be part of the G&A calculations because they indirectly relate to the general operations of the company. *Id.*

As to the R&D costs, GEO explained that Commerce's questionnaire specifically requires YGK/Nagase to include "amounts incurred for general R&D activities" in the G&A expenses and that YGK/Nagase's reporting of product-specific expenses should be viewed with skepticism because the accounting classifications are not documented beyond the period of time YGK/Nagase knew would be subject to an administrative review. *Id.* at Appx102835-102837.

Non-Confidential Version

As to the compensation for payment expenses, GEO explained that these expenses should be included in the G&A expenses because they relate indirectly to the general operations of the company rather than directly to the production process, and such expenses are part of the normal course of business for YGK/Nagase.  *Id.* at Appx102832- 102835.

On August 17, 2021, YGK/Nagase submitted their rebuttal brief and, once again, did not challenge Commerce's assessment rate calculations for CEP sales.  YGK/Nagase Rebuttal Brief, C.R. 84, Appx102839-102864.

On September 23, 2021, Commerce issued the *Final Results*, assigning YGK/Nagase a dumping margin of 27.71%, unchanged from the *Preliminary Results*.  *See Final Results*, P.R. 106, Appx2910–2915.  In the *Final Results*, Commerce also rejected YGK/Nagase's arguments concerning the exclusion of R&D costs and compensation for payment expenses from the G&A calculations.  *See* Final IDM, P.R. 102, Appx2919-2910, and Appx2921-2922.

As to the compensation for payment expenses, Commerce found that the "compensation for payment" expenses "do not relate directly to the production of non-subject merchandise" but rather indirectly relate to the general operation of the company, and Commerce allocates one-time expenses of this nature, such as penalties, litigation accruals, or fines, to the company as a whole.  *Id.*  In fact, Commerce found that the company's press release demonstrates that the expenses relate to the company as a whole.  *Id.*

Further, as to R&D costs, Commerce similarly found that they should be included in the calculation of the G&A expense ratio since YGK/Nagase's GAAP-compliant financial statements demonstrate that these R&D expenses are recorded as general expenses and that no R&D costs were allocated to specific products.  *Id.*  In fact, the record contains YGK's

NON-CONFIDENTIAL VERSION

admission from Commerce's cost verification report stating that it "does not assign R&D expenses to specific products in the normal course of business because researchers do R&D work as a seed for future products, and so it is difficult to attach R&D expenses to existing products." *Id.* As to the worksheets allocating R&D costs to various product categories submitted by YGK on the record, Commerce found that these are "after-the-fact" allocations of company-wide R&D costs to broad product categories. Therefore, Commerce found that YGK/Nagase's books and records show that R&D costs are general expenses that should be included in the G&A expense ratio calculations.

Pursuant to 19 C.F.R. § 351.222, no party filed ministerial error comments for the *Final Results*.

On October 18, 2021, YGK/Nagase's counsel spoke with Commerce to "discuss the assessment of AD duties on their client's entries pursuant to the final results of the review." *See* Memo from Dana S. Mermelstein to the File, "Final Results of Administrative Review of the Antidumping Duty Order on Glycine from Japan; 2018 – 2020; Telephone Conversation with Counsel for Respondent" (Oct. 19, 2021), P.R. 109, Appx3068. Commerce declined to reopen the completed proceeding and "explained that this administrative review is complete, the record is closed, and there is no mechanism for Commerce to change the results or the manner of duty assessment." *See id.*

## IV.  SUMMARY OF ARGUMENT

Commerce's *Final Results* are supported by substantial evidence on the record, otherwise in accordance with law, and should be sustained. Commerce properly included R&D costs in the G&A expenses. The statute mandates Commerce to calculate costs "based on the records of the

exporter or producer of the merchandise, if such records are kept in accordance with generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1).  YGK's GAAP-compliant financial statements record its R&D costs as a general expense.  Commerce reasonably relied on these financial statements and included these R&D costs in the G&A expenses.  YGK/Nagase failed to demonstrate that their R&D costs are allocated on a product-specific basis.  Thus, Commerce's determination is supported by substantial evidence and consistent with established practice.

Commerce's inclusion of the "compensation of payment" expenses in the G&A expenses is also supported by substantial evidence.  Commerce is afforded significant discretion in calculating G&A expenses under the substantial evidence standard.  Record evidence demonstrates that YGK's "compensation of payment" expenses were categorized as an extraordinary loss in its 2019-2020 income statement.  YGK's press release shows that this expense was incurred as part of a settlement with a customer to cover losses arising from a failed commercial arrangement related to non-subject merchandise.  Commerce therefore concluded that these expenses were a cost of doing business for YGK – akin to penalties, litigation accruals, and fines.  Commerce's determination as to "compensation of payment" expenses should not be disturbed unless the record contains evidence so compelling that no reasonable factfinder could reach the same conclusions.  Here, Commerce's decision is supported by substantial evidence, otherwise in accordance with the statute, and consistent with its past practice.  The Court should reject Plaintiff's arguments and sustain Commerce's decision.

**NON-CONFIDENTIAL VERSION**

Commerce also properly relied on Nagase's reported entered value and calculated the assessment rate for Nagase's CEP sales.  It is the respondent's responsibility to supply Commerce with accurate information.  The alleged error concerning Nagase's CEP sales was not egregious and obvious from the record, and Commerce did not have any obligation to correct the alleged error.  If the alleged error was in fact egregious and obvious, YGK/Nagase would not have failed to raise it to Commerce after the *Preliminary Results*, 25 days after the release of the final calculations, and 19 days after the publication of the *Final Results*, which is well beyond the deadline to file ministerial errors to Commerce – *i.e.,* five days after the release of the final calculations. 19 C.F.R. § 351.224(c)(2).  Commerce's refusal to re-open the record was, in fact, a reasonable exercise of its discretion to preserve the finality of its decision.  Further, by failing to raise their arguments in their brief and within the mandated ministerial comments deadline, YGK/Nagase failed to follow the procedures and to exhaust administrative remedies.  YGK/Nagase's arguments are thus moot, and Commerce is not required to consider any of their proposed methodologies.

## V.   **STANDARD OF REVIEW**

Commerce's determinations in administrative reviews may be held unlawful only if they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (citations omitted); *see also Matsushita Elec. Industrial Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).  Moreover, the fact that the Court may draw two inconsistent conclusions from the record "does not prevent an administrative agency's

finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted); *see also Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, No. 2020-2014, 2021 U.S. App. LEXIS 21386, at *16 (Fed. Cir. July 20, 2021) ("Reasonable minds may differ on the outcome, but 'a determination does not fail for lack of substantial evidence on that account.'") (citation omitted).  Rather, the agency's conclusions may be set aside only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *see also Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1287 (Ct. Int'l Trade 2009).  Accordingly, "the Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion." *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001); *see also Goldlink Industries Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) ("{T}he Court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.") (citations and internal quotation marks omitted).

## VI.  ARGUMENT

### A.  COMMERCE PROPERLY INCLUDED R&D COSTS IN G&A EXPENSES

Commerce reasonably determined that Nagase/YGK's R&D costs were not incurred on a product-specific basis and should be wholly included in the calculation of the G&A expense ratio.  Plaintiff challenges this determination and asks this Court to reweigh record evidence and reach a different conclusion. *See, e.g.*, Pl's Brief at 3-4 (arguing that Commerce's factual

findings were contradicted by the record evidence and that Commerce's inclusion of the expenses was not supported by substantial evidence); *id.* at 9 (arguing that substantial evidence does not support Commerce's decision that YGK's R&D costs were not incurred on a product-specific basis); *id.* at 10 (arguing that YGK's accounting practice Commerce investigated and verified during the investigation and relied on during this review was "obsolete" and thus has little value); *id.* at 10 (arguing that substantial evidence does not support Commerce's decision that the "worksheets {were} an 'after-the-fact' allocation of company-wide R&D costs to broad product categories using headcount or hours.").  In making these arguments, Plaintiff ignores the appropriate standard of review and seeks to have the Court substitute its judgment for that of the agency. *See Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, No. 2020-2014, 2021 U.S. App. LEXIS 21386, at *16 (Fed. Cir. July 20, 2021) (noting that "{f}actual determinations supporting antidumping margins are . . . 'best left to the agency's expertise.'") (citing *F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F. 3d 1027, 1032 (Fed. Cir. 2020)).  As demonstrated in this brief, Plaintiff's argument that Commerce erred by including R&D costs specific to non-subject merchandise in the calculation of the G&A expense ratio is without merit because record evidence supports Commerce's determination that YGK's R&D costs are not allocated on a product-specific basis.  As such, Commerce's decision is supported by substantial evidence and otherwise in accordance with law.

### 1.    Legal Framework Controlling Commerce's Determination of G&A Expenses

Commerce followed the statutory instruction under Section 773(b)(3) of the Tariff Act of 1930, as amended (the "Act"), and calculated the COP "based on the sum of the costs of materials and fabrication for the foreign like product, plus amounts for selling, general, and

Non-Confidential Version

administrative (SG&A) expenses and packing." *See* Department Memorandum, "Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review:  Glycine from Japan" (June 30, 2021), at 13, P.R. 88, Appx2665.  In calculating the COP, Commerce adjusted YGK's reported G&A expenses by including R&D costs and compensation for payment expenses.  *Id.*

Section 773(b)(3) of the Act, in full, provides that Commerce shall calculate the COP of a mandatory respondent by including:

(A) the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business;

(B) an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question; and

(C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment.

19 U.S.C. § 1677b(b)(3).  "Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1).  Commerce "shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer . . . ."  *Id.*  Neither the statute nor Commerce's regulation further defines how expenses are to be allocated in calculating the SG&A expenses.  *Mid Continent Steel & Wire, Inc. v. United States*, 273 F. Supp. 3d 1161, 1169 (Ct. Int'l Trade 2017), *affirmed by, in part, vacated by, in part,*

NON-CONFIDENTIAL VERSION

*remanded by Mid Continent Steel & Wire v. United States*, 2019 U.S. App. LEXIS 29,654 (Fed. Cir. Oct. 3, 2019) (the pertinent SG&A issue was not appealed to the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit")).

G&A expenses "are generally understood to mean expenses which relate to the activities of the company as a whole rather than to the production process." *Coal. of Am. Millwork Producers v. United States*, 2022 Ct. Int'l Tr. LEXIS 67* at *36 (June 15, 2022) (quoting *Mid Continent Steel & Wire, Inc. v. United States,* 273 F. Supp. 3d 1161, 1166 (Ct. Int'l Trade 2017). Commerce is afforded "significant deference" in the calculation of G&A expenses because "it is a determination 'involv{ing} complex economic and accounting decisions of a technical nature.'" *Id.* at *37 (quoting *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996)).

In calculating G&A expenses, Commerce relies on a respondent's financial statements that are consistent with the exporting country's GAAP and reasonably reflect the respondent's costs, pursuant to the directive of Section 773(f)(1) of the Act.  19 U.S.C. § 1677b(f)(1); *see Mid Continent Steel & Wire*, 273 F. Supp. 3d at 1169 ("Commerce's practice of {G&A expenses} is to rely upon the books and records of an exporter if such records are in accordance with GAAP and reasonably reflect the costs of production, pursuant to the directive of 19 U.S.C. § 1677b(f)(1)(A)"); *see Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers From Mexico*, 77 Fed. Reg. 17,422 (Dep't of Commerce March 26, 2012), and accompanying Issues and Decision Memorandum at Comment 27 ("Section 773(f)(1)(A) of the Act does not explicitly address the treatment of R&D expenses in the calculation of a

NON-CONFIDENTIAL VERSION

producer's/exporter's COP. The Department . . . has established a practice of relying on R&D

costs as maintained in a company's normal books and records unless the record evidence shows

that the normal records unreasonably allocate costs."). Here, Commerce properly followed its

practice, statutory requirements, and court precedent by including R&D costs in YGK's reported

G&A expenses.

> **2.     Record Evidence Supports Commerce's Factual Findings That
> YGK/Nagase's R&D Costs Are Not Recorded on a Product-
> Specific Basis**

Substantial evidence supports Commerce's inclusion of R&D costs in its calculation of

the G&A expenses.  Commerce explained in the *Final Results* that it included R&D costs in the

calculation of G&A expenses because YGK's financial statements for the 2018 and 2019 fiscal

years recognized R&D costs "as a general expense."  *See* Final IDM, P.R. 102, Appx2921 (citing

to YGK/Nagase's Letter, "Glycine from Japan: Response to Section A of the Questionnaire,"

dated October 30, 2020 ("YGK/Nagase's AQR"), at Exhibit A-19, YGK's 2018 and 2019

Financial Statements, C.R. 7, Appx80170-80171 and Appx80203).  It is not disputed in this

appeal that YGK's financial statements are compliant with Japan's GAAP, and nothing on the

record suggests that these financial statements do not reasonably reflect YGK's costs of

production and sale.  The Department thus reasonably relied on these financial statements and

included the R&D costs reported in the financial statements in the G&A expenses.  As such,

Commerce's determination is supported by substantial evidence and consistent with Commerce's

practice.

Commerce further explained how YGK's trial balance accounts – "worksheets" – do not

outweigh the financial statements (*id.*, P.R. 102, Appx 2921), describing them as an "'after-the-

NON-CONFIDENTIAL VERSION

fact' allocation of company-wide R&D costs to broad product categories using headcount or hours." *Id.* (referencing YGK/Nagase's Letter, "Response to Section D of the Questionnaire," dated November 23, 2020 ("YGK/Nagase's DQR"), at Exhibit D-9, C.R. 22)).  YGK, however, has asked the Court to reweigh evidence.  Plaintiff's Brief at 23 (arguing that YGK "provided account-level detail demonstrating its product-category-specific recording of R&D expenses at each location (*i.e.*, the Tokyo Research Institute ("TRI") and the production engineering departments at the Joban/Tokiwa Plant) (citing to YGK/Nagase's Letter, "Glycine from Japan: Response to First Supplemental Questionnaire Response," dated January 22, 2021 ("YGK/Nagase's SQR"), at 17, C.R. 31, Appx84165 and at Exhibit S-20, C.R. 36, Appx84962-84973)).

The account-level detail YGK provided at Exhibit S-20 in its first supplemental questionnaire response nevertheless confirms Commerce's finding that the R&D costs are allocated to headcount or hours.  It shows that YGK allocated the R&D costs based on "Effort" (*i.e.*, "Person Month") for each month at each location.  YGK/Nagase's SQR at Exhibit S-20, C.R. 36, Appx84969-84972.  YGK first determined the allocation percentages by headcount or personal hours for each "product category" during a given month at each division, *id.*, C.R. 26, Appx84969-84972, and then applied the percentages to the total R&D costs to reach the "product-category-specific" costs – specifically, [          ] for amino acids .  *Id.* at C.R. 36, Appx84973.  The worksheets at Exhibit D-9 of YGK's Section D questionnaire response showed that YGK removed the total R&D costs (*i.e.*, [          ] thousands of yen) but added these "after-the-fact" allocated amino acid R&D costs (*i.e.*, [          ] thousands of yen) to the G&A expense calculation.  YGK/Nagase's DQR at Exhibit D-9, C.R. 22.

NON-CONFIDENTIAL VERSION

Even assuming that the worksheets do suggest otherwise, Commerce's decision to rely on the financial statements over these worksheets is well within its discretion and consistent with its practice. In *Mid Continent Steel & Wire*, this Court affirmed Commerce's denial to exclude certain expenses from the G&A expenses despite certain cost worksheets on the record in the underlying administrative proceeding showing the expenses "related to {non-subject} products" when "'the company's audited financial statements . . . ma{k}e no such distinction.'" *Mid Continent Steel & Wire*, 273 F. Supp. 3d at 1169. For support, this Court alluded to Commerce's factual finding that the expenses were "'recorded in {the respondent's} financial statements . . . along with other G&A expenses, indicating that they are general in nature and not product-specific.'" *Mid Continent Steel & Wire*, 273 F. Supp. 3d at 1169 (quoting and affirming Commerce's finding in the remand results, Final Results of Redetermination Pursuant to Court Remand, June 21, 2017, following *Mid Continent Steel & Wire, Inc. v. United States*, 219 F. Supp. 3d 1326 (Ct. Int'l Tr. 2017)). Similarly, the record in the underlying proceeding here contains GAAP-compliant financial statements showing that YGK recorded the R&D costs as a general expense. This evidence supports Commerce's decision that the R&D costs are not incurred on a product-specific basis. Commerce thus reasonably followed the statute and its practice to rely on YGK's financial statements to include R&D costs in its calculation of the G&A expenses. As the Court stated in *Mid Continent Steel & Wire*, "{t}he court affords Commerce significant deference in developing a methodology for determining this component of {COP} because it is a determination "involv{ing} complex economic and accounting decisions of a technical nature." *Id.*, 273 F. Supp. 3d. at 1166 (quoting *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996)).

**NON-CONFIDENTIAL VERSION**

Commerce's decision was also supported by the original investigation's cost verification report YGK itself placed on the record that showed YGK's normal accounting practice "does not assign R&D expenses to specific products." Final IDM, P.R. 102, Appx2991. The Federal Circuit has held that "Commerce shall consider the exporter's or producer's records on allocation of costs only if the records of the exporter or producer have been historically used by the exporter or producer." *Hynix Semiconductor, Inc. v. United States*, 424 F. 3d 1363 (Fed. Cir. 2005) (quoting *Am. Silicon Techs v. United States*, 261 F.3d 1371, 1379 (Fed. Cir. 2001)); *see also Statement of Administrative Action, Uruguay Round Agreements Act*, Pub. L. No. 103-465, 103rd Cong. 2d Sess., H. Doc. 103-316, vol. I, at 834 (1994) ("The exporter or producer will be expected to demonstrate that it has historically utilized such allocations, particularly with regard to the establishment of appropriate amortization and depreciation periods and allowances for capital expenditures and other development costs."). The cost verification report – even though it was pertinent to the period of investigation – supports the finding that YGK did not "historically" use the alleged product-specific allocation. Consistent with its practice, Commerce reasonably denied YGK's alleged allocation of costs since YGK failed to provide evidence to demonstrate that it has historically utilized such allocations. Commerce cogently explained its decision. The Court should sustain its decision to include YGK's R&D costs in the calculation of G&A expenses.

### B. COMMERCE PROPERLY INCLUDED COMPENSATION FOR PAYMENT EXPENSES IN G&A EXPENSES

Plaintiff contends that Commerce erred by including the "compensation for payment" expenses in the G&A expense calculation. Pl's Br. at 28-29. Plaintiff avers that Commerce failed to determine whether the expenses relate to the company's general operations as a whole

**NON-CONFIDENTIAL VERSION**

and failed to consider record evidence that demonstrates that the "compensation for payment" was specific to a non-subject product. *Id.* Plaintiff's argument, however, is nothing more than a request that this Court reweigh evidence.

YGK/Nagase's "compensation of payment" expenses were categorized under "extraordinary loss" in YGK's income statement for the period of April 1, 2019, through March 31, 2020. *See* YGK/Nagase's AQR at Exhibit A-19, C.R. 7, Appx80191. Contrary to Plaintiff's argument, Commerce found in the *Final Results* that the "compensation for payment" expenses "relate indirectly to the general operation of the company." Final IDM at 4, P.R. 102, Appx2919. Commerce explained the basis for this factual finding – pointing out that the respondent's press release demonstrates that "the expenses relate to the company as a whole." *Id.* (referencing YGK/Nagase's SQR at Exhibit S-22, Appx84978-84980). The press release stated the reason for recording the "compensation of payment" expenses as an "extraordinary loss": "{w}hen a customer's application for a drug was made to use the raw materials manufactured by the Company, the application was put on hold by the authorities." YGK/Nagase's SQR at Exhibit S-22, Appx84979.

Plaintiff disagrees with Commerce's conclusion, arguing that "the contents of the press release indicated that the expense related directly to YGK's provision of a service for a non-subject product." Pl.'s Br. at 31. Plaintiff contends that Commerce "failed to address evidence on the record demonstrating that the expense was not related to YGK's general operations." Pl.'s Br. at 28. Contrary to Plaintiff's arguments, Commerce fully considered the record evidence but simply drew a different conclusion from the same evidence. While the failed arrangement related to non-subject merchandise, Commerce considered the loss as a company

business cost akin to "penalties, litigation accruals, fines, etc." Final IDM at 4, P.R. 102, Appx2919.

Moreover, Commerce's decision to allocate as G&A expenses the "compensation for payment" expenses for the suspended drug application is consistent with the agency's practice. Commerce generally considers expenses or losses of this nature "as a cost of general operations" "rather than the current production of a specific product" even if they relate to non-subject merchandise in some manner. *Seah Steel Corp. v. United States*, 513 F. Supp. 3d 1367, 1404 (Ct. Int'l Trade 2021) (treating penalty that plaintiff alleged was related to non-subject merchandise production as a cost of general operations rather than the current production of a specific product); *Husteel Co. v. United States*, 520 F. Supp. 3d 1296, 1307 (Ct' Int'l Trade 2021) (upholding Commerce's decision to include in G&A expenses losses relating to the suspended production of certain product lines because "{n}o revenue from any products normally produced on {the suspended} lines was generated for the period . . . . the costs associated with the suspended production lines were necessarily covered by all the other products."). Consistent with this practice, Commerce here reasonably allocated the similar "compensation for payment" expenses for the failed arrangement in the G&A expenses.

In calculating G&A expenses, Commerce may exercise its authority to draw reasonable inferences from the record. *Thai Plastic Bags Indus. Co. v. United States*, 36 Ct. Int'l Tr. 947, 962 (2012) (citing *Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Technical, Salaried and Mach. Workers, AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993); *Grobest I-Mei Indus. (Vietnam) Co. v. United States,* 815 F. Supp. 2d 1352, 1356 (Ct. Int' Tr. 2012)). The Court sets aside the agency's conclusions only if the record contains evidence "so compelling that no reasonable

NON-CONFIDENTIAL VERSION

factfinder" could reach the same conclusions. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84

(1992); *see also Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1287 (Ct. Int'l Trade

2009). That certainly does not apply here. Commerce properly reached its decision based on

record evidence like the press release and cogently explained its decision. Its decision is

otherwise in accordance with the statute and consistent with its past practice.

Plaintiff is effectively asking the Court to favor Plaintiff's own view of the record

evidence. However, even if the Court could justifiably side with Plaintiff's view of the record

evidence had the matter been before it *de novo*, the fact that the Court may draw two inconsistent

conclusions from the record "does not prevent an administrative agency's finding from being

supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. at 620; *see also*

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S.*, No. 2020-2014, 2021 U.S. App. LEXIS

21386*, at *16 (Fed. Cir. July 20, 2021). Once again, Plaintiff ignores the appropriate standard

of review and seeks to have the Court substitute its judgment for that of the agency. The Court

should reject Plaintiff's arguments and sustain Commerce's decision.

### C. COMMERCE PROPERLY RELIED ON YGK/NAGASE'S REPORTED ENTERED VALUE AND PROPERLY CALCULATED THE ASSESSMENT RATE FOR YGK/NAGASE'S CEP SALES

#### 1. Legal Framework Controlling Assessment Rate

Section 751 of the Act provides that Commerce shall "review, and determine (in

accordance with paragraph(2)), the amount of any antidumping duty . . . ." 19 U.S.C.

§ 1675(a)(1)(B). Paragraph two of Section 751(a)(1)(B) of the Act further states that the

dumping margin "shall be the basis for the assessment of . . . antidumping duties on entries of

merchandise . . . ." 19 U.S.C. § 1675(a)(2)(C). Commerce determines those duties by

NON-CONFIDENTIAL VERSION

first calculating the "dumping margin" for the subject merchandise, *i.e.*, the total amount by

which the price charged for the subject merchandise in the home market (the "normal value")

exceeds the price charged in the United States (the "U.S. price"). 19 U.S.C. § 1677(35)(A).

Commerce uses the dumping margin to assess antidumping duties on merchandise imported

during the review period and also to calculate "cash deposits of estimated duties for future

entries" of the subject merchandise. *Koyo Seiko Co. v. United States*, 258 F. 3d 1340, 1342 (Fed.

Cir. 2001) (quoting *Torrington Co. v. United States*, 44 F.3d 1572, 1575 (Fed. Cir. 1995)).

 The statute is silent on the methodology of the determination of the assessment rate.

Commerce's regulation codifies Commerce's practice, stating, in pertinent part, that:

> The Secretary normally will calculate the assessment rate by
> dividing the dumping margin found on the subject merchandise
> examined by the entered value of such merchandise for normal
> customs duty purposes. The Secretary then will instruct the
> Customs Service to assess antidumping duties by applying the
> assessment rate to the entered value of the merchandise.

19 C.F.R. § 351.212(b)(1); *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296,

27,314 (Dep't of Commerce May 19, 1997) ("{The regulation} . . . codifies the Department's

current practice.").

 Commerce's methodology to calculate assessment rates differs from its methodology to

calculate cash deposit rates. *Torrington Co.*, 44 F. 3d at 1576 ("{Commerce} calculated the

assessment rate as a percentage of *entered value* and the cash deposit rate as a percentage of

*United States price*.") (emphasis added). This is because "duty deposits are merely *estimates* of

future dumping liabilities" whereas the assessment rate is applied to the merchandise imported

(*i.e.*, actual entries) during the review period. *See id.* ("{Commerce} explained this difference:

. . . As the Department has stated on numerous occasions, duty deposits are merely *estimates* of

NON-CONFIDENTIAL VERSION

future dumping liabilities."); *Koyo Seiko Co.*, 258 F. 3d at 1342-1343 (explaining the differences between Commerce's methodologies to calculate cash deposit rates and to calculate assessment rates).

Commerce adopted this methodology to rely on the entered value to determine the assessment rate primarily because "in most cases, respondents have not been able to link specific entries to specific sales," particularly in CEP circumstances where "there is a delay between the importation of merchandise and its resale to an unaffiliated {customer}." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. at 27,314. Commerce reasoned as follows:

> Historically, the Department (and, before it, the Department of the Treasury) used the so-called "master list" (entry-by-entry) assessment method. Under the master list method, the Department would list the appropriate amount of duties to assess for each entry of subject merchandise separately in its instructions to the Customs Service. However, in recent years, the master list method has fallen into disuse for two principal reasons. First, in most cases, respondents have not been able to link specific entries to specific sales, particularly in CEP situations in which there is a delay between the importation of merchandise and its resale to an unaffiliated customers. Absent an ability to link entries to sales, the Department cannot apply the master list method. Second, even when respondents are able to link entries to sales, there are practical difficulties in creating and using a master list if the number of entries covered by a review is large. Preparing a master list that covers hundreds or thousands of entries is a time-consuming process, and one that is prone to errors by Department and/or Customs Service staff. Therefore, as the Department explained in the AD Proposed Regulations, 61 FR at 7317, the Department would consider using the master list method of assessment only in situations where there are few entries during a review period and the Department can tie those entries to particular sales.

NON-CONFIDENTIAL VERSION

*Id.* There is no dispute that Commerce in the underlying review properly followed this regulation, relying on YGK/Nagase's self-reported entered value, and properly calculated the assessment rate.

> **2.   Commerce Properly Relied on YGK/Nagase's Reported Entered Value to Calculate the Assessment Rate and Refused to Consider Their Alleged Error After the Review Concluded**

Plaintiff complains that the assessment rate for its CEP sales is incorrect.  Pl.'s Br. at 34.  Plaintiff, however, is not challenging Commerce's methodology of relying on the entered value of Nagase/YGK's CEP sales in calculating the assessment rate.  *Id.* at 14 ("This is not a dispute regarding the merits of a methodological issue."); *see also id.* at 34 ("The error does not arise from a dispute regarding the merits of a methodological issue.").  Plaintiff instead has admitted that the error was self-inflicted.  *Id.* at 14 ("the source of the error . . . stems from the reporting of entered value in YGK/Nagase' U.S. sales database submitted with its first supplemental questionnaire response.") (citing YGK/Nagase's SQR at Exhibit S-28, Appx85019-85029).  Commerce thus relied on Nagase's reported value and calculated an assessment rate of

[          ] for YGK/Nagase's CEP sales in the *Preliminary Results*, which was not changed in the *Final Results*.  *See* Preliminary Margin Output, C.R. 79, Appx102781-102784; Final Margin Output, C.R. 90, Appx103299-103300.

In this appeal, Plaintiff alleges that YGK/Nagase inadvertently reported as the entered value for Nagase's CEP sales the amount of regular U.S. duty paid on Nagase's imports.  Pl. Br. at 14-15.  In its brief, Plaintiff further submits that "the correct total entered value of Nagase's CEP sales is over four million dollars."  *Id.* at 35-36.  The record in the underlying administrative review did not contain any of this information, let alone any evidence supporting this allegation.

NON-CONFIDENTIAL VERSION

All of this information was alleged *post-hoc*, and Commerce did not have an opportunity to review and verify it in the underlying proceeding.

Even if this value is truly an error – which Commerce did not have the opportunity to review and verify – Plaintiff cannot expect Commerce to correct YGK/Nagase's own submissions and guarantee their accuracy. It is the respondent's obligation to supply Commerce with accurate information. *Acciai Spciali Terni S.P.A. v. United States*, 25 Ct. Int'l Tr. 245, 257 (2001) (quoting *Yamaha Motor Co., Ltd. v. United States*, 19 Ct. Int'l Tr. 1349, 1359 (1995)); *NSK, Ltd. and NSK Corp. v. United States*, 17 Ct. Int'l Tr. 590 (1993) ("To {require Commerce to correct respondents' errors} would put an undue burden on Commerce 'and litigants might tend to become slovenly with submitted data.") (citing *Sugiyama Chain Co. v. United States*, 797 F. Supp. 989, 995 (Ct. Int'l Trade 1992)). As YGK/Nagase stated in their section A questionnaire response, YGK produced glycine and sold glycine through its affiliated U.S. reseller, Nagase America LLC for its CEP sales. *See* YGK/Nagase's AQR at A-3, C.R. 7, Appx80047. In other words, Nagase America LLC acted as importer of record for these CEP sales during the POR and should have maintained proper records for their entered value. As Nagase America LLC is the only party that knows its entered value for these CEP sales, "{t}he burden was on {the respondent} to create a record upon which Commerce could base its findings." *Mannesmannrohren-Werke AG v. United States*, 24 Ct. Int'l Tr. 1082, 1096 (2000) (citing *Ta Chen Stainless Steel Pipe Ltd. v. United States*, 1999 Ct. Int'l Tr. LEXIS 110, *45 (Oct. 28, 1999) and *Chinsung Indus. Co., Ltd. v. United States*, 13 Ct. Int'l Tr. 103, 106, 705 F. Supp. 598, 601 (1989) ("If plaintiffs' argument were to prevail the result would be to . . . shift the burden of creating an adequate record from respondents to Commerce.")).

**NON-CONFIDENTIAL VERSION**

Commerce may correct a respondent's clerical error if the error was egregious and obvious from the record. *Acciai Speciali Terni S.P.A.*, 25 Ct. Int'l Tr. at 257-258 (citing *Tehnoimportexport v. United States*, 15 Ct. Int'l Tr. 250, 258-59 (1991) and *NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995)). Contrary to Plaintiff's argument, the error was not apparent on the record. Plaintiff argues that the error was self-evident because "the assessment rate was calculated at over [          ] the value of the imported merchandise, or over [          ] the dumping margin." Pl. Br. at 35. This argument is comparing apples to oranges. As explained previously, the assessment rate and the dumping margin are calculated by different methodologies – the former is a percentage of *entered value* and the latter is a percentage of *U.S. price. Torrington Co.*, 44 F. 3d at 1576.

Moreover, the difference between the dumping margin and the assessment rate is rooted in the difference between the entered value and the sales price reported by YGK/Nagase. Disparate entered values and U.S. prices are common for CEP sales. In fact, the disparity between the entered value and the U.S. sales price for CEP sales is exactly why Commerce developed and codified its methodology in a regulation to rely on entered value for the assessment rate in the first instance. As Commerce reasoned in *Antidumping Duties; Countervailing Duties*, it is unable to link entries to CEP sales as "there is often a delay between the importation of subject merchandise and the resale of the subject merchandise in CEP sales." 62 Fed. Reg. at 27,314. The disparity between the assessment rate and the dumping margin was not a reasonable basis for Commerce to suspect the accuracy of YGK/Nagase's reported entered value for their CEP sales.

**NON-CONFIDENTIAL VERSION**

Plaintiff also argues that YGK/Nagase's reported entered value was obviously erroneous because "it is less than the entered value" for a random sample entry that YGK/Nagase submitted for a separate, unrelated purpose as Exhibit C-14 in their section C questionnaire response.  Pl. Br. at 35 (citing Letter from White & Case LLP, "Response to Section B and C of the Questionnaire" (Nov. 19, 2020) ("YGK/Nagase's BCQR"), at 14, C.R. 15, Appx80756, and at Exhibit C-14, C.R. 15, Appx80047).  This argument is similarly flawed.  "{I}t is not Commerce's duty to search the record to deduce {the} answer." *Mannesmannrohren-Werke AG v. United States*, 24 Ct. Int'l Tr. 1082, 1095 (2000) (citing *Yamaha Motor Co., Ltd. v. United States*, 19 Ct. Int'l Tr. 1349, 1359 (1995).  Exhibit C-14 contains a sample entry summary, listing the entered quantity in kilograms.  YGK/Nagase's BCQR at 14, C.R. 15, Appx80756, and at Exhibit C-14, C.R. 15, Appx80047.  While the entered value for this single entry is also listed, it was submitted to support YGK/Nagase's alleged unit cost of U.S. customs duty.  There was no reason for Commerce to review this entry summary within the context of an entered value comparison.  Moreover, this single entry summary did not contain sufficient information to allow Commerce to determine whether this entry was comparable to other CEP sales.  As the Court reasoned previously, Plaintiff's result-driven argument, if it were to prevail, would "place an undue burden on Commerce" and "shift the burden of creating an adequate record from respondent to Commerce." *Mannesmannrohren-Werke AG*, 24 Ct. Int'l Tr. at 1096 (quoting *Chinsung Indus. Co.*, 13 Ct. Int'l Tr. at 106).

Commerce, in fact, relied on this allegedly erroneous "entered value" and calculated the [          ] assessment rate in the *Preliminary Results.*  If this error was indeed so egregious and obvious as Plaintiff alleged, YGK/Nagase – the parties with knowledge of their own importing

NON-CONFIDENTIAL VERSION

records and a vested interest in their proper reporting -- should have raised the alleged error to Commerce's attention shortly after the release of Commerce's preliminary calculations. YGK/Nagase, however, did not respond until October 18, 2021, 25 days after the release of the final calculations and 19 days after publication of the *Final Results.* Pl.'s Br. at 15. As the Federal Circuit recognized in *Alloy Piping Prods. v. Kanzen Tetsu Sdn. Bhd.*, "{i}f the alleged errors were difficult to identify by {respondent}, the party that created the database and submitted to Commerce, it would be even more difficult for Commerce to identify the alleged errors without assistance from the party." 334 F.3d 1284, 1293 (Fed. Cir. 2003).

### D. COMMERCE HAS "BROAD DISCRETION" TO NOT AMEND ITS FINAL RESULTS TO PRESERVE THE FINALITY OF ITS DECISION

Commerce has previously recognized that it may not refuse to correct a clerical error simply because the correction was an "untimely submission." *See NTN Bearing Corp.,* 74 F.3d at 1208; *Fischer S.A. v. United States*, 34 Ct. Int'l Tr. 334 (2010); *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006). However, as the Federal Circuit pointed out in *Goodluck India Ltd. v. United States*, these cases "all stand for the proposition that Commerce cannot reject corrective information at a *preliminary* determination stage (where there are no finality concerns), provided that the corrections are otherwise justifiably necessary." *Goodluck India Ltd. v. United States*, 11 F.4h 1335, 1343 (Fed. Cir. 2021).

Here, Plaintiff did not discover the "error" until well after the *preliminary* determination stage – 25 days after the release of final calculations and 19 days after the publication of *Final Results* – well after the "five days after the release of the final calculations" deadline to file ministerial errors. *See Alloy Piping Prods.*, 334 F.3d at 1293 ("{T}he respondent is required to

exhaust its administrative remedies.  Under the regulation, this means Commerce will correct the error within five days of the release of the final calculations or, if an extension is granted, within five days after the publication of the final determination.") (citing 19 C.F.R. § 351.224(c)(2),(c)(4)).  In *Goodluck India Ltd.*, the Federal Circuit affirmed Commerce's rejection of the respondent's revisions where the respondent submitted its revised databases at verification because it was too late for the respondent to submit this information, holding that "{v}erification represents a point of no return."  *Goodluck India Ltd.*, 11 F.4h at 1344. Verification – while late – still occurs before Commerce issues its final determination or results during an administrative proceeding.  Here, YGK/Nagase did not submit any statements in their administrative briefs following the *Preliminary Results* or submit any ministerial error comments after the release of the final calculations, remaining silent until days after the *Final Results* were published.

"Whenever a question concerning administrative, or judicial, reconsideration arises, two opposing policies immediately demand recognition: the desirability of finality, on the one hand, and the public interest in reaching what, ultimately, appears to be the right result on the other." *NTN Bearing Corp.*, 74 F. 3d at 1208 (quoting *Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 321, 6 L. Ed. 2d 869, 81 S. Ct. 1611 (1961) (footnote omitted)).  Unlike *NTN Bearing Corp.,* where the "tension between finality and correctness simply did not exist at the time NTN requested correction," Plaintiff has admitted here that this proceeding "raises issues of the finality of administrative decisions."  Pl.'s Br. at 38.  As the Federal Circuit noted, after Commerce issued its *Final Results* – particularly well after the five-day window to challenge any

ministerial errors in the final calculations -- "Commerce enjoys 'broad discretion' to promulgate and enforce its procedural rules." *Goodluck India Ltd.*, 11 F.4h at 1344.

Commerce's refusal to re-open the record after "this administrative review is complete" was a reasonable exercise of its discretion to preserve the finality of its decision. This Court should reject Plaintiff's claim.

### E.   PLAINTIFF'S ARGUMENTS FOR ERROR CORRECTION ARE WAIVED

As discussed, Commerce's preliminary calculations relied on the allegedly erroneous "entered value." Assuming that the entered value reflects a clerical error, Commerce's regulations provide in 19 C.F.R. § 351.224(c) that "{c}omments concerning ministerial errors made in the preliminary results of a review should be included in the party's case brief." Further, 19 C.F.R. § 351.309(c)(2) provides that "{t}he case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination." This specific allegation, however, is not alleged in YGK/Nagase' administrative case brief or rebuttal brief.

In *Dorbest, Ltd. v. United States*, the Federal Circuit held that the Department has discretion not to correct a clerical error where the error was discoverable but not pointed out to Commerce during the time period specified in the regulations. *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1376-1377 (Fed. Cir. 2020). Specifically, Dorbest did not raise an alleged ministerial error present in the preliminary determination in its case brief, raising it later instead both in a footnote in its rebuttal brief and during the ministerial comment period before Commerce's adoption of its final determination. *Id.* at 1375. The Federal Circuit, affirming the CIT's decision, held that Dorbest's failure to raise this argument in its administrative case brief before

**NON-CONFIDENTIAL VERSION**

Commerce constituted a failure to exhaust administrative remedies.   The Federal Circuit

explained that parties are "procedurally required to raise the{ir} issue before Commerce at

the time Commerce {is} addressing the issue." *Id.* (quoting *Mittal Steel Point Lisas Ltd. v.*

*United States*, 548 F.3d 1375, 1383 (Fed. Cir. 2008)).

Here, like *Dorbest*, Plaintiff's alleged ministerial error — Commerce's inclusion of an

allegedly erroneous entered value in the assessment rate calculation — was similarly

discoverable earlier in the proceeding (*i.e.*, immediately following the *Preliminary Results*) but

was not alleged to Commerce in YGK/Nagase's administrative case brief during the time period

specified by Commerce's regulations.  *Id.* at 1377 (concluding that no case of either the Court or

the Federal Circuit holds that Commerce's refusal to fix a clerical error in the calculation of an

antidumping duty margin is an abuse of discretion when the clerical error was discoverable

during the original proceeding but was not pointed out to Commerce during the time period

specified in the regulations).  YGK/Nagase did not challenge Commerce's assessment rate

calculations for CEP sales in their administrative briefing.  *See* YGK/Nagase Case Brief, C.R.

81, Appx102799-102823; YGK/Nagase Rebuttal Brief, C.R. 84, Appx102839-102864.

As discussed, neither did YGK/Nagase file ministerial error comments pursuant to 19 C.F.R.

§ 351.222 with respect to the *Final Results*.  As this Court pointed out in *Alloy Piping Prods. v.*

*United States* concerning a respondent's clerical errors, "{p}rocedures exist allowing

respondents to correct submitted data" and "{the respondent's} failure to follow those

procedures in this case is fatal to its position."  *Alloy Piping Prods. v. United States*, 26 Ct. Int'l

Tr. 330, 352 (2002), *aff'd, Alloy Piping Prods. v. Kanzen Tetsu Sdn. Bhd.,* 334 F. 3d 1284 (Fed.

Cir. 2003).

**Non-Confidential Version**

Plaintiff, however, does not dispute or offer any excuse for YGK/Nagase's failure to exhaust administrative remedies or failure to follow Commerce's regulations.  It simply argues that the Court should order Commerce to "fix" this "error" because a correction is easy:  either calculate an alternative per kilogram rate for Nagase's CEP sales or "reverse engineer" the total entered value.  Pl's Br. at 36-37.  These arguments, however, are moot because Plaintiff has waived its claim, failing to follow regulatory procedures and failing to exhaust administrative remedies.  Commerce is not required to consider any of Plaintiff's proposed methodologies.

## VII.   <u>CONCLUSION</u>

For these reasons, GEO respectfully requests that the Court deny Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record and sustain Commerce's *Final Results*.

Respectfully submitted,

/s/ David M. Schwartz_____
David M. Schwartz
Meixuan (Michelle) Li
THOMPSON HINE LLP
1919 M Street, N.W., Suite 700
Washington, D.C. 20036
202.263.4170
202.331.8330 (fax)

*Counsel to GEO Specialty Chemicals, Inc.*

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| NAGASE & CO., LTD.,<br><br>                      Plaintiff,<br><br>   v.<br><br>UNITED STATES,<br><br>                      Defendant,<br><br>   and<br><br>GEO SPECIALTY CHEMICALS, INC.,<br><br>                      Defendant-Intervenor. | **Court No. 21-00574** |

## PROPOSED JUDGMENT

Upon consideration of Plaintiff's Motion for Judgment on the Agency Record, Defendant United States' response thereto, Defendant-Intervenor GEO Specialty Chemicals, Inc.'s response thereto, and all other papers and proceedings had herein, it is hereby

**ORDERED** that the USCIT Rule 56.2 Motion for Judgment on the Agency Record filed by Plaintiff is denied; and it is further

**ORDERED** that the Complaint filed by Plaintiff is dismissed.

**SO ORDERED.**

                                 _____
                                 Stephen Alexander Vaden, Judge

Dated: _____
      New York, New York

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains approximately 8,712 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

/s/ David M. Schwartz

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that copies of the attached document are being served by CM/ECF, on July 21, 2022, addressed to the following parties:

Kelly M. Geddes
Trial Attorney
U.S. Department of Justice
Civil Division, Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 307-2867
Fax: (202) 305-2062
Email: kelly.geddes2@usdoj.gov

Jay Charles Campbell
White & Case, LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
(202) 626-3632
Fax: (202) 639-9355
Email: jcampbell@whitecase.com

/s/ David M. Schwartz
David M. Schwartz
THOMPSON HINE LLP
1919 M Street, N.W., Suite 700
Washington, D.C.  20036
(202) 263-4170
(202) 331-8330
*Counsel to GEO Specialty Chemicals, Inc.*