**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

NAGASE & CO., LTD.,

               Plaintiff,

    v.

UNITED STATES,

               Defendant,

    and

GEO SPECIALTY CHEMICALS, INC.,

    Defendant-Intervenor.

Court No. 21-00574

**NON-CONFIDENTIAL VERSION**

**Business Proprietary
Information on pages 8, 11, 14, 16-19
and 21 has been deleted.**

**REPLY BRIEF IN SUPPORT OF MOTION
FOR JUDGMENT ON THE AGENCY RECORD**

White & Case LLP
701 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 626-3600

Law Office of Neil Ellis PLLC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C. 20015
(202) 258-5421

Counsel to Nagase & Co., Ltd.

August 26, 2022

# TABLE OF CONTENTS

I.    Introduction ............................................................................................................2

II.    Argument ...............................................................................................................4

    A.    Commerce's Decision to Include R&D Costs for Non-Subject Products in YGK's G&A Ratio Cannot Be Sustained .................................................4

        1.    Defendant and Petitioner Impermissibly Rely on Post Hoc Rationalizations.........................................................................................4

        2.    Defendant and Petitioner Misconstrue Commerce's Past Practice Regarding the Inclusion of R&D Costs in the G&A Ratio.........................5

        3.    Defendant and Petitioner Fail to Identify Substantial Record Evidence Supporting Commerce's Factual Findings....................................9

    B.    Commerce's Inclusion of an Expense Related to Production of a Non-Subject Product in YGK's G&A Expense Ratio Cannot Be Sustained................11

        1.    Defendant and Petitioner Rely on Post Hoc Rationalizations ..................12

        2.    Defendant and Petitioner Cannot Justify Commerce's Failure to Address Significant Contradictory Evidence................................................13

    C.    Commerce Abused Its Discretion by Issuing Liquidation Instructions Based on a Patently Erroneous Assessment Rate ...................................................14

        1.    Nagase's Oversight Does Not Justify Abandoning the Remedial and Fairness Principles Underlying the Antidumping Law.............................15

        2.    Once Identified, the Assessment Rate Error Is Unmistakable..................15

        3.    The Timing of Nagase's Raising the Issue with Commerce Does Not Excuse Application of a Patently Erroneous Assessment Rate ................17

        4.    The Policy of Finality Does Not Give Commerce License Knowingly to Direct CBP to Over-Collect Antidumping Duties ................................19

        5.    The Error Can Be Corrected Based on Data on the Record .....................21

        6.    If the Court Remands This Case with Regard to Either of the First Two Counts, It Should Direct Commerce to Correct the Assessment Rate Error................................................................................................22

III.    Conclusion and Relief Sought ............................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allegheny Ludlum Corp. v. United States*,
   112 F.Supp.2d 1141 (Ct. Int'l Trade 2000) ...........................................................................14

*Borlem S.A.-Empreedimentos Industriais v. United States*,
   913 F.2d 933 (Fed. Cir. 1990).................................................................................................21

*Burlington Truck Lines v. United States*,
   371 U.S. 156 (1962).....................................................................................................4, 10, 12

*Chaparral Steel Co. v. United States*,
   901 F.2d 1097 (Fed. Cir. 1990)........................................................................................15, 20

*Dorbest Ltd. v. United States*,
   604 F.3d 1363 (Fed. Cir. 2010)..............................................................................................18

*Federal-Mogul Corp. v. United States*,
   872 F.Supp. 1011 (Ct. Int'l Trade 1994) ...............................................................................15

*Goodluck India Ltd. v. United States*,
   11 F.4th 1335 (Fed. Cir. 2021) .........................................................................................20, 21

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States*,
   815 F.Supp.2d 1342 (Ct. Int'l Trade 2012) ......................................................................20, 21

*Husteel Co. v. United States*,
   520 F.Supp.3d 1296 (Ct. Int'l Trade 2021) ...........................................................................12

*Hynix Semiconductor, Inc. v. United States*,
   424 F.3d 1363 (Fed. Cir. 2005).....................................................................................5, 8, 11

*Itochu Bldg. Prods. Co. v. United States*,
   163 F.Supp.3d 1330 (Ct. Int'l Trade 2016) .............................................................................4

*Jinan Yipin Corp. v. United States*,
   637 F.Supp.2d 1183 (Ct. Int'l Trade 2009) .....................................................................22, 23

*Koyo Seiko Co. v. United States*,
   746 F.Supp. 1108 (Ct. Int'l Trade 1990) ...............................................................................20

*McCarthy v. Madigan*,
   503 U.S. 140 (1992).................................................................................................................19

*Mid Continent Steel & Wire, Inc. v. United States*,
273 F.Supp.3d 1161 (Ct. Int'l Trade 2017) ..................................................6

*NTN Bearing Corp. v. United States*,
74 F.3d 1204 (Fed. Cir. 1995)....................................................................21

*Qingdao Sea-Line Trading Co. v. United States*,
766 F.3d 1378 (Fed. Cir. 2014)....................................................................9

*QVD Food Co. v. United States*,
658 F.3d 1318 (Fed. Cir. 2011)..................................................................18

*Rhone Poulenc, Inc. v. United States*,
899 F.2d 1185 (Fed. Cir. 1990)............................................................15, 20

*SeAH Steel Corp. v. United States*,
513 F.Supp.3d 1367 (Ct. Int'l Trade 2021) ........................................12, 13

*Serampore Indus. Pvt. Ltd. v. U.S. Dep't of Com.*,
696 F.Supp. 665 (Ct. Int'l Trade 1988) ....................................................23

*Stanley Works (Langfang) Fastening Sys. v. United States*,
964 F.Supp.2d 1311 (Ct. Int'l Trade 2013) ..............................................19

*Suzano S.A. v. United States*,
No. 21-00069, slip op. 22-95 (Ct. Int'l Trade Aug. 16, 2022).............4, 6

*Tehnoimportexport v. United States*,
766 F.Supp. 1169 (Ct. Int'l Trade 1991) ..................................................20

*Universal Camera Corp. v. Nat'l Lab. Rel. Bd.*,
340 U.S. 474 (1951).....................................................................................13

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
716 F.3d 1370 (Fed. Cir. 2013)..................................................................11

## STATUTES AND REGULATIONS

19 U.S.C. § 1677b(f)(1)(A)................................................................................7

28 U.S.C. § 2637(d) .......................................................................................19

19 C.F.R. § 351.224(c)(2)...............................................................................18

## ADMINISTRATIVE DETERMINATIONS

*Certain Lined Paper Products from India*,
74 Fed. Reg. 17149 (Dep't Commerce Apr. 14, 2009)............................6

*Certain Softwood Lumber Products from Canada*, ,
   67 Fed. Reg. 15539 (Dep't Commerce Apr. 2, 2002)............................................................13

*Chlorinated Isocyanurates from Spain*,
   74 Fed. Reg. 50774 (Dep't Commerce Oct. 1, 2009) ..................................................................6

*Circular Welded Pipe from the Republic of Korea*,
   79 Fed. Reg. 37284 (Dep't Commerce July 1, 2014) ............................................................13

*High-Tenacity Rayon Filament Yarn from Germany*,
   60 Fed. Reg. 15897 (Dep't Commerce Mar. 28, 1995) ............................................................7

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| NAGASE & CO., LTD.,<br><br>     Plaintiff,<br><br>  v.<br><br>UNITED STATES,<br><br>     Defendant,<br><br>  and<br><br>GEO SPECIALTY CHEMICALS, INC.,<br><br>  Defendant-Intervenor. | Court No. 21-00574<br><br>**NON-CONFIDENTIAL VERSION**<br><br>**Business Proprietary  Information on pages 8, 11, 14, 16-19  and 21 has been deleted.** |

## REPLY BRIEF IN SUPPORT OF MOTION
## FOR JUDGMENT ON THE AGENCY RECORD

Plaintiff Nagase & Co., Ltd. ("Nagase") submits this brief in reply to Defendant United States' Response in Opposition to Plaintiff's Motion for Judgment Upon the Administrative Record (ECF 37, 38) ("Def's Br.") and Defendant-Intervenor ("Petitioner") GEO Specialty Chemicals, Inc.'s Response to Plaintiff's Motion for Judgment on the Agency Record  (ECF 39, 40) ("Pet's Br.").  For the reasons provided below and in Nagase's initial brief, Nagase respectfully requests that the Court remand the challenged determination of the U.S. Department of Commerce ("Commerce") with instructions to recalculate Nagase's dumping margin and assessment rate.

## I.   INTRODUCTION

The arguments presented in Defendant's and Petitioner's briefs are either erroneous as a matter of law or unsupported by record evidence or both.   Nagase submits that the following fundamental principles govern the resolution of this case.

First, the principles governing the legal aspects of this case are:

➢ Commerce's decisions cannot be affirmed on the basis of post hoc rationalizations by litigation counsel.  Contrary to this principle, Defendant's and Petitioner's arguments on Nagase's first and second Counts mostly consist of new rationalizations that were not presented or implied in Commerce's determination.

➢ As to the third Count, the concept of exhaustion of administrative remedies does not compel the Court, Commerce and Nagase to stand by helplessly while U.S. Customs and Border Protection ("CBP") liquidates Nagase's entries at an astronomically inflated antidumping duty rate.  The statute incorporates an "appropriateness" standard in applying the exhaustion doctrine, and Commerce's refusal to correct Nagase's assessment rate was an abuse of discretion.

➢ If the Court orders Commerce to reconsider either or both of the first two Counts, it may also direct Commerce to correct other errors, such as that identified in the third Count.  The Court has the authority to ensure that Commerce fulfills its statutory obligation to calculate dumping margins as accurately as possible and that the Government collects the correct amount of antidumping duties due – no more.

Second, the following principles govern the Court's evaluation of the factual issues involved in this case, pursuant to the statutory "substantial evidence" standard of review:

➢ As to the first Count, contrary to Defendant's assertions, Commerce's established practice is not simply to rely on a respondent's high-level reporting of costs of

production in its financial statements.  Rather, as required by the statute, Commerce generally demands cost reporting at the most granular, product-specific level that may be derived from a company's books and records.

➢ Petitioner's assertion that a respondent cannot change a cost allocation methodology from one administrative proceeding to the next is erroneous, at least regarding non-amortized costs such as the R&D costs involved in the first Count.  Indeed, its argument contravenes the fundamental principle that each administrative review is a distinct proceeding, and each determination is based on its own record.

➢ Regarding the second Count, contrary to Commerce's assertion, costs incurred when production is canceled are not the same as legal penalties or fines.  Likewise, Defendant errs in arguing (post hoc) that Commerce's practice is to treat costs attributable to the discontinued production of an individual product as G&A expenses to be allocated over all production.

➢ Regarding the third Count, no party seriously argues that the astronomical assessment rate assigned to Nagase is correct, and Defendant relies on conjecture in asserting that Nagase failed to demonstrate that it is erroneous.

➢ Also regarding the third Count, Nagase raised the issue with Commerce as soon as it was discovered.  Although that was late in the process, the company is not raising the issue for the first time before this Court without having previously flagged it for consideration by the agency.

➢ Moreover, the error – and the methods by which it can be corrected – can be identified and implemented entirely from evidence already on the record.  No additional data are

needed, and the record need not be reopened except for the straightforward arithmetic exercise of correcting the assessment rate calculation.

## II.   ARGUMENT

### A.   Commerce's Decision to Include R&D Costs for Non-Subject Products in YGK's G&A Ratio Cannot Be Sustained

Defendant and Petitioner fail to justify Commerce's decision to include R&D costs for non-subject products in YGK's G&A ratio because they:  (1) engage in post hoc rationalization; (2) disregard Commerce's practice of excluding R&D costs that are specific to non-subject merchandise; and (3) are unable to identify substantial record evidence supporting Commerce's decision.

#### 1.   Defendant and Petitioner Impermissibly Rely on Post Hoc Rationalizations

It is well-settled that "{t}he courts may not accept appellate counsel's *post hoc* rationalizations for agency action . . . ." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).[1]  Defendant and Petitioner, however, rely extensively on post hoc rationalizations to support Commerce's flawed decision to disregard YGK's recording of R&D costs by product-category in its normal records during the period of review ("POR").

For example, Defendant introduces a new test, asserting that companies must link R&D costs to specific "commercially viable products" for Commerce to exclude non-subject R&D costs from a respondent's G&A expenses.  Def's Br. at 12.  Commerce, however, did not offer or even

---

[1] This principle was very recently reaffirmed by this Court in *Suzano S.A. v. United States*, No. 21-00069, slip op. 22-95, at 13 (Ct. Int'l Trade Aug. 16, 2022) (explaining that an argument raised by the Government was "not present in the text of the {Issues and Decision Memorandum} and therefore cannot be reviewed") (citing *Itochu Bldg. Prods. Co. v. United States*, 163 F.Supp.3d 1330, 1337 (Ct. Int'l Trade 2016)).

suggest this rationale in the *Final Decision Memo*. Similarly, in arguing that Commerce properly disregarded documentation demonstrating YGK's recording of R&D costs by product category, Petitioner introduces irrelevant case law regarding Commerce's unrelated practice of accepting only historically-used methodologies in the context of amortized expenses. *See* Pet's Br. at 16 (citing *Hynix Semiconductor, Inc. v. United States*, 424 F.3d 1363 (Fed. Cir. 2005)). Commerce, however, did not adopt this rationale, likely because YGK's R&D costs were not amortized.

Defendant's and Petitioner's reliance on post hoc rationalizations underscores the deficiency of Commerce's analysis and the need for remand on this issue.

**2.** **Defendant and Petitioner Misconstrue Commerce's Past Practice Regarding the Inclusion of R&D Costs in the G&A Ratio**

As outlined in Nagase's initial brief, Commerce's established practice has been to exclude product-specific R&D costs from a respondent's G&A expense ratio, where supported by the company's normal books and records. *See* Nagase's Memorandum of Points and Authorities in Support of Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record (ECF 34, 36) ("Nagase's Br.") at 21–22. In response, Defendant and Petitioner misinterpret the agency's practice, wrongly contending that Commerce: (1) may rely solely on the classification in the respondent's high-level financial statements in determining whether R&D costs relate to specific products or the company's general operations; (2) may only exclude R&D costs pertaining to "commercially viable products" from a respondent's G&A expenses; and (3) may accept cost allocations only if based on a methodology historically used by the respondent.

First, Commerce declined to exclude R&D costs for non-subject products from YGK's G&A expense ratio because "YGK/Nagase reported R&D expenses as a general expense in its GAAP-compliant financial statement." *Final Decision Memo* at 6, Appx2921. In arguing that Commerce properly relied solely on YGK's financial statements to determine its G&A expenses,

*see* Def's Br. at 10–11, Pet's Br. at 13, 15, Defendant and Petitioner overlook Commerce's practice to the contrary.  While Commerce's analysis of G&A expenses may ***begin*** with the respondent's classification of expenses in the financial statements, it does not ***end*** there – particularly if the company's normal books and records support reclassifying certain expenses for antidumping reporting purposes.  As this Court recently noted in *Suzano*, the fact that a respondent's financial statements are GAAP-compliant is an insufficient basis to disregard evidence on the record supporting a respondent's more detailed cost reporting for antidumping purposes.  *See* slip op. 22-95 at 13–14.

Commerce itself has endorsed this principle.  For example, in *Chlorinated Isocyanurates from Spain*, 74 Fed. Reg. 50774 (Dep't Commerce Oct. 1, 2009) (final results admin. review), and accompanying Issues and Decision Memorandum ("IDM") at 13, Commerce explained that it included only "the exact amount of R&D expense related to . . . the merchandise under consideration" even though only "the total R&D recorded by {the respondent} is included in its trial balances and in its financial statements prepared in accordance with Spanish GAAP").  Further, in *Certain Lined Paper Products from India,* 74 Fed. Reg. 17149 (Dep't Commerce Apr. 14, 2009) (final results admin. review), IDM at 12, Commerce explained that "although these {salary and office rent} costs were reported as G&A expenses on the income statement, they were nonetheless costs directly related to {Respondent's} newsprint trading operations and were not supporting the general operations of the company as a whole."[2]

---

[2] Petitioner cites *Mid Continent Steel & Wire, Inc. v. United States*, 273 F.Supp.3d 1161, 1169 (Ct. Int'l Trade 2017) in support of its argument that Commerce may limit its analysis of G&A expenses to the respondent's audited financial statements.  *See* Pet's Br. at 15.  In that case, however, the Court merely noted Commerce's "practice of ***generally*** relying upon the classifications of expenses as recorded on a company's audited financial statements . . . ."  273 F.Supp.3d at 1167 (emphasis added).  Moreover, although *Mid Continent* refers to "research and development and depreciation" as "non-manufacturing-related expenses," *see id.* at 1165 n.4,

Commerce's established practice is supported by the statutory language.  Under 19 U.S.C. § 1677b(f)(1)(A), Commerce must rely on a respondent's reported costs of production when: (1) such costs are based on "records" maintained in accordance with the home country's GAAP; and (2) they reasonably reflect the costs associated with the production and sale of the merchandise.  Commerce cited this statutory provision to justify its decision to limit its G&A analysis to YGK's "GAAP-compliant financial statement . . . ."  *Final Decision Memo* at 6, Appx2921.  Section 1677b(f)(1)(A), however, uses the general term "records," and, consequently, is not limited to a company's "financial statement."

Here, although R&D costs were classified as general expenses in YGK's financial statements, YGK/Nagase submitted YGK's underlying accounting records to demonstrate that a large portion of YGK's R&D costs related to non-subject merchandise during the POR.  *See* DQR at D-24, Appx83974, Exhibit D-11, Appx84035; SQR at 17–18, Appx84165–84166, Exhibit S-20, Appx84962–84973.  By disregarding YGK/Nagase's explanation and documentation of how YGK recorded R&D costs in the normal course of business, Commerce failed to meet its obligation to look beyond financial statement classifications where warranted based on the respondent's normal books and records.  *See High-Tenacity Rayon Filament Yarn from Germany*, 60 Fed. Reg. 15897 (Dep't Commerce Mar. 28, 1995) (final results admin. review), IDM at Comment 5 (excluding R&D expenses relating to non-subject merchandise because "R&D expenses submitted by {respondent} were allocated on a product-specific or product line basis . . . . {and t}he methodology used to allocate the R&D is that used in {respondent's} normal course of business and reconciles to the financial statements").

---

Section D of the Department's AD Questionnaire explicitly identifies ***product-specific*** R&D as a manufacturing cost (*i.e.*, fixed overhead), *see* DQR at D-35, Appx83985.

Second, Defendant claims that Commerce's practice is to treat an R&D cost as product-specific (*i.e.*, not related to the company's general operations) only if it relates to a "specific commercially viable" product. *See* Def's Br. at 12. Defendant, however, fails to cite any precedent supporting this purported practice, and it is inconsistent with the Commerce and court decisions cited above, which do not include any such requirement. Moreover, a "commercially viable product" test would be unreasonable. As previously explained, the question is whether R&D costs relate to specific product lines or are general in nature. *See* Nagase's Br. at 20–22. Regardless of whether R&D projects designed for non-subject merchandise resulted in commercially viable products, such R&D costs cannot reasonably be treated as general expenses and allocated to the cost of production for subject merchandise. In any event, YGK submitted records showing that the company's R&D costs supported specific product categories (*i.e.*, [

]) that include commercially viable products. *See* SQR at 17–18, Appx84165–84166, and Exhibit S-20, Appx84962–84973.

Finally, Petitioner cites the Federal Circuit's decision in *Hynix* to support its post hoc argument that Commerce only considers a reported cost allocation methodology that was historically used by the respondent, *see* Pet's Br. at 16, but that case is inapposite. In *Hynix*, the respondent switched methodologies across several consecutive review periods – first amortizing its R&D costs, then expensing them, and then reverting to amortization – which was perceived as an impermissible effort to shift costs from one period to another. *See Hynix,* 424 F.3d at 1370. Unlike the respondent in *Hynix*, YGK did not amortize its R&D costs, but rather expensed them as they were incurred. *See* SQR at Exhibit S-20, Appx84962–84973. Thus, contrary to Petitioner's argument, the manner in which YGK recorded R&D costs prior to the POR is irrelevant. Furthermore, it is well-settled that "each administrative review is a separate exercise of

Commerce's authority that allows for different conclusions based on different facts in the record." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014).

### 3.   Defendant and Petitioner Fail to Identify Substantial Record Evidence Supporting Commerce's Factual Findings

Defendant and Petitioner also fail to identify substantial evidence supporting Commerce's finding that YGK's product-category-specific R&D costs were general expenses. Instead, they rely on post hoc (and unreasonable) interpretations of the record evidence to justify Commerce's erroneous finding that YGK's product-specific assignment of R&D costs was performed "after the fact" and its ultimate decision to treat YGK's product-category-specific R&D costs as general expenses.

In the *Final Results*, Commerce unreasonably dismissed the evidence that YGK recorded R&D costs on a product-category-specific basis during the POR as an "'after the fact' allocation of company-wide R&D costs to broad product categories using headcount or hours." *Final Decision Memo* at 6, Appx2921. In doing so, Commerce failed to account for YGK's underlying accounting records, which showed that YGK recorded R&D costs by product category on a monthly basis in the normal course of business. *See* SQR at Exhibit S-20, Appx84962–84973. Defendant now argues that "YGK did not actually allocate the R&D expenses to {product} subcategories for the majority of the period of review." Def's Br. at 12–13. Defendant's argument is both post hoc and incorrect.

YGK's underlying records (described in detail in Nagase's initial brief) show that YGK began recording R&D expenses by project and by product category in April 2019 (*i.e.*, for 12 of the 19 months of the POR, April 2019 through March 2020). This period aligns with the fiscal year for which Commerce instructed YGK/NAGASE to report G&A expenses (*i.e.*, the fiscal year that most closely corresponds with the POR). *See* DQR at D-30, Appx83980. YGK's records thus

confirm that, during this fiscal year, YGK recorded R&D costs by product category; YGK's R&D records were **not** prepared "after the fact."   Although YGK did not update its ***trial balance*** to reflect R&D costs by product categories before October 2019, *see* DQR at Exhibit D-11, Appx84035, Commerce (and Defendant) ignore YGK's underlying records, which were prepared monthly in the normal course of business.   Commerce's finding that YGK's assignment of R&D costs on a product-category-specific basis was "after the fact" is refuted by YGK's monthly records prepared and kept in the normal course of business during the POR.

Petitioner points to YGK/Nagase's G&A ratio calculation submitted with Nagase's questionnaire response as evidence that YGK's assignment of R&D costs was made "after the fact." *See* Pet's Br. at 14.   This is absurd.   As explained, in calculating the G&A ratio to submit to Commerce, YGK excluded R&D costs for non-subject product categories based on the company's monthly records kept in the normal course of business and in accordance with Commerce's practice. *See* Nagase's Br. at 22–28; DQR at Exhibit D-9, Appx84029; SQR at Exhibit S-20, Appx84969–84973.   Petitioner's reference to YGK/Nagase's G&A ratio calculation for submission to Commerce – which is necessarily prepared after the fact – is unremarkable and fails to support Commerce's erroneous conclusion.

Moreover, contrary to Petitioner's assertion, *see* Pet's Br. at 14, Nagase is not asking the Court to reweigh evidence on this issue, but instead is demonstrating the absence of record evidence to support Commerce's conclusion.   Commerce failed to "articulate any rational connection between the facts found and the choice {it} made." *See Burlington Truck Lines*, 371 U.S. at 168 ("The agency must make findings that support its decision, and those findings must be supported by substantial evidence.").

Finally, based solely on the fact that YGK produced [

], Defendant argues that Commerce reasonably concluded that R&D

expenses incurred for all product categories – (*i.e.*, [

]) related to subject merchandise.   Def's Br. at 13–14 (citing AQR at A-24,

Appx80068).  This is, again, post hoc rationalization, as Commerce did not assert or even imply

this reasoning in the *Final Decision Memo*.  Further, Defendant's argument is speculative, based

on faulty logic, and unsupported by substantial evidence.  *See Yangzhou Bestpak Gifts & Crafts*

*Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (stating that Commerce's determination

cannot be made "on the basis of mere conjecture or supposition") (citation omitted); *see also*

*Hynix*, 424 F.3d at 1371 (holding that Commerce's "paltry evidence of cross-fertilization" based

on a list of project names and expert engineer testimony did "little to show that all semiconductor

R&D had impacted the development of {subject merchandise}").   No record evidence suggests

that the R&D YGK conducted for [                                        ] was relevant to glycine; rather,

YGK's monthly records identify the specific [                                                            ]

products for which the research projects were performed.  *See* SQR at Exhibit S-20, Appx84969–

84972.

**B.     Commerce's Inclusion of an Expense Related to Production of a Non-Subject Product in YGK's G&A Expense Ratio Cannot Be Sustained**

In its initial brief, Nagase demonstrated that Commerce erroneously treated a non-subject

expense – referred to as a "compensation for payment" – as akin to "penalties, litigation accruals,

{and} fines."  Significant evidence on the record – unaddressed by Commerce – contradicts its

decision and shows that the expense specifically related to YGK's provision of a non-subject

service (*i.e.*, its consigned production of a non-subject pharmaceutical product).  *See* Nagase's Br.

at 30–32.  In response, Defendant and Petitioner engage in post hoc rationalization, and are unable to justify Commerce's failure to account for significant contradictory evidence.

### 1.  Defendant and Petitioner Rely on Post Hoc Rationalizations

As previously noted, "{t}he courts may not accept appellate counsel's *post hoc* rationalizations for agency action." *Burlington Truck Lines*, 371 U.S. at 168.  Contrary to this basic administrative law principle, Defendant and Petitioner offer a novel (and incorrect) explanation for Commerce's decision to include the non-subject expense in YGK's G&A ratio: namely, that the expense was unrelated to the ongoing production of any revenue-generating non-subject merchandise, but rather was tied to a suspended non-subject production line.  *See* Def's Br. at 16–18; Pet's Br. at 18 (both citing *Husteel Co. v. United States*, 520 F.Supp.3d 1296, 1307 (Ct. Int'l Trade 2021)).  Commerce, however, did not offer or imply this reasoning in its *Final Decision Memo.*  Instead, Commerce simply labeled YGK's non-subject expense as akin to a penalty, litigation accrual, or fine, and on this basis alone decided to include it in YGK's G&A expenses.  *See Final Decision Memo* at 4, Appx2919.

Moreover, this post hoc argument is erroneous on the merits, because YGK did not shut down or suspend a non-subject production line.[3]  Rather, YGK continued to be "engaged in custom manufacturing of {active pharmaceutical ingredients} and pharmaceutical intermediates for new pharmaceuticals and generics" and continued to "offer custom manufacturing services that meet a variety of customer needs" throughout the POR, even after paying the "compensation for payment" expense.  AQR at Exhibit A-29, Appx80375, Appx80378.  Therefore, the revenue generated by

---

[3] Further, even when a production line *is* suspended, Commerce must justify its "departure from the statutory preference for determining costs according to an exporter's or producer's records" before reclassifying costs as G&A.  *SeAH Steel Corp. v. United States*, 513 F.Supp.3d 1367, 1400 (Ct. Int'l Trade 2021).

other merchandise produced on the line in question could bear the costs associated with the non-subject expense. Defendant's and Petitioner's assertion that the non-subject expense is unrelated to ongoing revenue-generating activities is contradicted by the record and unsupported by substantial evidence.

> ### 2. Defendant and Petitioner Cannot Justify Commerce's Failure to Address Significant Contradictory Evidence

Commerce's finding that YGK/Nagase's non-subject expense is akin to a penalty, litigation accrual, or fine is not supported by substantial evidence because Commerce failed to address significant contradictory evidence demonstrating that the expense related to the consigned production of a non-subject product. *See* Nagase's Br. at 30–32; *see also Universal Camera Corp. v. Nat'l Lab. Rel. Bd.*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). In response, Defendant and Petitioner cite inapposite cases and wrongly assert that Nagase is asking the Court to reweigh the evidence.

Defendant and Petitioner cite cases in which Commerce treated litigation expenses as G&A expenses attributable to subject merchandise. *See* Def's Br. at 16 n.7 (citing *Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 15539 (Dep't Commerce Apr. 2, 2002) (final AD determ.), IDM at Comment 48; *Circular Welded Pipe from the Republic of Korea*, 79 Fed. Reg. 37284 (Dep't Commerce July 1, 2014) (final results admin. review), IDM at 14–15)); Pet's Br. at 18 (citing *SeAH Steel Corp.*, 513 F.Supp.3d at 1404). These cases, however, are inapposite because YGK's non-subject expense was different. Nagase does not dispute that expenses relating to penalties, litigation, or fines are not production expenses. But significant record evidence, discussed in detail in Nagase's Br. at 30–32, demonstrates that YGK's non-subject expense

directly related to the consigned production of a non-subject product, which is simply not akin to litigation types of expenses. Commerce failed to address this evidence in its *Final Decision Memo.*

Finally, Nagase is not asking the Court to "reweigh evidence," contrary to Petitioner's claim. *See* Pet's Br. at 16–17, 19. Rather, Nagase argues that Commerce's treatment of YGK's non-subject expense as akin to a penalty, litigation accrual, or fine is unsupported by substantial evidence, and that Commerce "total{ly} fail{ed} to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion . . . ." *Allegheny Ludlum Corp. v. United States*, 112 F.Supp.2d 1141, 1165 (Ct. Int'l Trade 2000). For these reasons, a remand is necessary.

### C.     Commerce Abused Its Discretion by Issuing Liquidation Instructions Based on a Patently Erroneous Assessment Rate

In response to Nagase's arguments regarding the erroneous assessment rate, Defendant and Petitioner: (1) note that the error originated with Nagase; (2) assert that the error was not obvious from Commerce's materials, and muddle the point made by Nagase's comparison of the entered value of a single entry to the (erroneous) total entered value for all CEP sales shown in Commerce's Margin Output; (3) focus on when Nagase brought the issue to Commerce's attention; (4) emphasize the policy in favor of finality of administrative determinations; and (5) argue  that, even if the error may be corrected using information already on the record, Commerce need not do so.

None of these arguments, however, obliges the Court to stand by helplessly while CBP collects [                                        ] more than the actual amount of antidumping duties to which the Government is entitled. Nor do these arguments prevent this Court from exercising its authority to order Commerce to correct the erroneous assessment rate calculation to ensure that the proper remedial goal of the antidumping law is fulfilled.

14

**1.    Nagase's Oversight Does Not Justify Abandoning the Remedial and Fairness Principles Underlying the Antidumping Law**

The error's origin in data submitted by Nagase, *see* Def's Br. at 19, is not in dispute. Nagase recognizes, regrettably, that the error originated in YGK/Nagase's U.S. sales database. *See* CQR at Exhibit C-1, Appx80776–80785, and Exhibit C-2, Appx80786–80787.  Specifically, the per-unit amounts of regular U.S. duties paid on Nagase's imports corresponding with CEP sales were inadvertently duplicated and reported as the entered values for those sales.  Commerce then compounded this error by using Nagase's reported entered values to calculate the denominator of its assessment rate calculation. *See* Nagase's Br. at 15.

However, the fact that the error stems from Nagase's inadvertence does not justify a refusal to correct it – now that its existence is clear and CBP has yet to liquidate Nagase's entries.  In other words, Nagase's responsibility for the error does not justify rejecting fundamental principles of fairness and the remedial nature of the antidumping law. *See Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1103–04 (Fed. Cir. 1990); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).  Nor does it justify converting the law into a punitive instrument to inflict a huge financial penalty on Nagase for an oversight.  "The Court has stated that 'fair and accurate determinations are fundamental to the proper administration of our dumping laws' and has recognized that 'courts have uniformly authorized the correction of any clerical errors which would affect the accuracy of a determination.'" *Federal-Mogul Corp. v. United States*, 872 F.Supp. 1011, 1014 (Ct. Int'l Trade 1994) (citations omitted).

**2.    Once Identified, the Assessment Rate Error Is Unmistakable**

Defendant attempts to rebut Nagase's highlighting of the extreme magnitude of the error, asserting that "Nagase appears to be asking the court to compare the entered value for a specific shipment of Glycine *imported* to the United States in the {POR} to the total entered values for all

*sales* of glycine made during the {POR}." Def's Br. at 22 (emphasis in original).[4]  Petitioner

likewise asserts that Nagase is comparing apples to oranges by comparing the assessment rate to

the dumping margin.  Pet's Br. at 24.  These arguments are misdirected.

Of course, the quantity and value ("Q&V") of entries during the POR will differ from the

Q&V of sales during the POR in CEP situations.  Nagase already acknowledged this in explaining

why cash deposit rates and assessment rates differ in the first place.  See Nagase's Br. at 33–34 &

n.17.  If the Q&Vs of entries and CEP sales were equal, there would be no need to calculate a

separate assessment rate.  But the natural difference between Q&Vs for entries and Q&Vs for CEP

sales does not support Defendant's suggestion that, mathematically, the entered value of a single

entry could exceed the entered value of all CEP sales over the course of a 19-month period.  That

is the comparison Nagase highlighted in its initial brief, *see id.* at 35, and it is one of the reasons

why the error in the assessment rate is so clear once it is found:  It is extraordinarily improbable

that the total entered value for all CEP sales would be less than the entered value for a single import

entry.  In fact, that situation is impossible in this case, as demonstrated by entry documentation

submitted by Nagase showing that the actual entered value for one CEP sale reported in the U.S.

---

[4]  Defendant also claims that "it is impossible to determine whether the shipment in question was linked to U.S. CEP sales during the period of review," Def's Br. at 23, from which it jumps to the conclusion that "it is meaningless to compare the value or quantity of a period of review *entry*, which would be placed in the consignment warehouse along with glycine from other entries including those predating the period of review, to the entered value of period of review consignment *sales* from the warehouse that may be completely unrelated to that specific entry." *Id.* (emphasis in original).  The claim that entries cannot be linked to sales is flatly incorrect. Commerce expressly instructed Nagase to reconcile certain U.S. sales to import data compiled by Commerce.  In response, YGK/Nagase provided a reconciliation of entries to the corresponding CBP Forms 7501, from which  it was possible to link the U.S. sale to the import entry.  The reconciliation worksheet includes the specific entry corresponding with the CEP sale mentioned in Nagase's initial brief.  That is, the entry summary [                    ] (which shows a quantity of [        ] kg,  an entered value of $[          ], and an entry date of [                ]), *see* CQR at Exhibit C-14, Appx80854, corresponds with the CEP sale reported under reference SEQU [    ] in YGK/Nagase's U.S. sales database.  *See* SQR at Exhibit S-6, Appx84752.

sales database ($[          ]) exceeds the total (and erroneous) entered value Commerce used in the

denominator of the CEP assessment rate calculation (*i.e.*, $[          ]).

The existence of the error is also evident from the fact that Nagase reported identical per-unit amounts for U.S. duties (field USDUTYU) and entered value (field ENTVALU) for each CEP sale (also shown in Commerce's margin calculation materials).[5]  Defendant and Petitioner argue that Commerce should not be expected to "burrow" through the database to find errors, *see* Def's Br. at 23–24; Pet's Br. at 23, 25–26, but that is not Nagase's point.  Rather, once the duplicative data in the duty and entered value fields are found, the error becomes unmistakable.

### 3. The Timing of Nagase's Raising the Issue with Commerce Does Not Excuse Application of a Patently Erroneous Assessment Rate

Petitioner challenges the length of time Nagase took to identify the erroneous assessment rate.  *See* Pet's Br. at 25–26.  However, as described in Nagase's initial brief, the error was found on page 123 of a 126-page computer printout.  *See* Margin Output at 123, Appx103299.  A single number (*i.e.*, [     ] percent assessment rate) in a 100-plus-page document containing the technical details of Commerce's margin calculation is not readily apparent – particularly considering all the other documents Commerce releases with a final antidumping determination, including its notice of the final results, the decision memorandum, and calculation memoranda, etc.

Moreover, Nagase's counsel, once they discovered the error in mid-October 2021, promptly alerted Commerce personnel and discussed the issue by telephone on October 18, 2021.  *See* Ex Parte Memo, Appx3068.  During the telephone conference, counsel explained the error and the manner in which it could be corrected using data on the record.  This was admittedly after

---

[5]  *See* Margin Output at 11–12, Appx103187–103188; *see also* SQR at Exhibit S-28, Appx85019–85029 (revised U.S. sales database).

Commerce's regulatory deadline for identifying ministerial errors had expired, 19 C.F.R. § 351.224(c)(2), but it was prompt in terms of the gap of time between discovery and communication. Commerce thereby became aware of the issue, but determined (incorrectly) that it could do nothing because the review had concluded.[6]

Notably, in this proceeding Commerce did not take the routine step of issuing draft liquidation instructions to the parties for their review. Draft liquidation instructions are often issued by Commerce with its preliminary and/or final determinations in administrative reviews. Those documents are very short (as seen in the actual liquidation instructions issued by Commerce to CBP in this case on November 24, 2021, Appx.103306–103310), and their entire focus is the assessment rate – the very number at issue in this appeal. Had Commerce done so, the erroneous assessment rate would have been glaring and could have been raised within the time period set aside for correction of ministerial errors.

The precedents discussed by Defendant and Petitioner regarding exhaustion of administrative remedies do not compel this Court to affirm an inadvertent clerical error that will result in the collection of [                    ] in duties to which the Government is not entitled. For example, in *QVD Food Co. v. United States*, 658 F.3d 1318, 1328 (Fed. Cir. 2011), the Court noted that the error may not have been ministerial in nature; rather, it involved the potential double-counting of costs incorporated into the financial expense ratio used to calculate constructed value. In *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375–76 (Fed. Cir. 2010), the

---

[6] After the discussion with Nagase's counsel, Commerce did not dispute that the assessment rate found in the Margin Output was erroneous, but rather submitted a memo to the file expressing procedural helplessness: "{T}his administrative review is complete, the record is closed, and there is no mechanism for Commerce to change the results or the manner of duty assessment." Ex Parte Memo, Appx3068. This expression of helplessness is incorrect, as discussed in Nagase's initial brief at 16 and further below.

issue was raised for the first time in remand proceedings – far later, obviously, than in the current case.  And, in *Stanley Works (Langfang) Fastening Sys. v. United States*, 964 F.Supp.2d 1311, 1339–40 (Ct. Int'l Trade 2013), the error was found in Commerce's computer programming language – not a self-evident numeric error, as here.

Moreover, neither Defendant nor Petitioner refers to the statutory provision that governs the application of the exhaustion doctrine in proceedings before this Court.  The statute states that "the Court of International Trade shall, ***where appropriate***, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d) (emphasis added).  Thus, Congress incorporated flexibility in the application of the exhaustion requirement, and the Supreme Court has explained that, "where Congress has not clearly required exhaustion, sound judicial discretion governs."  *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992).  Nagase submits that rigid application of the exhaustion doctrine in this case – which would result in the Government's over-collection of [

] in antidumping duties – would violate the fundamental policies of fairness and accuracy underlying the antidumping law – and, hence, would not be "appropriate" and, indeed, would be an abuse of discretion.

> **4.     The Policy of Finality Does Not Give Commerce License Knowingly to Direct CBP to Over-Collect Antidumping Duties**

Petitioner argues that, similar to the exhaustion doctrine, the interest of finality of administrative decisions prevents Commerce from correcting the error because it was brought to Commerce's attention after the preliminary determination.  Pet's Br. at 26–28.  This argument fails to recognize other important policies that must be balanced in considering the agency's interest in finality.

"When considering whether Commerce's rejection of an untimely filing amounts to an abuse of discretion, the court is guided first by the remedial, and not punitive, purpose of the

antidumping statute, . . . and the statute's goal of determining margins 'as accurately as possible,' . . . ." *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815 F.Supp.2d 1342, 1365 (Ct. Int'l Trade 2012) (citing *Chaparral Steel*, 901 F.2d at 1103–04; *Rhone Poulenc*, 899 F.2d at 1191). Thus, "while deferring to Commerce's necessary discretion to set and enforce its deadlines, the court will review on a case-by-case basis whether the interests of accuracy and fairness outweigh the burden placed on the Department and the interest in finality." *Id.*; *accord*, *Koyo Seiko Co. v. United States*, 746 F.Supp. 1108, 1111 (Ct. Int'l Trade 1990) ("As this court has previously recognized, failure to reopen a determination which is known to be based on erroneous factual information that would clearly mandate a change in result would itself be arbitrary and capricious. . . . The Court therefore finds it necessary to balance the preference for accurate determinations with the necessity for meaningful final determinations.") (citation omitted). The Court has recognized that this balancing applies even where a respondent has been "dilatory" in notifying Commerce of an error. In *Tehnoimportexport v. United States*, 766 F.Supp. 1169 (Ct. Int'l Trade 1991), the Court explained that, "{g}iven the dilatory nature of plaintiffs' corrections, and the need to complete the final determinations, . . . {Commerce} acted within its discretion in refusing to correct most of plaintiffs' mistakes." *Id.* at 1178–79. But it immediately clarified that one particular mistake "was so obvious that the failure to correct it did constitute an abuse of discretion." *Id.* at 1179. The same is true here. Once identified and reported to Commerce, the error in Nagase's assessment rate is so obvious that Commerce's refusal to correct it was an abuse of discretion.

Petitioner, *see* Pet's Br. at 26–27, also relies heavily on the Federal Circuit decision in *Goodluck India Ltd. v. United States*, 11 F.4th 1335 (Fed. Cir. 2021), which upheld Commerce's refusal to accept a new database from the respondent at verification. But that is not remotely the

situation here.  Nagase is not trying to submit new data on the record of this proceeding.  Rather, after thorough review of Commerce's Margin Output, Nagase discovered an egregious error in the CEP assessment rate, which can be corrected using information already on the record.  Consequently, "the burden imposed upon the agency," *Grobest*, 815 F.Supp.2d at 1365 (citation omitted), to correct the error will be minimal, and the interest of finality cannot outweigh the contrary "public interest in reaching . . . the right result," as recognized by the Court of Appeals in *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (citation omitted) – quoted by Petitioner itself.  Pet's Br. at 27.  Moreover, the Court of Appeals in *Goodluck* reiterated the basic principle that "Commerce's discretion has limits," and explained the balancing of goals: "'Congress' desire for speedy determinations on dumping matters should not be interpreted as authorizing proceedings that are based on inaccurate data.'"  *Goodluck*, 11 F.4th at 1342 (quoting *Borlem S.A.-Empreedimentos Industriais v. United States*, 913 F.2d 933, 937 (Fed. Cir. 1990)).

### 5.    The Error Can Be Corrected Based on Data on the Record

Defendant does not dispute that the methods proposed by Nagase to correct the error rely entirely on current record evidence.  Rather, it argues that this does not mean that Commerce abused its discretion in declining to correct the error.  Def's Br. at 25–27.  But if taken seriously, this argument means we must stand by while CBP applies an assessment rate that is over [       ] the correct rate and collects [            ] in duties to which the Government is not entitled. The principles of administrative law and judicial review do not compel such helplessness.  To the contrary, the policies of accuracy and fairness that undergird the antidumping law lead to the opposite conclusion.

Further, Defendant attempts to rebut Nagase's argument that Commerce already has demonstrated an ability and willingness to correct an error in the Margin Output when issuing the liquidation instructions.  Def's Br. at 25–26. Defendant asserts that the change in the listed identity

of the importer did not indicate that there had been an error in the Margin Output; rather, the change was intentional, because the Margin Output intended to identify the CEP customer of the merchandise, whereas the liquidation instructions intended to identify the importer of record.

Assuming this is true, it is beside the point.  The key fact is that Commerce recognizes its authority – and responsibility – to revise information included in the Margin Output when it issues its liquidation instructions.  In the case of the CEP importer's identity, the code used to identify the CEP customer on page 123 of the Margin Output would have failed to generate the correct duty amount (generating zero duties) if applied in the liquidation instructions.  Accordingly, Commerce revised that code before issuing the liquidation instructions to CBP.  The same logic applies to the CEP assessment rate shown on the same page of the Margin Output.  Once that figure was flagged as erroneous, there was no legal impediment to Commerce's correcting the error before issuing the liquidation instructions – and Commerce had a responsibility to do so.

**6.   If the Court Remands This Case with Regard to Either of the First Two Counts, It Should Direct Commerce to Correct the Assessment Rate Error**

This Court has the authority to direct Commerce to correct an obvious error on remand – even one that had not been identified previously – when it remands a case to the agency for reconsideration of other issues.  For example, in *Jinan Yipin Corp. v. United States*, 637 F.Supp.2d 1183, 1196–97 (Ct. Int'l Trade 2009), the Court remanded a ministerial error to Commerce because it "would not be the sole issue remanded to Commerce, nor would addressing the issue require Commerce to reconsider any factual findings or conclusions of law that previously were made{,}" even though Plaintiff could have identified the error after the preliminary results but did not raise it until the remand proceeding.  The Court noted that, where "Commerce has *refused* to act in response to a clerical error that is alleged to have existed in the Final Results but was undiscovered until the remand proceeding{,} . . . . the Court of International Trade previously has exercised its

discretion to require Commerce to correct clerical errors raised upon remand so that the court would not be affirming knowingly a determination affected by such errors." *Id.* at 1197 (citing *Serampore Indus. Pvt. Ltd. v. U.S. Dep't of Com.*, 696 F.Supp. 665, 673 (Ct. Int'l Trade 1988)) (emphasis in original).

The same situation exists here. Accordingly, Nagase respectfully submits that, in the event of a remand on either of the first two Counts, this Court should also direct Commerce to correct the clear error in the assessment rate.

## III.   CONCLUSION AND RELIEF SOUGHT

For the reasons discussed in Nagase's Brief and above, Plaintiff respectfully requests that the Court enter judgment in favor of Nagase.

Respectfully submitted,

/s/ Jay C. Campbell
Jay C. Campbell
White & Case LLP
701 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 626-3600
jcampbell@whitecase.com

/s/ Neil R. Ellis
Neil R. Ellis
Law Office of Neil Ellis PLLC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C. 20015
(202) 258-5421
neil@neilellislaw.com

*Counsel to Plaintiff Nagase & Co., Ltd.*

August 26, 2022

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chambers Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for the Reply Brief filed by Nagase & Co., Ltd., as computed by White & Case LLP's word processing system (Microsoft Word 2016), is 6,891 words.

/s/ Jay C. Campbell
Jay C. Campbell