A-588-878
Remand
Slip Op. 23-46
POR: 10/31/2018 – 5/31/2020
**Public Document**
E&C/OVI: JKD

***Nagase & Co., Ltd. v. United States***
**Court No. 1:21-cv-00574, Slip Op. 23-46 (CIT April 11, 2023)**
**Glycine from Japan**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

I.     **SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination in accordance with the opinion and remand order of the U.S. Court of

International Trade (the Court) issued on April 11, 2023, in *Nagase & Co., Ltd. v. United States*,

Court No. 1:21-cv-00574, Slip Op. 23-46 (CIT 2023) (*Remand Order*).  These final results of

redetermination concern the final results in the 2018-2020 administrative review of the

antidumping duty order on glycine from Japan.[1]

In the underlying review, Commerce calculated a final dumping margin of 27.21 percent

for Yuki Gosei Kogyo Co., Ltd./Nagase & Co., Ltd (YGK/Nagase).[2]  In the *Remand Order*, the

Court remanded one issue:  Commerce's treatment of compensation for payment expense as a

general and administrative expense.[3]  The Court held that Commerce's findings, that the

compensation for payment should be treated as a general and administrative expense, rather than

as an expense related directly to the production of non-subject merchandise, were conclusory and

---

[1] *See Glycine from Japan:  Final Results of Antidumping Duty Administrative Review; 2018–2020*, 86 FR 53946 (September 29, 20210) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[2] *Id.*  Commerce determined that Yuki Gosei Kogyo Co., Ltd., and Nagase & Co., Ltd., are affiliated within the meaning of section 771(33)(E) of the Tariff Act of 1930, as amended (the Act) and should be treated as a single entity pursuant to 19 CFR 351.401(f).  *Id.*  Commerce initially selected Nagase & Co., Ltd. for review.  *See Glycine from Japan:  Preliminary Results of Antidumping Administrative Review; 2018-2020*, 86 FR 36105 (July 8, 2021).
[3] *See Remand Order* at 38-39.

were contradicted by record evidence.[4]  Therefore, the Court ordered Commerce to reconsider

the entire record of evidence regarding the compensation for payment expense, to allow

YGK/Nagase the opportunity to respond to arguments, and to make a decision based on the facts

on the record.[5]

On June 8, 2023, YGK/Nagase filed a letter requesting that Commerce exercise its

discretion and recalculate the assessment rate for an importer of YGK/Nagase.[6]  Although the

Court did not remand the issue of the incorrectly reported entered value and resulting importer-

specific assessment rate calculation, for which YGK/Nagase failed to exhaust administrative

remedies, it stated that "Nagase is not wholly without remedy" and that, among other possible

actions, Nagase may continue to request that Commerce correct the assessment rate.[7]  The Court

also stated that Commerce retains the discretion to correct the rate until after judicial review is

completed.[8]  Accordingly, YGK/Nagase requested Commerce to recalculate the assessment rate

and suggested three alternative approaches for determining an entered value different from the

entered value that YGK/Nagase reported and recalculating the assessment rate using a different

entered value.[9]  Our final results of redetermination are discussed below.

## II.    DISCUSSION

### i.    Statutory and Regulatory Background

Section 773(b)(3) of Act states that the cost of production (COP) shall be the sum of:

(A) the cost of materials, fabrication, and processing to produce the merchandise; and (B) an

amount for selling, general, and administrative expenses based on actual data pertaining to

---

[4] *Id*. at 27-28.
[5] *Id*. at 31.
[6] See YGK/Nagase's Letter, "Remand Proceedings Pursuant to *Nagase & Co., Ltd. v. United States*, Slip Op. 23-46," dated June 8, 2023 (YGK/Nagase Remand Letter).
[7] *Id*. at 38.
[8] *Id*.
[9] *Id*. at 2.

production and sales of the foreign like product by the exporter in question; and (C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment. In addition, section 773(f)(1)(A) of the Act states that costs shall normally be calculated based on the records of the exporter or producer of the merchandise … and reasonably reflect the costs associated with the production and sale of the merchandise.

Section 736(a)(1) of the Act directs U.S. Customs and Border Protection (CBP) to assess antidumping duties equal to the amount by which the normal value of the merchandise exceeds the export price (or the constructed export price). Commerce's regulations, at 19 CFR 351.414, describe how Commerce compares normal value with export price or constructed export price.[10] Section 736(c)(3) of the Act directs the administering authority to publish notice in the *Federal Register* of the results of its determination of normal value and export price (or constructed export price), and that determination shall be the basis for the assessment of antidumping duties. Finally, 19 CFR 351.212(b)(1) states that Commerce will calculate an assessment rate for each importer and "normally will calculate the assessment rate by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty purposes" and that Commerce will then instruct CBP "to assess antidumping duties by applying the assessment rate to the entered value of the merchandise."

---

[10] Commerce modified its calculation methodology in certain antidumping duty proceedings. *See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 FR 8101 (February 14, 2012).

## ii. Factual Background

Compensation for Payment

As noted above, Commerce issued the final results of review with respect to YGK and Nagase on September 29, 2021.[11]  In the *Final Results*, Commerce included the "compensation for payment" expense in the general and administrative (G&A) expenses for YGK/Nagase.[12] Commerce stated that "the record indicates that the 'compensation for payment' expenses do not relate directly to the production of non-subject merchandise but, rather, relate indirectly to the general operation of the company."[13]  Commerce further stated that it "allocates expenses of this nature (*e.g.*, penalties, litigation accruals, fines, *etc*.) over all products because they do not relate to a production activity, but to the company as a whole; in this case, the fact that the expenses relate to the company as a whole is demonstrated by the company's press release."[14]

In the *Remand Order*, the Court stated that Commerce's usual practice is "to exclude expenses related to the production of non-subject merchandise from its calculation of general and administrative expenses if the expenses are allocated properly in the producer's normal books and records."[15]  The Court stated that Commerce concluded that the compensation for payment expense did not relate directly to the production of non-subject merchandise,[16] with Commerce citing to the Press Release.[17]  However, the Court further stated that Commerce's citation to the Press Release in support of its finding that the compensation for payment expense was related to the company as a whole was done "without any analysis" and was insufficient.[18]  The Court also

---

[11] *See Final Results*.
[12] *See Final Results* IDM at Comment 1.
[13] *Id*. (citing YGK/Nagase's Letter, "Response to First Supplemental Questionnaire Response," dated January 22, 2021 (First Supplemental Response) at Exhibit S-22 (*i.e.*, the Press Release)).
[14] *Id*.
[15] *See Remand Order* at 6.
[16] *Id*. at 11, 25.
[17] *Id*.
[18] *Id*. at 25.

stated that YGK/Nagase had provided evidence that the compensation for payment expense was the result of a contract with a non-glycine customer that consigned production of a non-glycine product.[19] The Court held that, under the substantial evidence standard, Commerce must provide a reasonable explanation for its actions and, further, address any information on the record that significantly detracts from its conclusion.[20] The Court found that Commerce failed to meet this standard, and that Commerce's findings with respect to this issue were "conclusory and contradicted by record evidence that {Commerce} failed to address."[21] In light of its findings, the Court ordered that Commerce reconsider the entire record of evidence regarding the compensation for payment expenses and to allow Nagase an opportunity to respond to any arguments that Commerce makes.[22]

Assessment Rate

In the *Remand Order*, the Court held that "Commerce did not exceed its lawful discretion by denying Nagase's untimely request" to correct the alleged assessment rate error.[23] The Court found that YGK/Nagase admitted that the alleged error was the result of YGK/Nagase's own submission of incorrect information on the record, that the issue was detectable once Commerce issued the preliminary results of review, but that YGK/Nagase did not seek correction of its reporting error until 19 days after the publication of the *Final Results* and 14 days after the five-day window for ministerial error comments closed.[24] Additionally, the Court stated that, even though YGK/Nagase suggested several methodologies for deriving the "correct" figure for the entered value of the constructed export price sales, such figure is not part of the record,[25] and

---

[19] *Id*. at 26.
[20] *Id*.
[21] *Id*. at 27-29.
[22] *Id*. at 31.
[23] *Id*. at 33.
[24] *Id*. at 32.
[25] *Id*.

further stated that the Court cannot determine the veracity of YGK/Nagase's suggested "work-around methodologies" to derive the correct entered value figure.[26]

Nevertheless, the Court also held that Commerce's discretion to correct ministerial errors ends only after judicial review is completed[27] and further stated that YGK/Nagase "may even continue to request that Commerce correct the assessment rate."[28]

In the YGK/Nagase Remand Letter, YGK/Nagase suggested that Commerce could allow YGK/Nagase to report accurate entered values for constructed export price sales, or could "reverse engineer" the entered values by dividing the reported constructed export price entered values by the U.S. duty rate, or could calculate constructed export price assessment rates as a per-unit (weight-based) rate, instead of an *ad valorem* rate.[29]

### iii. Analysis

*Compensation for Payment*

Pursuant to the *Remand Order*, we have re-examined the record evidence with respect to the compensation for payment. YGK/Nagase submitted the financial statements of both companies as part of its section A antidumping duty questionnaire response.[30] YGK's income statement for 2019-2020 contained a line item for compensation for payment expense.[31] In its section D questionnaire response, YGK/Nagase stated that it calculated the G&A expense using YGK's financial statements.[32] However, the compensation for payment expense was not included in the G&A calculation.[33]

---

[26] *Id*. at 36-37.
[27] *Id*. at 33.
[28] *Id*. at 38.
[29] *Id*. at 3.
[30] *See* YGK/Nagase's Letter, "Response to Section A of the Questionnaire," dated October 30, 2020 (AQR).
[31] *Id*. at Exhibit A-19.
[32] *See* YGK/Nagase's Letter, "Response to Section D of the Questionnaire," dated November 23, 2020 (DQR) at page D-24 and Exhibit D-9.
[33] *Id*.

In response to a supplemental questionnaire from Commerce, YGK/Nagase stated that the compensation for payment "was incurred to compensate a customer that had consigned production of a pharmaceutical product to YGK for losses due to a delay in the approval of the pharmaceutical by the relevant government authority."[34] YGK/Nagase provided a copy of the Press Release in Exhibit S-22 of the 1SQR, and stated further that Exhibit S-22 contained an invoice from the customer with an allocation of the amount of compensation for various expenses and actions.[35] YGK/Nagase stated that the expense was related to a specific, non-subject product and not to YGK's general operations and was, thus, properly excluded from the G&A expense ratio.[36]

YGK/Nagase, in response to a separate supplemental questionnaire from Commerce, further described the circumstances underlying the compensation for payment.[37] YGK/Nagase stated that the product which was the subject of the compensation for payment was consigned production of a non-glycine product from an unaffiliated customer to YGK. YGK/Nagase provided a copy of a memorandum detailing the compensation for payment, which indicated that YGK was to produce the non-glycine product in question using materials provided, in part, by the unaffiliated customer.[38] However, due to a U.S. government action, YGK was forced to cease production of the non-glycine product in question for the unaffiliated customer and dispose of any production related to this order.[39]

---

[34] *See* YGK/Nagase's Letter, "Response to the First Supplemental Questionnaire Response," dated January 22, 2021 (1SQR) at 20.
[35] *Id*.
[36] *See* 1SQR at 20.
[37] *See* YGK/Nagase's Letter, "Response to Second Supplemental Questionnaire Response," dated May 6, 2021 (2SQR) at 6-7 and Exhibits SS-7 and SS-8.
[38] *Id*.
[39] *Id*.

For purposes of these final results of redetermination, Commerce has examined Exhibit S-22 of the 1SQR and Exhibits SS-7 and SS-8 of the 2SQR, per the instructions of the *Remand Order*. This evidence on the record indicates that YGK manufactured the non-glycine product in question for a non-affiliated customer on a consignment basis, and that ultimately the merchandise in question was not suitable for sale to other parties.[40] The product in question is not glycine and is not subject to the antidumping duty order on glycine from Japan.

Furthermore, Exhibit SS-7 of the 2SQR indicates that the compensation for payment is attributable solely to the production of the non-glycine product in question for the unaffiliated company.[41] The final actual compensation amount is contained in Exhibit SS-8 of the 2SQR, which is an invoice from the unaffiliated company to YGK.[42] While Commerce initially considered the compensation for payment similar to litigation or settlement claims, upon re-examination, we find that the amount represents the reimbursement of certain of the consignee's expenses incurred for the production of non-subject merchandise. Furthermore, although YGK's production of the non-glycine product in question was unsuccessful, YGK/Nagase engaged in other non-subject subcontract production.[43] Consequently, we find it appropriate that YKG/Nagase's continuing subcontracted production activities for non-subject products absorb the production expenses related to the failed non-glycine product production. Thus, record evidence shows that the compensation for payment represents subcontracted production costs that are not related to Nagase's own production or sale of glycine. Moreover, because the amount reflects subcontracted production costs that can be absorbed by other subcontracted

---

[40] *Id*.
[41] *See* 2SQR at Exhibit SS-7.
[42] *Id*. at Exhibit SS-8
[43] *See* 1SQR at Exhibit S-1.

activities, we find the compensation for payment is not related to the general operations of the company.

Section 773(b)(3)(B) of the Act states that the COP shall be the sum of an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question. Furthermore, section 773(F)(1)(A) of the Act directs Commerce to use costs based on records of the exporter or producer of subject merchandise where such costs reasonably reflect costs associated with the production and sale of the subject merchandise. With respect to G&A expenses, therefore, Commerce does not require that the expenses relate solely to the production of subject merchandise but, instead, considers expenses related to the general operations of a company as a whole to be part of G&A expenses.[44] The Court has upheld this approach.[45] In contrast, Commerce has specifically rejected the use of costs in G&A that are directly related to a particular production process or product and considers these to be manufacturing costs.[46]

Record evidence indicates that the compensation for payment expense relates to a production process or manufacturing cost that does not involve glycine and that YGK/Nagase continues to produce other subcontracted non-glycine products.[47] Therefore, for these final

---

[44] *See, e.g., Stainless Steel Sheet and Strip in Coils from Mexico; Final Results of Antidumping Duty Administrative Review*, 68 FR 6889 (February 11, 2003), and accompanying IDM at Comment 11; *Certain Steel Concrete Reinforcing Bars Final Results, Rescission of Antidumping Duty Administrative Review in Part, and Determination to Revoke in Part*, 70 FR 67665 (November 8, 2005), and accompanying IDM at Comment 13.
[45] *See U.S. Steel Group, et al. v. United States*, 998 F. Supp. 1151, 1154 (CIT 1998).
[46] *See Notice of Final Determination of Sales at Less Than Fair Value and Negative Critical Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea*, 77 FR 17413 (March 26, 2012), and accompanying IDM at Comment 35; *see also Notice of Final Determination of Sales at Less Than Fair Value: Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Japan,* 64 FR 24329, 24354 (May 6, 1999), and accompanying IDM at Comment 25.
[47] *See* 1SQR at Exhibit S-1.

results of redetermination on remand, we are excluding the compensation for payment expense in the calculation of YGK/Nagase's G&A expenses.[48]

*Assessment Rate*

In the YGK/Nagase Request, YGK/Nagase stated that Commerce could permit YGK/Nagase to submit new information regarding entered value, or could "reverse engineer" entered values by calculating a per-unit rate.[49] However, the assessment rate that Commerce calculated relied on YGK/Nagase's own submitted data.[50] The Court found that YGK/Nagase did not seek to correct its own error until well after the disclosure of calculations in the *Final Results*.[51] Finally, the Court acknowledged that the correct figure for entered value is not on the record,[52] and that parties do not consent that YGK/Nagase's proposed alternative methodologies will correct the alleged error,[53] and that it is not possible to discern whether YGK/Nagase's proposals are accurate without the correct entered value.[54] Nevertheless, the Court also noted that YGK/Nagase was not without remedy, providing a number of possible remedies that YGK/Nagase could pursue, including termination of the employee(s) responsible for the alleged erroneous data submission or action against YGK/Nagase's counsel.[55]

In *Alloy Piping*,[56] the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) held that "Commerce is not required to correct a final determination reflecting an error made by a private party when that error is not apparent from Commerce's final calculations released

---

[48] *See* Memorandum, "Analysis of Data Submitted by Yuki Gosei Kogyo Co., Ltd. and Nagase & Co., Ltd (YGK/Nagase) in the Draft Results of Remand of the Antidumping Duty Administrative Review of Glycine from Japan, 2018-2020 (Remand Preliminary Analysis Memorandum).
[49] *See* YGK/Nagase Request.
[50] *See Remand Order* at 32.
[51] *Id*.
[52] *Id*.
[53] *Id*. at 36-37.
[54] *Id*. at 36.
[55] *Id*. at 38.
[56] *See Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd.*, 334 F.3d 1284, 1292-93 (Fed. Cir. 2003) (*Alloy Piping*).

pursuant to 19 C.F.R. § 351.224(d) or from the final determination itself."[57] Even when an error

is apparent or should have been apparent from the face of the calculations or the final

determination, "the respondent is required to exhaust its administrative remedies" by "applying

to Commerce to correct the error within five days of the release of calculations or, if an extension

is granted, within five days after the publication of the final determination."[58] These

requirements are important because the Federal Circuit "recognize{s} … a strong interest in the

finality of Commerce's decisions."[59]

Consistent with *Alloy Piping*, the Court found that "Commerce is required to correct a

respondent's error that is apparent on the face of the final determination only where the

respondent has exhausted its administrative remedies."[60] The Court held that, "{u}nder the

regulation, this means applying to Commerce to correct the error within five days of the release

of the final calculations or, if an extension is granted, within five days after the publication of the

final determination."[61] The Court found that YGK/Nagase failed to raise the alleged error within

five day period after the release of final calculations and publication of Commerce's final

determination.[62]

The issue before us is whether it would be appropriate to disturb the administrative

finality of an issue that the Court did not remand, based on YGK/Nagase's request to correct the

alleged error arising from Commerce's reliance of YGK/Nagase's reported data. The

YGK/Nagase Remand Letter did not reference any prior Commerce remand determinations in

which Commerce made a correction for an issue that the Court did not remand. In its July 21,

---

[57] *Id.*
[58] *Id.* at 1292-93 (citing 19 CFR 351.224(c)(2), (c)(4)).
[59] *Id.* at 1292 (citing *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995)).
[60] *See Remand Order* at 36.
[61] *Id.* (citing *Alloy Piping*, 335 F.3d at 1293).
[62] *See Remand Order* at 36.

2023, comments on the draft results of redetermination, Nagase referenced one prior remand redetermination from more than 25 years ago in which Commerce corrected a programming error that inadvertently converted reported freight values to zero and was discovered during the remand proceeding, but for the reasons explained below, that case is inapposite. Commerce's calculations used YGK/Nagase's own reported data and Nagase failed to timely allege an error regarding its reported entered value within the deadlines provided by Commerce's regulations. The *Remand Order* instructed Commerce to reconsider one issue, unrelated to the entered value reported by YGK/Nagase. As such, we are not persuaded that we should disturb the finality of the issue of the entered value at this time.

In conformance with the *Remand Order*, Commerce released the draft results of redetermination for comment on July 14, 2023.[63] YGK/Nagase filed comments, in accordance with the briefing schedule, on July 21, 2023.[64] Below, we address arguments raised by YGK/Nagase on our Draft Redetermination.

### iv.    YGK/Nagase Comments

- YGK/Nagase agrees with Commerce's decision on remand to exclude the compensation for payment expense from the general and administrative expenses, as this decision is consistent with the Court's opinion and is supported by substantial evidence and in accordance with the law.[65]

- YGK/Nagase disagrees with Commerce's decision to calculate an *ad valorem* assessment rate, rather than a per-unit assessment rate, in the Draft Redetermination.[66]

---

[63] *See* Draft Results of Redetermination Pursuant to Court Remand, *Nagase & Co., Ltd. v. United States*, Court No. 1:21-cv-00574 (CIT April 11, 2023), dated July 14, 2023 (Draft Redetermination).
[64] *See* YGK/Nagase's Letter, "Comments on Draft Remand Results of Redetermination Pursuant to Court Remand," dated July 21, 2023 (YGK/Nagase Comments).
[65] *See* YGK/Nagase Comments at 2-3.
[66] *Id.*

- Commerce revised the assessment rate in its Draft Redetermination, and that rate must be supported by substantial evidence and in accordance with the law.[67]

- Commerce should amend its calculation of the assessment rate for three reasons:
  (1) Commerce has the discretion to correct the assessment rate; (2) revising the assessment rate is necessary to avoid over-collecting antidumping duties in a matter that would violate the remedial purpose of the statute, and; (3) revising the assessment rate is possible without disturbing the finality of the issue of entered value.[68]

- Commerce has made a correction in a court redetermination where the Court did not remand that specific issue.[69]

- In the Draft Redetermination, Commerce recalculated the antidumping duty margin for YGK/Nagase using information that Commerce knows is incorrect.[70]

- Commerce can confirm that the information regarding entered value is incorrect, as the reported entered value was a duplication of the per-unit U.S. duty amount.[71]

- It is unreasonable and impermissible under the statute and court rulings to calculate an assessment rate based in information that Commerce knows is in error.[72]

- The Court cannot affirm Commerce's recalculation of YGK/Nagase's antidumping duty rates if Commerce is aware that the recalculated rates are based on incorrect information.[73]

---

[67] *Id.*

[68] *Id.*

[69] *Id.* at 2-3, (citing *Cemex, S.A. v. United States*, 20 CIT 993 (CIT 1996) (*Cemex*), *aff'd*, 133 F.3d 897 (Fed. Cir. 1998) (*Cemex II*)).

[70] *Id.* at 3.

[71] *Id.* at 4.

[72] *Id.* at 5.

[73] *Id.*, (citing, *exempli gratia*, *Hyundai Electronics Industries. Co. v. United States*, 395 F. Supp. 2d 1231, 1243 (CIT 2005) (*Hyundai Electronics*); *Serampore Industries Pvt., Ltd. v. U.S. Department of Commerce*, 12 CIT 825, 834 (1988) (*Serampore*); and *Peer Bearing Co. v. United States*, 12 F. Supp. 2d 445, 452–53 (CIT 1998) (*Peer Bearing*)). YGK/Nagase also cites to *Anshan Iron & Steel Co. v. United States*, 358 F. Supp. 2d 1236, 1243 (CIT 2004) (*Anshan Iron*) and *Union Camp Corp. v. United States*, 53 F. Supp. 2d 1310, 1324 (CIT 1999) (*Union Camp*),

- Commerce need not reopen the record to obtain new entered value information, but, instead, may recalculate the antidumping duty assessment rate as a per-unit rate rather than an *ad valorem* rate.[74]

- Commerce calculated a per-unit assessment rate for YGK/Nagase's export price sales in this administrative review, and has used a per-unit assessment rate calculation in other proceedings.[75]

- Commerce has calculated per-unit rates *in lieu* of *ad valorem* rates in other antidumping duty administrative reviews of separate proceedings.[76]

- Calculating a per-unit assessment rate would ensure the correct amount of antidumping duties are collected without requiring Commerce to collect new information or otherwise disturb the finality of the issue of entered value.[77]

### v. Comment Analysis

YGK/Nagase states that it agrees with Commerce's decision to remove the compensation for payment expense from the G&A expenses.[78]  No other party commented on this issue.

---

where the Court remanded cases to Commerce where Commerce was aware that information was false based on information in a separate proceeding or a separate segment of the same proceeding.  Commerce is not aware of any such alternative information from a separate proceeding or a separate segment of the same proceeding for the purposes of this redetermination.

[74] *Id*. at 6.

[75] *Id*. at 6-7, (citing *Fujian Lianfu Forestry Co., Ltd. v. United States*, 638 F. Supp. 2d 1325 (CIT 2009) (*Fujian*); *1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2016-2018*, 84 FR 67925 (December 12, 2019) (*HEDP China*), accompanying IDM at Comment 5; *Notice of Final Results of Antidumping Duty Administrative Review:  Certain Softwood Lumber Products from Canada*, 70 FR 73437 (December 12, 2005) (*Canada Lumber*), accompanying IDM at Comment 38; and *Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 76 FR 70957 (November 16, 2011) (*Chlorinated Isos China*), accompanying IDM at Comment 8.

[76] *Id*. at 7 (citing *Amended Final Results of Antidumping Duty Administrative Review and New Shipper Reviews: Wooden Bedroom Furniture from the People's Republic of China*, 72 FR 46957 (August 22, 2007) (*Bedroom Furniture China*), accompanying IDM at Comment 36.

[77] *Id*. at 7.

[78] *Id*. at 2-3.

Therefore, we continue to remove the compensation for payment expense from the calculation of general and administrative expenses for these final results of redetermination on remand.

However, we decline to calculate YGK/Nagase's assessment rate using the "per-unit" methodology and continue to calculate the assessment rate using Commerce's standard *ad valorem* methodology. Our reasoning and analysis are set forth below.

As the Court has recognized, Commerce's regulations state that Commerce will "normally calculate an assessment rate by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customers purposes."[79] Commerce's practice is "to use a respondent's reported entered value to calculate an *ad valorem* assessment rate for sales associated with a particular importer, where a respondent reports the actual entered value for all sales associated with that importer."[80] In this case, Commerce, thus, followed its standard methodology in calculating the *ad valorem* rate for YGK/Nagase. YGK/Nagase has not alleged that Commerce failed to follow its standard practice or regulations in calculating the *ad valorem* assessment rate. We acknowledge that the relevant regulation uses the term "normally" when instructing Commerce to calculate an assessment rate by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise,[81] which suggests that the agency has some discretion to potentially depart from the norm, as an exception, if appropriate. Accordingly, the manner in which Commerce calculated the assessment rate in this proceeding is the norm and the central issue before us is whether it would be appropriate to disturb the administrative finality of an issue that

---

[79] *See* 19 CFR 351.212(b)(1), cited in *Fujian* at 1355.
[80] *See Fujian* at 1355.
[81] *See* 19 CFR 351.212(b)(1).

the Court did not remand, based on YGK/Nagase's request to correct the error arising from Commerce's reliance of YGK/Nagase's reported data, and depart from that norm.

YGK/Nagase offers three primary arguments stating that Commerce should change its methodology and calculate the assessment rate in a different manner.[82] However, we do not find these arguments persuasive.

First, YGK/Nagase contends that "Commerce has the discretion to correct the {constructed export price} (CEP) assessment rate on remand."[83] This may be so, but it does not resolve the issue of whether it would be appropriate to disturb the administrative finality of an issue that the Court did not remand, based on YGK/Nagase's request to correct the alleged error arising from Commerce's reliance on YGK/Nagase's reported data. In the Draft Redetermination, we observed that the YGK/Nagase Remand Letter did not reference any prior Commerce remand determinations in which Commerce made a correction for an issue that the Court did not remand.[84] In its July 21, 2023 comments, YGK/Nagase attempted to remedy this deficiency in its argument by citing to *Cemex*.[85]

Specifically, YGK/Nagase states that, in *Cemex*, Commerce corrected an error on remand that was not remanded to Commerce and was discoverable during the underlying antidumping duty investigation.[86] However, the facts in *Cemex* can be distinguished from the facts in this case. In *Cemex*, a programming error was discovered regarding the failure to deduct certain freight expenses.[87] Significantly, both Commerce and the Court agreed that the error in *Cemex*

---

[82] *See* YGK/Nagase Comments at 2.
[83] *Id.*
[84] *See* Draft Redetermination.
[85] *See* YGK/Nagase Comments at 2.
[86] *Id.* at 2-3.
[87] *See Cemex* at 1446.

was undiscoverable until after the publication of the final results of review.[88]  By contrast, here, the calculation of the *ad valorem* assessment rates and the methodology used to calculate such rates were available to YGK/Nagase in the preliminary results of review and, thus, any alleged reporting error should have been discovered and raised by Nagase during the administrative review.  In addition, the error in *Cemex* was a programming error that inadvertently converted reported freight values to zero and, thus, eliminated the freight deduction under the calculation methodology.[89]  In other words, the program inadvertently replaced the freight values that the respondent reported with a different value.  Such an error meets the definition of ministerial errors provided in section 751(h) of the Act:  "errors in addition, subtraction or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the administering authority considers ministerial."

YGK/Nagase have alleged no such error in Commerce's programming or in Commerce's calculation methodology used to calculate its assessment rate.  Thus, we do not find that circumstances surrounding *Cemex* justify a change in our methodology absent a remand from the Court regarding this issue.  Aside from citing to *Cemex*, which was issued more than 25 years ago and had different facts, YGK/Nagase did not identify any other instances of Commerce correcting an error on remand for an issue that the Court did not remand.  Accordingly, we find that YGK/Nagase provided no basis for us to depart from our decision in the draft remand not to reopen the issue that was not remanded.

---

[88] *Id*.; *see also Cemex II*, 133 F. 3d 904 ("The CIT agreed with Commerce and Ad Hoc Committee that the error was *undiscoverable* until after Commerce published its final results. … Given that the CIT found the error *undiscoverable* prior to the remand, it acted within its discretion in allowing the error to be corrected in a subsequent remand" (emphasis added).
[89] *Id*.

Second, YGK/Nagase argues that it is impermissible to calculate an assessment rate based on information that Commerce knows is erroneous.[90] We generally agree with the statement that Commerce should not use in its calculation information that Commerce knows is erroneous. However, this is not the case here because Nagase's understanding of the correct entered value is disputed. Although YGK/Nagase identified its own reporting error in entered value and suggested alternative methodologies, as the Court found, the "record does not contain a target at which Commerce should be aiming" and "the other interested parties do not accede to Nagase's understanding of the correct entered value total or to Commerce's use of nonstandard means to derive it."[91]

YGK/Nagase states in its comments on the Draft Redetermination, that Commerce recalculated the assessment rate using the reported entered value that is erroneous because it is a duplicate of the U.S. duty amounts, and thus is a fraction of the actual entered value.[92] YGK/Nagase states that the reported entered value is thus "obviously" incorrect and should not be used.[93] However, as previously stated, both YGK/Nagase's understanding of the correct entered value total and its proposed methodologies to derive a supposedly "correct" entered value are not without dispute.[94] Moreover, the revision to the calculation of the assessment rate that Commerce issued in the Draft Redetermination was limited to the issue that the Court remanded, *i.e.*, Commerce excluded the compensation for payment expense from the general and administrative expenses. Because no other issue was remanded, Commerce did not revisit or revise any other aspects of its assessment rate calculation.

---

[90] *See* YGK/Nagase Comments at 5.
[91] *See Remand Order* at 36-37, n.7.
[92] *See* YGK/Nagase Comments at 4.
[93] *Id*.
[94] *See Remand Order* at 36-37, n.7.

YGK/Nagase also argues that the entered value can be shown to be erroneous because the entered value for one sale on the record exceeds the total entered value used by Commerce to calculate YGK/Nagase's assessment rate.[95]  However, YGK/Nagase is asking that we compare the entered value for a specific shipment of Glycine *imported* to the United States in the period of review to the total entered values for all *sales* of glycine made during the period of review. The difference between these numbers does not demonstrate an error, because the quantity and value of Nagase's glycine *imported* to the United States do not match the quantity and value of glycine that Nagase's United States affiliates *actually sell* to its unaffiliated customer.

YGK/Nagase cites to *Hyundai Electronics* in support of its assertion that the Court cannot affirm a determination with known errors.[96]  However, in *Hyundai Electronics*, the Court noted that "all parties have agreed that the *Draft Remand Results* contained a miscalculation of {respondent's} entered value."[97]  In contrast, here, as noted above, the Court has found that interested parties do not accede to YGK/Nagase's understanding of the correct entered value total or to its proposed alternative methodologies for deriving such value.[98]

Further, in *Serampore*, which involved an allegation of a computer input error, the facts are different.  The data indicated a positive freight value for a Free-on-Board (*i.e.*, FOB) sale and the correct information was discernable based on a separate observation number of the same sale

---

[95] *See* YGK/Nagase Comments at 4, footnote 8.
[96] *Id.* at 5.  YGK/Nagase also cites to *ATC Tires Private Ltd. v. United States*, Court No. 17-00063, Slip Op. 18-88 (CIT 2018), which is inapposite.  This case states that the Court has "a responsibility to 'exercise its discretion to prevent knowingly affirming a determination with errors,'" citing to *Hyundai Electronics*.  In that case, the Court found that the administrative finality principle was inapplicable because Commerce *sua sponte* corrected a ministerial error and published an amended final determination within 30 days of the publication of its final determination, as contemplated by the preamble to Commerce's ministerial error allegations.  *See ATC Tires Private Ltd. v. United States*, 324 F. Supp. 3d 1355, 1363 (CIT 2018).  In contrast, here, the alleged error at issue was not corrected or even raised within 30 days of the publication of the final results.
[97] *See Hyundai Electronics* at 1243.
[98] *See Remand Order* at 36-37, n.7.

which contained the correct information.[99]  More importantly, in *Serampore*, the Court remanded that specific issue "for Commerce to determine whether there is an error in the computer input calculation."[100]  Accordingly, in that case, Commerce simply addressed the issue that the Court remanded.  In contrast, here, YGK/Nagase asks Commerce to reopen the record to address an issue that the Court did not remand and to adopt YGK/Nagase's understanding of the correct entered value, which other interested parties do not share.

With respect to *Peer Bearing* and YGK/Nagase's contention that this case also supports its assertion that Commerce should correct for an alleged error, in that case the Court stated that Commerce could not use an adverse facts available rate that had been invalidated in a separate segment of the proceeding.[101]  The Court stated that it was "irrational for Commerce to use a margin that has been invalidated."[102]  Commerce does not seek to use an invalidated rate to calculate YGK/Nagase's assessment but, instead, is using the information that YGK/Nagase itself reported.

YGK/Nagase, in support of its contention that the Court cannot uphold Commerce's decision if Commerce is aware that the conclusion is inaccurate, cites to various court cases where Commerce was aware of incorrect information because of its findings regarding the information in a separate proceeding or a separate segment of the proceeding.[103]  These citations are not applicable because the alleged erroneous information here was not discredited by Commerce in a separate proceeding or in separate segment of this proceeding.

---

[99] *See Serampore* at 834.
[100] *Id*.
[101] *See Peer Bearing* at 452-53.
[102] *Id*.
[103] *See* YGK/Nagase Comments at 5, n.11.

Finally, YGK/Nagase contends that it is unnecessary to disturb the finality of the entered value because Commerce can calculate a per-unit assessment rate.[104] We disagree. It is true that Commerce may choose to use a per-unit assessment rate when the entered value is unknown and an *ad valorem* assessment rate when the entered value is known. However, in this case, YGK/Nagase reported entered value and, thus, the entered value is on the record. At a minimum, Commerce would have to reopen the issue of entered value to reexamine and, if appropriate, disregard that reported entered value before it can apply a per-unit assessment rate.

With respect to the calculation of a per-unit assessment rate, in *Fujian*, Commerce found that the respondent did not report the actual entered value for all sales and instead reported values from commercial invoices or calculated estimates.[105] Commerce did not accept the reported invoice or estimated values because they were not the actual entered values submitted on customs forms.[106] In contrast to the situation in *Fujian* where the lack of proper entered values was discovered during the administrative review proceeding, there is no evidence that YGK/Nagase reported estimated values or invoice amounts rather than actual entered values. Although YGK/Nagase alleges that it reported incorrect entered values, it failed to notify Commerce of any erroneous entered values within the regulatory deadlines. Accordingly, we see no reason to deviate from Commerce's normal practice in calculating assessment rates.

In *HEDP China*, Commerce stated that its normal practice is to use a per-unit assessment rate when the entered value is unknown.[107] However, in that case, the respondent was able to report the entered values for some sales and unable to do so for other sales, and notified

---

[104] *Id*. at 2 and 6.
[105] *See Fujian* at 1355-56.
[106] *Id*.
[107] *See HEDP China* IDM at Comment 5.

Commerce of this fact pattern as part of the administrative review.[108]  Here, consistent with our normal practice, for the sales for which YGK/Nagase did not report entered values, we used the per-unit assessment methodology, and where they did report entered values, we used the *ad valorem* rate methodology.  YGK/Nagase did not notify Commerce of any concerns with its own reported entered values until well after the completion of the administrative review.

Additionally, as previously noted, parties have not agreed on a proper methodology to account for the supposed erroneous entered values reported by YGK/Nagase.  *Canada Lumber* is equally inapplicable:  in that case, the respondent's sales were not CEP (where Commerce normally calculates an *ad valorem* rate), but export price (where Commerce normally calculates a per-unit assessment rate).[109]  The issue in *Canada Lumber* is that the respondent left the field blank, not indicating whether the sales should or should not have a reported entered value.[110] Because YGK/Nagase identified the sales in question as CEP sales (rather than export price sales) and reported entered values, the fact pattern in *Canada Lumber* is not useful.  Finally, in *Bedroom Furniture China*, Commerce stated that its practice, when a respondent reports an entered value, is to use the reported data to calculate an *ad valorem* assessment rate.[111]  When a respondent does not report the entered value, then Commerce will calculate a per-unit assessment.[112]  This is precisely the methodology Commerce employed in the extant proceeding. Further, in *Bedroom Furniture China*, Commerce determined during the segment of the proceeding that the respondent's reported entered values were not correct.[113]  Again, as we have

---

[108] *Id.*
[109] *See Canada Lumber* IDM at Comment 38.
[110] *Id.*
[111] *See Bedroom Furniture China* IDM at Comment 36.
[112] *Id.*
[113] *Id.*

noted, YGK/Nagase did not notify us of any alleged errors in their own data until well after the *Final Results*.

## III.   FINAL RESULTS OF REDETERMINATION

In accordance with the *Remand Order*, Commerce reconsidered its previous decision with respect to the inclusion of the compensation of payment in the G&A expense ratio. We are, thus, not including the compensation of payment amount in the G&A ratio.

In addition, Commerce has determined not to modify its *Final Results* with respect to the calculation of the assessment rate.

As a result, in these final results of redetermination, Commerce calculates a weighted-average dumping of 15.93 percent to YGK/Nagase, for the period of review, October 31, 2018, through May 31, 2020, for glycine from Japan.[114]

8/9/2023

X 

Signed by: LISA WANG
Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[114] *See* Memorandum, "Final Remand Margin Calculation for Yuki Gosei Kogyo Co., Ltd./Nagase & Co., Ltd., 2018-2020 Remand," dated concurrently with these final results of redetermination.